IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| XCOAL ENERGY & RESOURCES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 18-cv-819-LPS |
| v. | ) |
| | ) **REDACTED PUBLIC VERSION** |
| BLUESTONE ENERGY SALES | ) **FILED JULY 2, 2018** |
| CORPORATION, SOUTHERN COAL | ) |
| CORPORATION, and JAMES C. | ) |
| JUSTICE, II, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff, Xcoal Energy & Resources ("Xcoal"), through its undersigned counsel, states as follows for its Complaint against Defendants, Bluestone Energy Sales Corporation, ("Bluestone"), Southern Coal Corporation ("SCC") and James C. Justice, II ("Justice") (all collectively, "Defendants"; SCC and Justice collectively "Guarantors").

### I. INTRODUCTION

1. Xcoal and Bluestone are parties to a Coal Supply Agreement ("CSA") made and entered into as of October 19, 2017, pursuant to which ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ A true and correct copy of the CSA is attached hereto as Exhibit 1.[1]

2. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ SCC and Justice executed a Performance Guarantee Agreement ("Guarantee"), ▇▇▇▇▇▇

---

[1] Pursuant to Article 15, the terms of the CSA shall remain confidential, and in accordance therewith, Xcoal is filing this Complaint under seal with the Court.

-2-

███████████████████████████████████████████████████████. A true and correct copy of the Guarantee is attached hereto as Exhibit 2.

3.  As set forth herein, Defendants have substantially and materially breached their respective obligations under the CSA and the Guarantee by, *inter alia*, failing to timely supply the quantity and quality of coal required under the CSA, and by otherwise failing to honor their other respective obligations under both the CSA and the Guarantee.

## II. PARTIES

4.  Xcoal is a Pennsylvania limited partnership with its principal place of business located in Latrobe, Pennsylvania.

5.  ███████████████████████████████████████████████████████████████████████████████████████████████████████.

6.  ████████████████████████████████████████████████████████████████████████.

7.  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

8.  █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

9. Bluestone, upon information and belief, is a Delaware corporation with its principal place of business located in Roanoke, Virginia.

10. SCC, upon information and belief, is a Delaware corporation with its principal place of business located in Roanoke, Virginia.

11. Justice, upon information and belief, is a resident of West Virginia.

### III. JURISDICTION AND VENUE

12. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332, in that Xcoal and Defendants are citizens of different states, and the sum in controversy exceeds $75,000.00, exclusive of interest and costs.

13. Venue in this jurisdiction is proper pursuant to 28 U.S.C. § 1391, as certain of the Defendants are incorporated in Delaware, and the parties have each agreed that the United States District Court for the District of Delaware shall have exclusive jurisdiction over any disputes arising under the CSA and/or Guarantee. Specifically, Article 18 of the CSA provides as follows:

.

14. The Guarantee incorporates by reference the terms of the CSA, including the above-referenced forum selection clause.

## IV. THE AGREEMENTS

**A.    The Terms of the CSA**

15.    The CSA is dated October 19, 2017 and provides for the sale of a specified quantity and quality of metallurgical grade coal by Bluestone to Xcoal.

16.    The CSA provides that ███████████████████████████████ ███████████████ (CSA, Article 1). The CSA is subject to a written Amendment ██ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ A true and correct copy of the Amendment is attached hereto as Exhibit 3.

17.    Pursuant to Article 3.1 and 3.2, as amended, Bluestone agreed to ██████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

18.    Article 6 of the CSA sets the final price for the Coal as follows:

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

(CSA, Article 6).

19.    The parties agreed that all coal to be supplied under the CSA would be ███ ███████████████████████████████████████████████████████████.

(CSA, Article 3.1 & Exhibit A thereto).  The specific quality specifications for the ▮▮▮ Coal are set forth in Exhibit A to the CSA.  *Id*.  To ensure compliance with the quality specifications, the parties agreed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (CSA, Article 5.2).

20.	With respect to the scheduling of coal deliveries, Article 3.5 provides that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

21.	The parties acknowledged that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (CSA, Article 3.5).  Bluestone also agreed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (CSA, Article 3.6).

22.	In order to ensure the availability and delivery of the required quantity and quality of coal, Xcoal reserved, and the CSA authorized, its right to, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Specifically, Article 3.4 provides as follows:



23.	The CSA contains several provisions regarding and defining what constitutes an "Event of Default" thereunder.

24. Article 10.1 defines an "Event of Default" to "mean any of the following":

(a) ███████████████████████████████████████████████████████████████
███████████████████;

(b) █████████████████████████████████████████████████;

(c) ███████████████████████████████████████████
███████████████████;

(d) ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████[;]

(e) █████████████████████████████████████████████████....

25. Article 10.2 provides that █████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████

26. Article 10.3 provides that ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████

**B.** **The Terms of the Guarantee**

27. On October 18 2017, SCC and Justice executed the Guarantee████████
████████████████████████████████████████████████████████████████.

28. Pursuant to the Guarantee, SCC and Justice agreed to:

---

[2] ███████████████████████████████████████████████████.



(Guarantee, p. 1)

29. SCC and Justice also agreed in the Guarantee to ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

30. Additionally, SCC and Justice agreed in the Guarantee to ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

### V. BLUESTONE'S MANIFEST FAILURE TO PERFORM UNDER THE CSA HAS CULMINATED IN THE CANCELATION THEREOF WITH FULL PRESERVATION OF XCOAL'S RIGHTS AND REMEDIES AGAINST BLUESTONE FOR ITS BREACH AND DEFAULT

31. As set forth further in Section VI below, Bluestone's manifest failure to perform its obligations under the CSA resulted in numerous breaches thereof and defaults thereunder prior to May 2018. Bluestone's inability and/or failure to perform continued into May 2018, and finally culminated in Xcoal's cancelation of the CSA on May 31, 2018, with full retention and preservation of its rights and remedies for Bluestone's breach and default.

-8-

32. Specifically, on March 16, 2018, Xcoal advised Bluestone of April load dates ███████████.

33. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

34. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

35. Nevertheless, as set forth further below, Bluestone repeatedly refused to deliver coal as scheduled by Xcoal, including the schedule timely advised of by Xcoal ████████████████████████████.

36. Despite rejecting the load dates previously scheduled by Xcoal for ███████████, by letter dated April 17, 2018, Bluestone informed Xcoal that "[c]oal continues to pile up at the Bishop facility and is ready to load." A true and correct copy of the April 17, 2018 letter is attached hereto as Exhibit 4.

37. In that same letter, Bluestone requested future load dates, which had previously been proposed by Bluestone for ███████████████.

38. On April 17, 2018, Xcoal selected and advised Bluestone of May load dates of ███████████.

39. More specifically, pursuant to Article 3.5 of the CSA, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In response, Bluestone accepted the scheduled loading dates. (*See* April 17, 2018 email exchange, a true and correct copy of which is attached hereto as Exhibit 5).

40. Subsequently, Xcoal obtained rail permits for each of the ▮▮▮▮▮ load dates in question and provided Bluestone with the applicable permit numbers for each scheduled loading.

41. Contrary to its prior representations, however, Bluestone was not "ready to load" on the first scheduled load date. In fact, on ▮▮▮▮▮▮▮, Bluestone failed to load any coal for Xcoal.

42. In accordance with the CSA, on ▮▮▮▮▮▮▮, Xcoal issued a written notice to Bluestone (with a copy to the Guarantors), thereby advising it that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A true and correct copy of the May 3, 2018 written notice is attached hereto as Exhibit 6.[3]

43. Bluestone also failed to meet the second loading date of ▮▮▮▮▮▮▮. As it did with respect to the first missed shipment, ▮▮▮▮▮▮▮, Xcoal issued a second written notice to Bluestone (with a copy to the Guarantors) advising that Bluestone had ▮▮▮▮▮▮▮ to cure with respect to the missed ▮▮▮ loading. (*See* Exhibit 6).

---

[3] As referenced in the notices included in Exhibits 6 and 7 hereto, each such notice attached past correspondence regarding certain of Bluestone's other coal delivery failures under the CSA. For the convenience of the Court, rather than attach five copies of this past correspondence hereto, Xcoal instead includes a single copy of the correspondence as part of Exhibit 6.

44. On ███, Bluestone made its only loading in May, supplying ███ to Xcoal. However, Bluestone did not, and has not, identified the scheduled load date (███) to which it intended for this ███ train to apply.

45. Upon receiving final testing results for the ███ loading from SGS, Xcoal timely issued ███ payment required under Article 7 of the CSA. Notably, Xcoal timely issued this payment despite initially being invoiced by Bluestone for ███ -- *i.e.,* ███ railcars in excess of what was actually loaded. Additionally, the coal supplied failed to meet the guaranteed ash content specifications, thus ███.

46. The balance of the price for the ███ loading is not yet due under the terms of Article 7 of the CSA and Bluestone has not yet invoiced for the price balance amount. In addition, as a result of Bluestone's Events of Default referred to herein, ███.

47. With no guidance from Bluestone as to what scheduled shipping date the ███ loading was to apply, Xcoal issued a third notice to Bluestone (with a copy to the Guarantors) advising that Bluestone had ███ to cure with respect to the scheduled ███ load date. (*See* Exhibit 6).

48. Subsequently, Bluestone failed to load on the ███.[4] As it had with the ███ prior scheduled load dates, Xcoal issued a

---

[4] In what amounts to nothing more than a desperate and futile attempt to excuse its failure to perform under the CSA, on May 19, 2018, Bluestone purported to declare *force majeure* due to "heavy rains" supposedly causing the "shut down" of an "impoundment" that would "diminish" and "delay" Bluestone's loading of coal. As an initial matter, Xcoal understands that no such impoundment is used in

written notice to Bluestone (with a copy to the Guarantors) thereby advising that Bluestone had ▮▮▮▮▮ days to cure with respect to the missed loadings. (*See* Exhibits 6 and 7).

49. In sum, as of May 31, 2018, Bluestone had loaded only approximately ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it was required to supply Xcoal during the month of May.

50. Additionally, as of this date, Bluestone's failure to deliver ▮▮▮▮▮▮▮ scheduled shipments remains "uncured" for a period in excess of ▮▮▮▮▮▮▮ after Bluestone's receipt of notice thereof. Accordingly, each failure constitutes an Event of Default under Article 10.1(d) of the CSA. These Events of Default represent *multiple* instances with respect to the May 2018 scheduled coal delivery and load dates alone whereby Bluestone failed to satisfy its obligations under the CSA, which failures substantially impaired the value of the whole CSA to Xcoal.

51. As a result of these and other previous Events of Default under the CSA, on May 31, 2018, Xcoal formally notified Bluestone in writing (the "May 31 Notice") that it was exercising its rights both under Article 10.2(a) and applicable law to cancel the CSA effective that day, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. All of Xcoal's rights and remedies for breach of the entire CSA, including without limitation with respect to the unperformed balance of the term of the CSA and the amounts and damages provided for under Article 10.3 thereof, were retained

---

the processing or loading of the coal to be supplied under the CSA. In any event, and on separate and additional grounds, the purported declaration is invalid and of no force or effect under Articles 9.1 and 9.3 of the CSA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮me.

and preserved and Xcoal also expressly reserved them. A true and correct copy of the May 31 Notice is attached hereto as Exhibit 8.

## VI. BLUESTONE'S MANY PRIOR BREACHES AND DEFAULTS SEPARATELY AND INDEPENDENTLY JUSTIFY CANCELLATION OF THE CSA

52. As indicated above, although Bluestone's uncured failures to deliver the required Coal during May 2018 alone constitute Events of Default justifying Xcoal's cancelation of the CSA under Article 10.2, these Events of Default represent only several recent of many breaches and defaults under the CSA.

53. In fact, Bluestone has disregarded the terms of the CSA from the outset. For example, the ▓▓▓▓ facility from which the coal is to be loaded under the CSA lacked the mechanical sampling system required under Article 5.2(a) of the CSA. Notably, upon information and belief, the facility still lacks the required sampling system.

54. Bluestone's inability and/or unwillingness to timely supply coal under the CSA also existed and persisted from the outset.

55. Beginning on September 19, 2017 and through the date of the May 31 Notice, Xcoal advised Bluestone of the loading dates and quantity of Coal to be delivered the following month. In each instance, Xcoal ordered ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ to be loaded on ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in each of November 2017, December 2017, January 2018, February 2018, March 2018, April 2018 and, as discussed above, May 2018.[5]

56. Of the ▓▓▓▓▓▓▓▓▓▓ scheduled by Xcoal for loading during the period November 2017 through May 2018, Bluestone loaded *only* ▓▓▓▓▓▓▓▓, including the single May

---

[5] Prior to issuing the May 31 Notice, Xcoal also advised Bluestone of load dates for June 2018.

shipment discussed previously.⁶ As a result, Xcoal received only approximately ▮▮▮▮▮ ▮▮▮▮▮ of coal properly scheduled for delivery during the months of November 2017 through May 2018.

57. As indicated above, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Nevertheless, Bluestone loaded ▮▮▮▮▮▮▮▮▮ but the coal loaded was of such poor quality that Xcoal exercised its right to reject the shipment for failing to comply with the quality specifications set forth in the CSA.

58. Subsequently, Bluestone loaded ▮▮▮▮▮▮▮▮▮▮▮. Although testing at Bluestone's loadout indicated that the coal's quality was compliant with the specifications set forth in the CSA, sampling at the port revealed that the quality of this coal was well below that specified in the CSA.

59. In addition to being of poor quality, the ▮▮▮▮▮ trains were also each materially underweight. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

60. Bluestone's pattern of breach, default and non-performance continued after these non-compliant November loadings and throughout the pendency of the CSA.

61. In early December, Bluestone informed Xcoal that it would be loading "split trains" on rail permits issued by the railroad at Xcoal's request, and expressly for the delivery of

---

⁶ As further set forth below, Bluestone also impermissibly loaded a fraction of another train, which was properly rejected by Xcoal.

coal to Xcoal. The first such "split train" would result in ███████████████████
████████████████████████████████████████████████████████████████████████████
███████.[7] Xcoal properly rejected these ██ cars on the basis of improper loading. Xcoal also separately rejected ██████████ cars on the basis that, in contravention of Article 5.2 of the CSA, ████████████████████████████████████████████████████████████████████████████
██████████████████████████████.

62. Notably, Bluestone's decision to load for ████████████████████ at Xcoal's expense also violated Article 8.1(d), whereby Bluestone represented, warranted, and agreed that ████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████.

63. In addition to attempting to "split trains" permitted by Xcoal, Bluestone on numerous occasions refused to supply coal on the load dates timely provided by Xcoal.

64. Bluestone purported to justify its failure and refusal to supply coal as scheduled on the basis that it disagreed with the dates supplied by Xcoal, and because Xcoal attempted to exercise its right to have a third party Xcoal representative present to observe loading and obtain representative coal samples.

65. Again, however, under Article 3.5 of the CSA, ████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████ (CSA, Article 3.5 (emphasis added)). This provision expressly provides ██████████████████

---

[7] This train that Bluestone attempted to improperly load in December was actually one of the shipments scheduled for November, ████████████████████████████████████████████████. Bluestone improperly rejected Xcoal's proposed December loading dates.

███████████████████████████████████████████████████████████████████

███████████████████ (CSA Article 3.5). The advance notice required under the CSA provides Bluestone with ample opportunity to prepare for all scheduled shipments.

66. Additionally, pursuant to Article 3.4 of the CSA, ████████████████

███████████████████████████████████████████████████████████████████

████████████████████████.

67. As a result of Bluestone's numerous failures, breaches, and defaults under the CSA, Xcoal on several occasions requested adequate assurances of performance. These good faith requests were never satisfied by Bluestone, either in word or deed.

68. To the contrary, despite (or perhaps because of) its failure to supply the required coal, Bluestone subsequently purported to "suspend" the CSA in December 2017. Bluestone, however, had absolutely no basis to do so, and no Events of Default by Xcoal under the CSA have ever occurred. Accordingly, no valid basis for "suspension" by Bluestone existed and any purported "suspension" by Bluestone constituted a material breach and repudiation of the CSA.[8]

69. In sum, Bluestone had repeatedly failed to perform even before the missed May 2018 loadings. And, as was the case in May, Xcoal repeatedly provided Bluestone with written notice and opportunity to cure its numerous breaches and defaults. Bluestone, however, failed to take advantage of these opportunities, with each uncured failure constituting an Event of Default under Article 10.1 of the CSA.

---

[8] Bluestone also wrongfully demanded adequate assurances of performance from Xcoal. Such demands were baseless, as Bluestone had no reasonable grounds for insecurity regarding Xcoal's performance. Nevertheless, in its ongoing good faith attempts to obtain coal from Bluestone, Xcoal continued to assure Bluestone that Xcoal had satisfied, and would continue to satisfy, all of its obligations under the CSA.

## VIII. SCC'S AND JUSTICE'S BREACH OF THE GUARANTEE

70. In accordance with the terms of the Guarantee, Xcoal issued written notice to the Guarantors ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████.

71. Three such notices were dated ███████████████, with each identifying both Bluestone's failure to deliver coal ███████████ and its other coal delivery failures under the CSA. (*See* Exhibit 6). In addition to being received via email on ███████████████, the Guarantors also received the notices via express mail on ███████████████, respectively, at the address identified in the Guarantee.

72. Xcoal also sent notices to the Guarantors after ███████████████████████ ███████████████. Like the prior notices, each of these notices (███████████████████) identified both Bluestone's failure to deliver coal ███████████ and its other coal delivery failures under the CSA. (*See* Exhibits 6 and 7). Each notice was received by the Guarantors via email and express mail at the address identified in the Guarantee.

73. The failures identified in the notices dated ███████████████ have not been cured within ███████████ days upon the Guarantors' receipt of the same.

74. The Guarantors have also not cured the failures identified in the subsequent two ███████████████ notices.

### COUNT I -- BREACH OF THE CSA
### (Xcoal v. Bluestone)

75. Xcoal incorporates by reference the preceding paragraphs as if set forth at length herein.

76. Xcoal has fulfilled all duties, obligations and conditions precedent with regard to enforcement of the CSA.

77. As set forth in detail above, Bluestone has substantially and materially failed to perform under and breached the terms of the CSA by, *inter alia*, failing and refusing to timely deliver the quantity and quality of coal required under the terms of the CSA.

78. Despite demand, Bluestone has failed and refused to remedy the above breaches, and has defaulted on and repudiated its obligations under the CSA.

79. Such breaches, non-performance, and defaults under the CSA are material and substantially impair the value of the entire CSA.

80. Xcoal has suffered and will continue to suffer substantial damages as a result of Bluestone's breach, default and repudiation of the CSA as set forth above. Such damages and/or other amounts to which Xcoal is entitled under the circumstances and the CSA include, but are not limited to: (i) ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, (*See* Article 6, 10.3); (ii) the difference in value between the quality of coal Bluestone was required to supply under the CSA and the quality of the coal that it actually supplied; (iii) rail charges, vessel charges, and other direct damages incurred by Xcoal due to Bluestone's failure to supply coal on a timely basis under Article 3.6; and (iv) all other damages to which Xcoal is entitled under applicable law, including under the Delaware Uniform Commercial Code.

**WHEREFORE**, Plaintiff Xcoal respectfully requests that this Court enter judgment in its favor and against Bluestone as follows:

(a) Awarding Xcoal damages and/or other amounts in excess of $75,000.00, exclusive of interest and costs, resulting from Bluestone's breach, default and repudiation of the CSA, including but not limited to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; and

(b) Awarding Xcoal such other and further damages and relief as is just and proper, including pre- and post-judgment interest, costs, expenses, disbursements and attorneys' fees.

## **COUNT II – BREACH OF THE GUARANTEE**
**(Xcoal v. SCC and Justice)**

81. Xcoal incorporates by reference the preceding paragraphs as if set forth at length herein.

82. Xcoal has fulfilled all duties, obligations and conditions precedent with regard to enforcement of the Guarantee.

83. As set forth in detail above, SCC and Justice have failed and refused to honor their respective obligations under the Guarantee to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. As a result, SCC and Justice have substantially and materially breached the terms of the Guarantee.

84. Despite demand, SCC and Justice have failed and refused to remedy the above breaches, and have breached their obligations under the Guarantee.

85. Xcoal has and will continue to suffer substantial damages as a result of SCC and Justice's breach of the Guarantee as set forth above.

86. Additionally, pursuant to the Guarantee, SCC and Justice are required ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

**WHEREFORE**, Plaintiff Xcoal respectfully requests that this Court enter judgment in its favor and against Defendants SCC and Justice as follows:

(a) Awarding Xcoal damages and/or other amounts in excess of $75,000.00, exclusive of interest and costs, including but not limited to ███████████████████████████████████████████████████████████████████████████████████████████████████████; and

(b) Awarding Xcoal such other and further damages and relief as is just and proper, including pre- and post-judgment interest, costs, expenses, disbursements and attorneys' fees.

### COUNT III – DECLARATORY RELIEF
**(Xcoal v. All Defendants)**

87. Xcoal incorporates by reference the preceding paragraphs as if set forth at length herein.

88. As alleged above, Bluestone's wrongful actions are material breaches of and Events of Default as defined in the CSA.

89. As a result, Xcoal properly cancelled the CSA and has been discharged and released from any and all obligations thereunder. Such cancellation does not deprive Xcoal of any past, present, or future damages incurred with respect to Defendants' breaches and/or defaults under the CSA and/or Guarantee.

90. SCC and Justice have also failed to honor their obligations under the Guarantee.

91. There is an actual controversy as to: (i) whether Xcoal properly cancelled the CSA and has been released and discharged from any and all obligations thereunder; and (ii) whether SCC and Justice have breached the terms of the Guarantee.

92. For the reasons previously stated, Xcoal is entitled to declaratory relief ordering that Xcoal has no further obligations under the CSA and that SCC and Justice are in breach of the Guarantee.

**WHEREFORE**, Plaintiff Xcoal respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

(a) Declaring the parties' respective rights, entitlements, obligations, and liabilities under the CSA, Guarantee, and circumstances, including that Bluestone has materially breached and caused one or more Event(s) of Default under the CSA, that Xcoal has been released and discharged from any and all obligations under the CSA, and that Xcoal properly cancelled the CSA;

(b) Declaring that SCC and Justice have materially breached and wrongfully failed to perform the Guarantee; and

(c) Awarding Xcoal such other and further damages and relief as is just and proper, including pre- and post-judgment interest, costs, expenses, disbursements and attorneys' fees.

Respectfully submitted,

By: */s/Geoffrey G. Grivner*
    Geoffrey G. Grivner (Del. Id. No. 4711)
    BUCHANAN INGERSOLL & ROONEY PC
    919 North Market Street, Suite 1500
    Wilmington, Delaware 19801-3046
    Telephone: (302) 522-4200
    Facsimile: (302) 522-4295
    Email: geoffrey.grivner@bipc.com

    OF COUNSEL:
    Kevin P. Lucas
    Daniel C. Garfinkel
    BUCHANAN INGERSOLL & ROONEY PC
    One Oxford Centre, 20th Floor
    301 Grant Street
    Pittsburgh, PA  15219
    Telephone: (412) 562-8800
    Facsimile: (412) 562-1041
    Email: kevin.lucas@bipc.com
          daniel.garfinkel@bipc.com

*Counsel for Plaintiff, Xcoal Energy & Resources*

DATED: May 31, 2018