IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| XCOAL ENERGY & RESOURCES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 18-cv-819-LPS |
| v. | ) |
| | ) **FILED UNDER SEAL** |
| BLUESTONE ENERGY SALES | ) |
| CORPORATION, SOUTHERN COAL | ) **(Amended Public Version)** |
| CORPORATION, and JAMES C. | ) |
| JUSTICE, II, | ) |
| | ) |
| Defendants. | ) |
| | ) |

# COMPLAINT

Plaintiff, Xcoal Energy & Resources ("Xcoal"), through its undersigned counsel, states as follows for its Complaint against Defendants, Bluestone Energy Sales Corporation, ("Bluestone"), Southern Coal Corporation ("SCC") and James C. Justice, II ("Justice") (all collectively, "Defendants"; SCC and Justice collectively "Guarantors").

## I. INTRODUCTION

1. Xcoal and Bluestone are parties to a Coal Supply Agreement ("CSA") made and entered into as of October 19, 2017, pursuant to which Bluestone agreed to supply Xcoal with ▮▮▮▮ net tons of coal in equal consecutive monthly shipments of approximately ▮▮▮▮ net tons throughout the ▮▮▮▮ term of the CSA. A true and correct copy of the CSA is attached hereto as Exhibit 1.[1]

2. In consideration of, and, *inter alia*, in order to induce Xcoal to enter into the CSA, SCC and Justice executed a Performance Guarantee Agreement ("Guarantee"), thereby

---

[1] Pursuant to Article 15, the terms of the CSA shall remain confidential, and in accordance therewith, Xcoal is filing this Complaint under seal with the Court.

-2-

unconditionally guaranteeing prompt payment and full performance under the CSA. A true and correct copy of the Guarantee is attached hereto as Exhibit 2.

3. As set forth herein, Defendants have substantially and materially breached their respective obligations under the CSA and the Guarantee by, *inter alia*, failing to timely supply the quantity and quality of coal required under the CSA, and by otherwise failing to honor their other respective obligations under both the CSA and the Guarantee.

## II. **PARTIES**

4. Xcoal is a Pennsylvania limited partnership with its principal place of business located in Latrobe, Pennsylvania.

5. ███████████████████████████████████████████████████████████████████████████████████.

6. ███████████████████████████████████████████████████████████████████.

7. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

8. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

9. Bluestone, upon information and belief, is a Delaware corporation with its principal place of business located in Roanoke, Virginia.

10. SCC, upon information and belief, is a Delaware corporation with its principal place of business located in Roanoke, Virginia.

11. Justice, upon information and belief, is a resident of West Virginia.

### III. JURISDICTION AND VENUE

12. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332, in that Xcoal and Defendants are citizens of different states, and the sum in controversy exceeds $75,000.00, exclusive of interest and costs.

13. Venue in this jurisdiction is proper pursuant to 28 U.S.C. § 1391, as certain of the Defendants are incorporated in Delaware, and the parties have each agreed that the United States District Court for the District of Delaware shall have exclusive jurisdiction over any disputes arising under the CSA and/or Guarantee. Specifically, Article 18 of the CSA provides as follows:

> Each Party hereby submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and all appellate courts therefrom and waives any objection which it may have at any time to the laying of venue of any proceedings brought in such court, waives any claim that such proceedings have been brought in an inconvenient forum, and further waives the right to object, with respect to such proceeding, that such court does not have jurisdiction over such Party.

14. The Guarantee incorporates by reference the terms of the CSA, including the above-referenced forum selection clause.

## IV.  THE AGREEMENTS

**A.     The Terms of the CSA**

15.     The CSA is dated October 19, 2017 and provides for the sale of a specified quantity and quality of metallurgical grade coal by Bluestone to Xcoal.

16.     The CSA provides that "[t]he term of this Agreement shall be ▮▮▮▮ beginning October 1, 2017." (CSA, Article 1).  The CSA is subject to a written Amendment "to change the commencement date of its term from October 1, 2017 to November 1, 2017 and also to change the commencement of the initial monthly shipments thereunder from October 2017 to November 2017, with all other terms and conditions of the Agreement remaining unchanged."  A true and correct copy of the Amendment is attached hereto as Exhibit 3.

17.     Pursuant to Article 3.1 and 3.2, as amended, Bluestone agreed to supply Xcoal with ▮▮▮▮ net tons of "Coal," as that term is defined by Exhibit A to the CSA, beginning November 1, 2017 and continuing through the ▮▮▮▮ term "in equal consecutive monthly shipments of approximately ▮▮▮▮ net tons, unless the Parties otherwise agree, in writing."

18.     Article 6 of the CSA sets the final price for the Coal as follows:

> The Price for coal supplied hereunder shall be based on the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and shall be in effect throughout the Term….  The final price shall be calculated as provided ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



(CSA, Article 6).

19.     The parties agreed that all coal to be supplied under the CSA would be mid-volatile coking coal ("Mid-Vol Coal") mined from Bluestone's Bishop, WV mine #02111.

(CSA, Article 3.1 & Exhibit A thereto).  The specific quality specifications for the Mid-Vol Coal are set forth in Exhibit A to the CSA.  *Id*.  To ensure compliance with the quality specifications, the parties agreed that "[t]he Coal shall be sampled and analyzed by [third party] SGS's Beckley, West Virginia laboratory ('SGS') by certified, bias tested mechanical sampling system, upon loading."  (CSA, Article 5.2).

20.     With respect to the scheduling of coal deliveries, Article 3.5 provides that Xcoal "shall advise [Bluestone] on or before the 20th day of the month preceding scheduled Shipments of the loading dates, the delivery schedule and the quantity of Coal from the sources identified on Exhibit A."

21.     The parties acknowledged that "[t]ime is of the essence in complying" with the delivery schedule so selected and advised by Xcoal, and agreed that "[t]he delivery schedule shall be binding on both Parties and may only be changed by a written agreement between the Parties."  (CSA, Article 3.5).  Bluestone also agreed to "reimburse [Xcoal] the amount of any demurrage, whether rail or vessel, or other direct damages … incurred by [Xcoal] due to the failure of [Bluestone] to supply the Coal hereunder on a timely basis."  (CSA, Article 3.6).

22.     In order to ensure the availability and delivery of the required quantity and quality of coal, Xcoal reserved, and the CSA authorized, its right to, *inter alia*, inspect and sample coal prior to deliver.  Specifically, Article 3.4 provides as follows:

> [Xcoal] or its representatives shall have the right, but not the obligation, from time to time, to make visits to the mine, processing facility and Delivery Point identified on Exhibit A as the source of Coal under this Agreement in order to observe the mining, stockpiling and loading of Coal for delivery, to obtain representative samples of such Coal, and to otherwise protect its interests in the Coal hereunder.

23.     The CSA contains several provisions regarding and defining what constitutes an "Event of Default" thereunder.

24. Article 10.1 defines an "Event of Default" to "mean any of the following":

 (a) the failure of the Defaulting Party to pay when due any required payment and such failure is not remedied within 5 business days after receipt of written notice thereof;

 (b) the Event of Default described under Section 4.3(c)[2] has occurred;

 (c) any representation or warranty herein made by a Party shall prove to be untrue in any material respect;

 (d) the failure of the Defaulting Party to comply with its other respective covenants or obligations under this Agreement, which failure continues uncured for 7 days after receipt of written notice thereof[;]

 (e) the Defaulting Party shall be subject to a Bankruptcy Proceeding….

25. Article 10.2 provides that "[u]pon the occurrence and during the continuance of an Event of Default, the other Party ('Non-Defaulting Party') may, in its sole discretion: (a) terminate, accelerate, and liquidate the Parties' respective obligations under this Agreement by establishing, and notifying the Defaulting Party of the termination date (which shall be no earlier than the date of such notice or no later than 20 days after the date of such notice) on which this Agreement shall terminate…."

26. Article 10.3 provides that "[i]f [Bluestone] is the cause of an Event of Default which is not cured within the period(s) provided for in this Agreement, in addition to other damages available at law, [Bluestone], and or its Guarantor, shall be liable to [Xcoal] for ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬,"

**B.** **The Terms of the Guarantee**

27. On October 18 2017, SCC and Justice executed the Guarantee, for "value received, and in consideration of, and in order to induce," *inter alia*, Xcoal to enter into the CSA.

28. Pursuant to the Guarantee, SCC and Justice agreed to:

---

[2] This clause addresses the receipt of non-conforming shipments under the CSA.

-6-

> jointly and severally unconditionally guaranty to Xcoal (a) the full and prompt payment and performance of all obligations, accrued and executory, which Counterparties [defined to include Bluestone] presently or hereafter may have to Xcoal under the Contracts [defined to include the CSA] (provided, however, that the exposure of James C. Justice II hereunder is capped accordingly at a maximum amount of ▮▮▮▮▮▮▮▮), and (b) the full and prompt payment and performance by Counterparties [including Bluestone] of all other obligations and liabilities of Counterparties to Xcoal, fixed and or contingent, due or to become due, direct or indirect, now existing or hereafter and howsoever arising or incurred under the Contracts….

(Guarantee, p. 1)

29. SCC and Justice also agreed in the Guarantee to "indemnify Xcoal against any losses Xcoal may sustain and expenses it may incur as a result of the enforcement or attempted enforcement by Xcoal of any of its rights and remedies under the Contracts, in the event of a default by Counterparties [including Bluestone] thereunder, and/or as a result of the enforcement or attempted enforcement by Xcoal of any of its rights against Guarantors hereunder." *Id.*

30. Additionally, SCC and Justice agreed in the Guarantee to "expressly waive all defenses which might constitute a legal or equitable discharge of a surety or guarantor, and agree[d] that this Performance Guarantee Agreement shall be valid and unconditionally binding upon Guarantors…." *Id.*

### V. BLUESTONE'S MANIFEST FAILURE TO PERFORM UNDER THE CSA HAS CULMINATED IN THE CANCELATION THEREOF WITH FULL PRESERVATION OF XCOAL'S RIGHTS AND REMEDIES AGAINST BLUESTONE FOR ITS BREACH AND DEFAULT

31. As set forth further in Section VI below, Bluestone's manifest failure to perform its obligations under the CSA resulted in numerous breaches thereof and defaults thereunder prior to May 2018. Bluestone's inability and/or failure to perform continued into May 2018, and finally culminated in Xcoal's cancelation of the CSA on May 31, 2018, with full retention and preservation of its rights and remedies for Bluestone's breach and default.

32. Specifically, on March 16, 2018, Xcoal advised Bluestone of April load dates of April 1, 3, 5, 7, and 9.

33. Xcoal scheduled these load dates consecutively because, as is well known by Bluestone, the coal purchased by Xcoal under the CSA is intended for export into the international market, with such coal being transported by rail for subsequent loading onto an oceangoing vessel departing from the East Coast.

34. In order to meet its vessel requirements, and consistent with its right to select and "advise" Bluestone as to loading dates, Xcoal scheduled consecutive shipments from the Bluestone rail loadout so that the coal could be placed onto a single vessel. As Xcoal was required to provide load dates for a given month by the 20th day of the preceding month, Bluestone was provided with ample time to mine and ready sufficient quantities of compliant coal for delivery to Xcoal on the scheduled load dates.

35. Nevertheless, as set forth further below, Bluestone repeatedly refused to deliver coal as scheduled by Xcoal, including the schedule timely advised of by Xcoal with consecutive load dates for April 1, 3, 5, 7, and 9.

36. Despite rejecting the load dates previously scheduled by Xcoal for April 1, 3, 5, 7, and 9, by letter dated April 17, 2018, Bluestone informed Xcoal that "[c]oal continues to pile up at the Bishop facility and is ready to load." A true and correct copy of the April 17, 2018 letter is attached hereto as Exhibit 4.

37. In that same letter, Bluestone requested future load dates, which had previously been proposed by Bluestone for May 2, 5, 9, 14, and 20.

38. On April 17, 2018, Xcoal selected and advised Bluestone of May load dates of May 2, 5, 9, 14, and 20.

39. More specifically, pursuant to Article 3.5 of the CSA, Xcoal so scheduled "[f]ive (5) Norfolk Southern trains of approximately ■ cars each, to be loaded at the Bishop loadout on May 2, May 5, May 9, May 14, and May 20." In response, Bluestone accepted the scheduled loading dates. (*See* April 17, 2018 email exchange, a true and correct copy of which is attached hereto as Exhibit 5).

40. Subsequently, Xcoal obtained rail permits for each of the five May load dates in question and provided Bluestone with the applicable permit numbers for each scheduled loading.

41. Contrary to its prior representations, however, Bluestone was not "ready to load" on the first scheduled load date. In fact, on May 2, 2018, Bluestone failed to load any coal for Xcoal.

42. In accordance with the CSA, on May 3, 2018, Xcoal issued a written notice to Bluestone (with a copy to the Guarantors), thereby advising it that Xcoal was giving "notice under Article 10.1(d) of the CSA that failure by Bluestone to deliver these ■ cars of coal within seven (7) days... shall constitute an 'Event of Default' as defined in Article 10.1(d) of the CSA." A true and correct copy of the May 3, 2018 written notice is attached hereto as Exhibit 6.[3]

43. Bluestone also failed to meet the second loading date of May 5, 2018. As it did with respect to the first missed shipment, on May 6, 2018, Xcoal issued a second written notice to Bluestone (with a copy to the Guarantors) advising that Bluestone had seven (7) days to cure with respect to the missed May 5 loading. (*See* Exhibit 6).

---

[3] As referenced in the notices included in Exhibits 6 and 7 hereto, each such notice attached past correspondence regarding certain of Bluestone's other coal delivery failures under the CSA. For the convenience of the Court, rather than attach five copies of this past correspondence hereto, Xcoal instead includes a single copy of the correspondence as part of Exhibit 6.

44. On May 9-10, 2018, Bluestone made its only loading in May, supplying ▇-cars of coal to Xcoal. However, Bluestone did not, and has not, identified the scheduled load date (*i.e.,* May 2, 5, or 9) to which it intended for this ▇-car train to apply.

45. Upon receiving final testing results for the May 9-10 loading from SGS, Xcoal timely issued the ▇ provisional price payment required under Article 7 of the CSA. Notably, Xcoal timely issued this payment despite initially being invoiced by Bluestone for ▇ total railcars -- *i.e.,* 2 railcars in excess of what was actually loaded. Additionally, the coal supplied failed to meet the guaranteed ash content specifications, thus requiring a billing penalty reduction per the terms of the CSA.

46. The balance of the price for the May 9-10 loading is not yet due under the terms of Article 7 of the CSA and Bluestone has not yet invoiced for the price balance amount. In addition, as a result of Bluestone's Events of Default referred to herein, Xcoal is and would be entitled under Article 10.2(b) of the CSA and applicable law to withhold payment of the price balance amount that otherwise would or possibly would become due in the future under the terms of Article 7 of the CSA.

47. With no guidance from Bluestone as to what scheduled shipping date the May 9-10 loading was to apply, Xcoal issued a third notice to Bluestone (with a copy to the Guarantors) advising that Bluestone had seven days to cure with respect to the scheduled May 9, 2018 load date. (*See* Exhibit 6).

48. Subsequently, Bluestone failed to load on the final two scheduled May load dates of May 14 and 20, 2018.[4] As it had with the three prior scheduled load dates, Xcoal issued a

---

[4] In what amounts to nothing more than a desperate and futile attempt to excuse its failure to perform under the CSA, on May 19, 2018, Bluestone purported to declare *force majeure* due to "heavy rains" supposedly causing the "shut down" of an "impoundment" that would "diminish" and "delay" Bluestone's loading of coal. As an initial matter, Xcoal understands that no such impoundment is used in

written notice to Bluestone (with a copy to the Guarantors) thereby advising that Bluestone had seven (7) days to cure with respect to the missed loadings.  (*See* Exhibits 6 and 7).

49. In sum, as of May 31, 2018, Bluestone had loaded only approximately ███ net tons of the ███ net tons it was required to supply Xcoal during the month of May.

50. Additionally, as of this date, Bluestone's failure to deliver at least four of the five scheduled shipments remains "uncured" for a period in excess of seven (7) days after Bluestone's receipt of notice thereof.  Accordingly, each failure constitutes an Event of Default under Article 10.1(d) of the CSA.  These Events of Default represent *multiple* instances with respect to the May 2018 scheduled coal delivery and load dates alone whereby Bluestone failed to satisfy its obligations under the CSA, which failures substantially impaired the value of the whole CSA to Xcoal.

51. As a result of these and other previous Events of Default under the CSA, on May 31, 2018, Xcoal formally notified Bluestone in writing (the "May 31 Notice") that it was exercising its rights both under Article 10.2(a) and applicable law to cancel the CSA effective that day, thereby "terminat[ing], accelerat[ing], and liquidat[ing] the Parties' respective obligations" thereunder and also under Article 10.2(b) and applicable law to withhold payment of the price balance amount otherwise to become or possibly to become due in the future under Article 7 with respect to the May 9-10 loading.  All of Xcoal's rights and remedies for breach of the entire CSA, including without limitation with respect to the unperformed balance of the term of the CSA and the amounts and damages provided for under Article 10.3 thereof, were retained

---

the processing or loading of the coal to be supplied under the CSA.  In any event, and on separate and additional grounds, the purported declaration is invalid and of no force or effect under Articles 9.1 and 9.3 of the CSA because Bluestone failed to provide Xcoal with the required "detailed evidence from an independent third party as to the occurrences of the Force Majeure and the expected duration thereof."  Such evidence was not included with Bluestone's May 19th letter, nor after Xcoal requested the same.

and preserved and Xcoal also expressly reserved them. A true and correct copy of the May 31 Notice is attached hereto as Exhibit 8.

## VI. BLUESTONE'S MANY PRIOR BREACHES AND DEFAULTS SEPARATELY AND INDEPENDENTLY JUSTIFY CANCELLATION OF THE CSA

52. As indicated above, although Bluestone's uncured failures to deliver the required Coal during May 2018 alone constitute Events of Default justifying Xcoal's cancelation of the CSA under Article 10.2, these Events of Default represent only several recent of many breaches and defaults under the CSA.

53. In fact, Bluestone has disregarded the terms of the CSA from the outset. For example, the Bishop facility from which the coal is to be loaded under the CSA lacked the mechanical sampling system required under Article 5.2(a) of the CSA. Notably, upon information and belief, the facility still lacks the required sampling system.

54. Bluestone's inability and/or unwillingness to timely supply coal under the CSA also existed and persisted from the outset.

55. Beginning on September 19, 2017 and through the date of the May 31 Notice, Xcoal advised Bluestone of the loading dates and quantity of Coal to be delivered the following month. In each instance, Xcoal ordered ▓▓▓▓ net tons of Bishop Mid-Vol Coal to be loaded on five trains on five different dates in each of November 2017, December 2017, January 2018, February 2018, March 2018, April 2018 and, as discussed above, May 2018.[5]

56. Of the thirty-five trains scheduled by Xcoal for loading during the period November 2017 through May 2018, Bluestone loaded *only four trains*, including the single May

---

[5] Prior to issuing the May 31 Notice, Xcoal also advised Bluestone of load dates for June 2018.

shipment discussed previously.[6] As a result, Xcoal received only approximately ▮ of the ▮ total net tons of coal properly scheduled for delivery during the months of November 2017 through May 2018.

57. As indicated above, monthly shipments under the CSA were to begin in October 2017 but were pushed back one month to November 2017 by the parties' agreement and amendment to the CSA. Nevertheless, Bluestone loaded one train on October 29, 2017, but the coal loaded was of such poor quality that Xcoal exercised its right to reject the shipment for failing to comply with the quality specifications set forth in the CSA.

58. Subsequently, Bluestone loaded three trains on November 11, 18, and 28, 2017. Although testing at Bluestone's loadout indicated that the coal's quality was compliant with the specifications set forth in the CSA, sampling at the port revealed that the quality of this coal was well below that specified in the CSA.

59. In addition to being of poor quality, the three November trains were also each materially underweight. As Article 7 of the CSA provides that Xcoal is to make an initial payment of ▮ percent of the "Provisional Price" based on "estimated rail weights of 100 metric tons per railcar" (*i.e.*, the amount of coal held in a fully-loaded railcar), Xcoal's initial payments materially exceeded ▮ percent of the Provisional Price. In other words, due to Bluestone's underloading of cars, it received inflated initial payments for each of the three trains.

60. Bluestone's pattern of breach, default and non-performance continued after these non-compliant November loadings and throughout the pendency of the CSA.

61. In early December, Bluestone informed Xcoal that it would be loading "split trains" on rail permits issued by the railroad at Xcoal's request, and expressly for the delivery of

---

[6] As further set forth below, Bluestone also impermissibly loaded a fraction of another train, which was properly rejected by Xcoal.

coal to Xcoal. The first such "split train" would result in a ▮-car train permitted by Xcoal containing ▮ cars of coal for delivery to one of Xcoal's *competitors*, while leaving only ▮ cars for Xcoal.[7] Xcoal properly rejected these ▮ cars on the basis of improper loading. Xcoal also separately rejected ▮ of the ▮ cars on the basis that, in contravention of Article 5.2 of the CSA, such cars were loaded without representatives of SGS's Beckley, West Virginia laboratory being present to sample the cars upon loading.

62. Notably, Bluestone's decision to load for one of Xcoal's competitors at Xcoal's expense also violated Article 8.1(d), whereby Bluestone represented, warranted, and agreed that it would "not enter into any agreements that would interfere with the due and timely performance of all of its obligations under this Agreement." Upon information and belief, this is but one of several occasions whereby loadings for other coal purchasers interfered with Bluestone's performance under the CSA.

63. In addition to attempting to "split trains" permitted by Xcoal, Bluestone on numerous occasions refused to supply coal on the load dates timely provided by Xcoal.

64. Bluestone purported to justify its failure and refusal to supply coal as scheduled on the basis that it disagreed with the dates supplied by Xcoal, and because Xcoal attempted to exercise its right to have a third party Xcoal representative present to observe loading and obtain representative coal samples.

65. Again, however, under Article 3.5 of the CSA, Xcoal "shall *advise* Seller on or before the 20th day of the month preceding scheduled Shipments of the loading dates, the delivery schedule and the quantity of Coal from the source identified on Exhibit A." (CSA, Article 3.5 (emphasis added)). This provision expressly provides Xcoal with the right to set load

---

[7] This train that Bluestone attempted to improperly load in December was actually one of the shipments scheduled for November, only three of which were delivered by Bluestone. Bluestone improperly rejected Xcoal's proposed December loading dates.

dates, which are "binding on both Parties and may only be changed by a written agreement between the Parties." (CSA Article 3.5). The advance notice required under the CSA provides Bluestone with ample opportunity to prepare for all scheduled shipments.

66. Additionally, pursuant to Article 3.4 of the CSA, Xcoal was fully within its rights in demanding that its third-party representatives be present during loading and permitted to obtain representative samples.

67. As a result of Bluestone's numerous failures, breaches, and defaults under the CSA, Xcoal on several occasions requested adequate assurances of performance. These good faith requests were never satisfied by Bluestone, either in word or deed.

68. To the contrary, despite (or perhaps because of) its failure to supply the required coal, Bluestone subsequently purported to "suspend" the CSA in December 2017. Bluestone, however, had absolutely no basis to do so, and no Events of Default by Xcoal under the CSA have ever occurred. Accordingly, no valid basis for "suspension" by Bluestone existed and any purported "suspension" by Bluestone constituted a material breach and repudiation of the CSA.[8]

69. In sum, Bluestone had repeatedly failed to perform even before the missed May 2018 loadings. And, as was the case in May, Xcoal repeatedly provided Bluestone with written notice and opportunity to cure its numerous breaches and defaults. Bluestone, however, failed to take advantage of these opportunities, with each uncured failure constituting an Event of Default under Article 10.1 of the CSA.

---

[8] Bluestone also wrongfully demanded adequate assurances of performance from Xcoal. Such demands were baseless, as Bluestone had no reasonable grounds for insecurity regarding Xcoal's performance. Nevertheless, in its ongoing good faith attempts to obtain coal from Bluestone, Xcoal continued to assure Bluestone that Xcoal had satisfied, and would continue to satisfy, all of its obligations under the CSA.

## VIII.   SCC'S AND JUSTICE'S BREACH OF THE GUARANTEE

70.   In accordance with the terms of the Guarantee, Xcoal issued written notice to the Guarantors (*i.e.,* SCC and Justice) advising that Xcoal intended to exercise its rights against them as provided in the Guarantee with respect to Bluestone's failure to perform its obligations under the CSA unless such failures were remedied within the applicable time period provided under the Guarantee.

71.   Three such notices were dated May 3, 6, and 10, 2018, with each identifying both Bluestone's failure to deliver coal on the preceding day and its other coal delivery failures under the CSA.  (*See* Exhibit 6).  In addition to being received via email on May 3, 6, and 10, 2018, the Guarantors also received the notices via express mail on May 4, 8, and 11, 2018, respectively, at the address identified in the Guarantee.

72.   Xcoal also sent notices to the Guarantors after Bluestone failed to deliver coal on May 14 and 20, 2018.  Like the prior notices, each of these notices (dated May 15 and 21, 2018) identified both Bluestone's failure to deliver coal on the preceding day and its other coal delivery failures under the CSA.  (*See* Exhibits 6 and 7).  Each notice was received by the Guarantors via email and express mail at the address identified in the Guarantee.

73.   The failures identified in the notices dated May 3, 6, and 10, 2018 have not been cured within ten (10) business days upon the Guarantors' receipt of the same.

74.   The Guarantors have also not cured the failures identified in the subsequent two May 15 and 21, 2018 notices.

## COUNT I -- BREACH OF THE CSA
### (Xcoal v. Bluestone)

75.   Xcoal incorporates by reference the preceding paragraphs as if set forth at length herein.

76. Xcoal has fulfilled all duties, obligations and conditions precedent with regard to enforcement of the CSA.

77. As set forth in detail above, Bluestone has substantially and materially failed to perform under and breached the terms of the CSA by, *inter alia*, failing and refusing to timely deliver the quantity and quality of coal required under the terms of the CSA.

78. Despite demand, Bluestone has failed and refused to remedy the above breaches, and has defaulted on and repudiated its obligations under the CSA.

79. Such breaches, non-performance, and defaults under the CSA are material and substantially impair the value of the entire CSA.

80. Xcoal has suffered and will continue to suffer substantial damages as a result of Bluestone's breach, default and repudiation of the CSA as set forth above. Such damages and/or other amounts to which Xcoal is entitled under the circumstances and the CSA include, but are not limited to: (i) recovery under Article 10.3 of the CSA, which provides in pertinent part that [REDACTED], (*See* Article 6, 10.3); (ii) the difference in value between the quality of coal Bluestone was required to supply under the CSA and the quality of the coal that it actually supplied; (iii) rail charges, vessel charges, and other direct damages incurred by Xcoal due to Bluestone's failure to supply coal on a timely basis under Article 3.6; and (iv) all other damages to which Xcoal is entitled under applicable law, including under the Delaware Uniform Commercial Code.

**WHEREFORE**, Plaintiff Xcoal respectfully requests that this Court enter judgment in its favor and against Bluestone as follows:

(a) Awarding Xcoal damages and/or other amounts in excess of $75,000.00, exclusive of interest and costs, resulting from Bluestone's breach, default and repudiation of the CSA, including but not limited to ███████████████████████████████████████████████████████████████████████; and

(b) Awarding Xcoal such other and further damages and relief as is just and proper, including pre- and post-judgment interest, costs, expenses, disbursements and attorneys' fees.

### COUNT II – BREACH OF THE GUARANTEE
(Xcoal v. SCC and Justice)

81. Xcoal incorporates by reference the preceding paragraphs as if set forth at length herein.

82. Xcoal has fulfilled all duties, obligations and conditions precedent with regard to enforcement of the Guarantee.

83. As set forth in detail above, SCC and Justice have failed and refused to honor their respective obligations under the Guarantee to "unconditionally" guarantee full and prompt payment and performance of all obligations under the now breached and repudiated CSA. As a result, SCC and Justice have substantially and materially breached the terms of the Guarantee.

84. Despite demand, SCC and Justice have failed and refused to remedy the above breaches, and have breached their obligations under the Guarantee.

85. Xcoal has and will continue to suffer substantial damages as a result of SCC and Justice's breach of the Guarantee as set forth above.

86. Additionally, pursuant to the Guarantee, SCC and Justice are required to "indemnify Xcoal against any losses Xcoal may sustain and expenses it may incur" in enforcing its rights and remedies under the CSA and/or Guarantee, which losses and expenses include attorneys' fees, expenses, and costs.

**WHEREFORE**, Plaintiff Xcoal respectfully requests that this Court enter judgment in its favor and against Defendants SCC and Justice as follows:

(a) Awarding Xcoal damages and/or other amounts in excess of $75,000.00, exclusive of interest and costs, including but not limited to a dollar amount under CSA Article 10.3 ███████████████████████████████████████ ████████████████████████████████████████ ████████ ; and

(b) Awarding Xcoal such other and further damages and relief as is just and proper, including pre- and post-judgment interest, costs, expenses, disbursements and attorneys' fees.

### COUNT III – DECLARATORY RELIEF
(**Xcoal v. All Defendants**)

87. Xcoal incorporates by reference the preceding paragraphs as if set forth at length herein.

88. As alleged above, Bluestone's wrongful actions are material breaches of and Events of Default as defined in the CSA.

89. As a result, Xcoal properly cancelled the CSA and has been discharged and released from any and all obligations thereunder. Such cancellation does not deprive Xcoal of any past, present, or future damages incurred with respect to Defendants' breaches and/or defaults under the CSA and/or Guarantee.

90. SCC and Justice have also failed to honor their obligations under the Guarantee.

91. There is an actual controversy as to: (i) whether Xcoal properly cancelled the CSA and has been released and discharged from any and all obligations thereunder; and (ii) whether SCC and Justice have breached the terms of the Guarantee.

92. For the reasons previously stated, Xcoal is entitled to declaratory relief ordering that Xcoal has no further obligations under the CSA and that SCC and Justice are in breach of the Guarantee.

**WHEREFORE**, Plaintiff Xcoal respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

(a) Declaring the parties' respective rights, entitlements, obligations, and liabilities under the CSA, Guarantee, and circumstances, including that Bluestone has materially breached and caused one or more Event(s) of Default under the CSA, that Xcoal has been released and discharged from any and all obligations under the CSA, and that Xcoal properly cancelled the CSA;

(b) Declaring that SCC and Justice have materially breached and wrongfully failed to perform the Guarantee; and

(c) Awarding Xcoal such other and further damages and relief as is just and proper, including pre- and post-judgment interest, costs, expenses, disbursements and attorneys' fees.

Respectfully submitted,

By: */s/Geoffrey G. Grivner*
Geoffrey G. Grivner (Del. Id. No. 4711)
BUCHANAN INGERSOLL & ROONEY PC
919 North Market Street, Suite 1500
Wilmington, Delaware 19801-3046
Telephone: (302) 522-4200
Facsimile: (302) 522-4295
Email: geoffrey.grivner@bipc.com

OF COUNSEL:
Kevin P. Lucas
Daniel C. Garfinkel
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219
Telephone: (412) 562-8800
Facsimile: (412) 562-1041
Email: kevin.lucas@bipc.com
          daniel.garfinkel@bipc.com

*Counsel for Plaintiff, Xcoal Energy & Resources*

DATED: May 31, 2018