# EXHIBIT C

## UNCONTESTED FACTS

The following facts are uncontested for purposes of the non-jury trial in this proceeding:

### The Trial and Mediation

On May 15-19, 2017, this Court held a bench trial in Consolidated Case Nos. 14-cv-00459-LPS and 15-cv-267-LPS (collectively, the "Consolidated Lawsuit") involving the parties in this case (with the exception of Bluestone Energy Sales Corporation) and certain of their affiliates. Before this Court rendered a decision, Mediation was held before Magistrate Judge Christopher J. Burke. The Mediation was held on August 3, 2017.

### The Fundamental Terms of Settlement

Subsequent to the Mediation, the parties entered into a document entitled the "Fundamental Terms of Settlement" (the "Fundamental Terms") dated August 18, 2017. The Fundamental Terms provided for, *inter alia*, the "[e]xecution and exchange of a Settlement Agreement between the Xcoal Parties and the Justice Parties...." Pursuant to the Fundamental Terms, the Settlement Agreement was to include, *inter alia*, the following provisions:

- "Execution and exchange of a mutually acceptable written coal supply agreement ('CSA') between Xcoal Energy & Resources and Bluestone Energy Sales Corporation incorporating the fundamental commercial terms on the attached outline..."

- "Execution and delivery by Southern Coal Corporation and James C. Justice, II, of a Guaranty and Suretyship Agreement from the Justice Parties to the Xcoal Parties guaranteeing performance under the CSA..., capped at a maximum amount of ▮▮▮▮▮▮▮."

- "Exchange as part of the Settlement Agreement of mutual general releases covering all claims existing as of (or based in whole or in part on the acts or omissions through) the Settlement effective date, as between the Xcoal Parties and their affiliates, on the one hand, and the Justice Parties and their affiliates on the other hand, (the 'Released Claims'), excepting only claims to enforce performance of, or for breach of, the terms of this Settlement and the agreements executed pursuant thereto which are preserved (the 'Preserved Claims')."

- "Acknowledgement as part of the Settlement Agreement that the Released Claims include, but are not limited to, all claims that were asserted or could have been asserted in the Parties' Current Lawsuits or their prior litigation docketed at 12-265 (W.D.Va.) (the '2012 Lawsuit') (collectively, the Current Lawsuits and the 2012 Lawsuit referred to as the 'Lawsuits'), and specifically including all claims or assertions on any legal or equitable basis whatsoever (e.g., lack or failure of consideration, misrepresentation, fraud, mistake, etc.) that this Settlement or any prior settlement of any or all the Lawsuits is invalid or subject to challenge or rescission."

- "Agreement as part of the Settlement Agreement by the Parties to file under Fed.R.Civ.P. 41... stipulations of dismissal of the Current Lawsuits...."

Subsequent to the execution of the Fundamental Terms, (i) the parties to the Consolidated Lawsuit entered into a Settlement Agreement and Mutual Release ("Mutual Release"); (ii) Xcoal Energy & Resources ("Xcoal") and Bluestone Energy Sales Corporation ("Bluestone") entered into a Coal Supply Agreement and an Amendment thereto ("CSA"); and Southern Coal Corporation ("SCC") and James C. Justice, II ("Justice") executed a Performance Guarantee Agreement ("Guarantee").

**The Mutual Release and Stipulation of Dismissal**

The Mutual Release is dated October 19, 2017 and resolved the Consolidated Lawsuit. Pursuant to its terms, the Mutual Release required that Xcoal and Bluestone execute the CSA, and that SCC and Justice execute the Guarantee. The Mutual Release also contained a Mutual General Release, whereby the parties to the Consolidated Lawsuit and "each of their respective affiliates" agreed, *inter alia*, to "release and forever discharge the other... from any and all past, present and future claims... provided, however, nothing contained herein shall be deemed to release any claims under" the Mutual Release, the CSA, or the Guarantee."  (Mutual Release, § 2).  It was further "expressly acknowledged and agreed by each of the Parties that the Released Claims specifically include any and all possible claims, defenses or assertions on any legal or

equitable basis whatsoever (including but not limited to lack or failure of consideration, misrepresentation, fraud, mistake, etc.) that their settlement, this Settlement Agreement, the Settlement Documents [defined to include the CSA and Guarantee], and/or the dismissal of the Current Lawsuits pursuant to Section 5 herein or their prior settlement of the 2012 Lawsuit is invalid or subject to challenge or rescission." *Id*.

The Mutual Release required that the parties to the Consolidated Lawsuit file a Stipulation of Dismissal pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure dismissing the Consolidated Lawsuits with prejudice, which was done on November 16, 2017 and pursuant to which the Consolidated Lawsuit was dismissed with prejudice by the Court on November 20, 2017.

### The CSA

The CSA is dated October 19, 2017 and provides for the sale of a specified quantity and quality of metallurgical grade coal by Bluestone to Xcoal. The CSA provides that "[t]he term of this Agreement shall be ▬▬▬, beginning October 1, 2017." (CSA, Article 1). The CSA is subject to a written Amendment "to change the commencement date of its term from October 1, 2017 to November 1, 2017 and also to change the commencement of the initial monthly shipments thereunder from October 2017 to November 2017, with all other terms and conditions of the Agreement remaining unchanged."

Pursuant to Article 3.1 and 3.2, as amended, Bluestone was to supply Xcoal with ▬▬▬ net tons of "Coal," as that term is defined by Exhibit A to the CSA, beginning November 1, 2017 and continuing through the ▬▬▬ term "in equal consecutive monthly shipments of approximately ▬▬▬ net tons, unless the Parties otherwise agree, in writing."

Article 6 of the CSA sets the final price for the Coal as follows:

3



The Price for coal supplied hereunder shall be based on ▓▓▓ and shall be in effect throughout the Term.… The final price shall be calculated as provided ▓▓▓

(CSA, Article 6). The parties agreed that all coal to be supplied under the CSA would be mid-volatile coking coal ("Mid-Vol Coal") mined from the Bishop, WV mine #02111. (CSA, Article 3.1 and Exhibit A). The specific quality specifications for the Mid-Vol Coal are set forth in Exhibit A to the CSA. *Id*.

Pursuant to Article 7, "[u]pon receipt of [Bluestone's] invoice based on estimated rail weights of 100 metric tons per railcar, and a Certificate of Analysis from SGS …, within 1 business day [Xcoal] shall pay to [Bluestone] 75% of the Provisional Price," with the balance to be paid "within 5 business days of the Parties' receipt of final weights from Norfolk Southern upon vessel loading…" Article 6 provides that the Provisional Price "be ascertained using the average of the Index over the 20 business days preceding the beginning of load of a shipment by [Bluestone]."

With respect to the scheduling of coal deliveries, Article 3.5 of the CSA provides that "[Xcoal] shall advise Bluestone on or before the 20th day of the month preceding scheduled Shipments of the loading dates, the delivery schedule and the quantity of Coal" to be delivered, and "Xcoal shall designate to Seller the scheduling, routing and method of Shipments of Coal purchased" under the CSA. Further, Bluestone was to cause the Coal "to be properly loaded into railcars for delivery to [Xcoal] … provided that [Xcoal] has provided [Bluestone] with

4

applicable loading instructions no less than 24 hours prior to the arrival" of the railcars. (CSA, Article 3.5). "The delivery schedule shall be binding on both Parties and may only be changed by a written agreement between the parties. Time is of the essence in complying with such delivery schedule." *Id*.

Article 5 of the CSA is entitled "Quantity and Quality Determinations." (CSA, Article 5, p. 5). Article 5.1 states that "[r]ailroad weights shall govern the determination of the quantity of Coal supplied hereunder." Article 5.2 of the CSA provides as follows:

> (a) The Coal shall be sampled and analyzed by SGS's Beckley, West Virginia laboratory ("SGS") by certified, bias tested mechanical sampling system, upon loading, in accordance with the applicable standards of the American Society for Testing and Materials ("ASTM"). The costs required for the determination of the quality of Coal shall be borne by [Xcoal].
>
> (b) SGS shall cause the results of analysis of the Specifications … to be reported to the Parties, along with Shipment I.D. number, and shipping date ("Shipping Report"), by fax, telephone (to be confirmed promptly by fax) or other electronic means, as soon as available, but in any event no later than 2 working days after completion of the loading of each Shipment. At the request of either Party, and at the expense of such Party, additional analysis may be performed by an independent laboratory agreed to by the Parties. The independent laboratory shall or shall cause the results of such additional analyses to be reported to the requesting Party, and the requesting Party shall be liable for the cost of such additional analyses.

Article 5.3 states that "[E]ach party shall have the right to observe, at its own expense, the sampling of the Coal." Article 5.4 provides that "[s]ampling will be conducted by SGS at the Delivery Point set forth on Exhibit A."

Article 5.5 provides:

SGS's samples of Coal representing each Shipment, and the analysis thereof, shall be used to determine rejection rights and quality remedies provided in Sections 4.2 and 4.3 hereof, respectively, and the rights under applicable law. Each sample shall be divided into

5

three (3) parts in accordance with then current ASTM standards and placed in separate airtight containers.

One Part:

(a) Will be analyzed by SGS;

(b) Shall be retained by SGS for a period of 60 days, or shipped as Buyer directs; and

(c) Shall be retained by SGS for a period of 60 days to be used for a referee analysis, if necessary.

Finally, Article 5.6 provides:

5.6   By notice to SGS within 10 days after the receipt of the results of analysis, either Party may object to an analysis ("Objection Party"), and if so, SGS shall submit the retained sample to another independent laboratory agreed to by the Parties, unaffiliated with the Objecting Party, for an independent analysis. All analyses shall be performed in accordance with then current published applicable ASTM standards. If the results of the referee independent analysis are:

(a)   within ASTM reproducibility limits, the certificate of analysis issued first shall be final and binding and the costs of the independent analysis shall be paid by the Objecting Party; and

(b)   not within reproducibility limits, the results of the referee independent analysis shall be final and binding and the costs of the independent analysis shall be borne equally by the Parties.

With respect to events of Force Majeure, the CSA provides, *inter alia*, that "[n]o failure or delay by either Party to perform its obligations hereunder, wholly or in part, shall be deemed a breach of this Agreement, if such failure or delay has arisen through … [Force Majeure]; <u>provided</u>, <u>however</u>, that the procedures under Section 9.3 have to be complied with. " (CSA, Article 9.1) (emphasis in original). Article 9.3 states:

If a Force Majeure becomes likely or predicted to happen, the Party which will be affected ("Affected Party") thereby shall immediately (but in no event more than 3 days from the date of the occurrence) given the other Party notice thereof in writing. If a Force Majeure occurs, the Affected Party shall immediately advise the other Party of the such Force Majeure, to be promptly confirmed by a written

notice describing the situation in detail. Such written notice shall be accompanied by detailed evidence from an independent third party as to the occurrence of the Force Majeure and the expected duration thereof.

With respect to the definition of Force Majeure, Article 9.2 provides, *inter alia*, that:

"Force Majeure" shall mean any event or events which are beyond the reasonable control of the Party affected thereby, in which it or its affiliates, and any of its or their respective employees, officers, directors, agents or contractors is not negligent, and shall include, but not be limited to: acts of God, acts of public enemies, acts of terrorism, insurrections, strikes, lockouts, fires, wars, explosions, floods, interruptions or delays in transportation due to breakdown or adverse weather (including fog), perils of the seas... and any other event or events whether or not of a similar nature which are beyond the control of the Party affected thereby, in which it is not negligent in any way.

During the period November 2017 through May 31, 2018, a total of 23,701.60 tons of coal was supplied by Bluestone and accepted by Xcoal, with three trains being supplied and accepted in November 2017 and one train being supplied and accepted in May 2018.

## The Guarantee

SCC and Justice executed the Guarantee, for "value received, and in consideration of, and in order to induce Xcoal Energy & Resources ('Xcoal'), Xcoal Energy & Resources, LLC and Ernie L. Thrasher to enter into the" Mutual Release and CSA.