## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Xcoal Energy & Resources, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 18-819-LPS |
| | : | |
| Bluestone Energy Sales Corp., Southern Coal | : | |
| Corp., and James C. Justice, II | : | |
| | : | |
| Defendants. | : | |
| | : | |

Geoffrey G. Grivner, BUCHANAN INGERSOLL & ROONEY PC, Wilmington, DE

Kevin P. Lucas, Daniel C. Garfinkel, BUCHANAN INGERSOLL & ROONEY PC, Pittsburgh, PA

     Attorneys for Plaintiff

John A. Sensing, Jennifer P. Buckley, Tracey E. Timlin, POTTER ANDERSON & CORROON, LLP, Wilmington, DE

Richard A. Getty, Danielle Harlan, THE GETTY LAW GROUP, PLLC, Lexington. KY

George J. Terwilliger, MCGUIRE WOODS LLP, Washington, DC

John D. Wilburn, Brooks H. Spears, MCGUIRE WOODS LLP, Tysons, VA

Ryan D. Frei, MCGUIRE WOODS LLP, Richmond, VA

     Attorneys for Defendants

## **MEMORANDUM ORDER**

Introduction

In this civil action involving claims and counterclaims for breach of contract and fraud,

the Court began a virtual bench trial[1] on Tuesday August 25, 2020 at 9:02 a.m.  The trial began

with introductions: among other attorneys, Kevin Lucas noted his appearance for Plaintiff Xcoal

Energy & Resources ("Xcoal" or "Plaintiff") and Richard A. Getty noted his appearance for

Defendants Bluestone Energy Sales Corp. ("Bluestone"), Southern Coal Corp. ("SCS"), and

West Virginia Governor James C. Justice, II ("Governor Justice" and, together with Bluestone

and SCS, "Defendants").  Then the Court inquired if the parties had any issues to raise.  (Trial

Tr. at 4, 6)[2]  The only issue raised dealt with sequestration of witnesses, for which the Court

heard argument and ultimately sided with Defendants.  (*Id.* at 6-15)  The Court then individually

asked Xcoal's counsel, Mr. Lucas, and Defendants' counsel, Mr. Getty, whether they had any

other issues to raise – and both answered "No, Your Honor."  (*Id.* at 15)  Opening statements

from both sides followed.  (*Id.* at 15-33 (Xcoal), 33-52 (Defendants))

Upon completion of the opening statements, the Court indicated that it was "prepared to

go right into the testimony," expecting that the first witness would be Xcoal's Chief Executive

Officer, Ernie Thrasher ("Thrasher").  (*Id.* at 52)  The Court asked Mr. Lucas if he would first

prefer a short break, to which he said yes.  (*Id.* at 52-53) ("Your Honor, I think maybe just a

short break, just to make sure we're all set up because we're going to have witnesses, just to

make sure that there isn't a problem.")  After the Court announced that there would then be a

---

[1] Utilizing videoconference technology, only the undersigned Judge was in the courtroom, while all other participants – counsel, witnesses, and Court staff – were at different locations.

[2] The trial transcript is separated into four parts: August 25 Volume A part I of II spans pages 1-55; August 25 Volume A part II of II spans pages 56-85; August 26 Volume B part I of II spans pages 86-99; and August 26 Volume B part II of II spans pages 100-127.  The Court will collectively cite to the trial transcript as "Trial Tr."

1

short recess of around 10 minutes, Mr. Getty added, "Yes, we would appreciate a break too,

Your Honor. Thank you." (*Id.* at 52)

When the Court returned, Mr. Getty requested a sidebar discussion, which the Court

granted.[3] (*Id.* at 53) The sidebar began with a revelation from Mr. Getty that he had recently

received an anonymous letter (hereinafter "the Letter"):

> I need to bring to your attention, to the Court's attention,
> something that in 46 years of practicing law I have never
> experienced. It's really quite serious, and I feel like I am
> professionally, ethically obligated to bring it to the Court's
> attention.
>
> I am also sitting here wondering whether I have further
> obligations to turn a letter that I have received over to the Federal
> Bureau of Investigation and the U.S. Attorney in Pittsburgh.
>
> This morning, I arrived – I received this literally as I
> walked in here. My secretary was off yesterday. I gave her the
> day off because we had worked so hard. But she came to the
> office this morning, and there is a letter addressed to me dated
> August 14[th] and it was mailed on August 19[th] in Pittsburgh. It was
> mailed to our old office address, which probably explains why it
> just arrived at our new office, you know, yesterday. But my
> secretary [name omitted] came in, opened it, and immediately got
> it here to us in Roanoke.
>
> So I literally read it as I walked into the room shortly
> before the opening statements.
>
> But it's a letter to me, and it's from a person who says they
> want to share information concerning the lawsuit between
> Bluestone and Xcoal. They say they are associated with Xcoal and
> that the information comes from that association.

(*Id.* at 58-59)

Mr. Getty then immediately proceeded to read the contents of the Letter into the record,

---

[3] The technology being employed could accommodate a private sidebar conversation.

noting that it was signed "Xcoal Whistleblower." (*Id.* at 60-61)[4]

Mr. Getty said of the Letter that he had been "stunned when I read it" and, after reading it to the Court, "I'm sitting here stunned again." (*Id.* at 62; *see also id.* ("[T]he letter has left me almost speechless.")) In Mr. Getty's view, the Letter "basically tracks and confirms some of what we have believed and, you know, hope to intend to prove in this litigation." (*Id.*) While he was "baffled as to what needs to be done," he also contended "we should be able to investigate this. . . . I can't imagine anything more significant." (*Id.* at 63)

Before trying to figure out what to do, the parties and the Court first devoted some attention to the timing with which Mr. Getty had raised the issue. On this topic, Mr. Getty first stated, with some degree of seeming self-contradiction:

> But I felt like I couldn't, you know, I could not, ***I could not wait. So I waited until after the openings***, and I felt I had to bring it to the Court's attention as soon as possible.

(*Id.* at 62) (emphasis added)

When it was his turn to speak, Mr. Lucas informed the Court that Mr. Getty had told him

---

[4] Although the Court initially directed Defendants to send a copy of the Letter to Xcoal and the Court (*see* Trial Tr. at 62-63), Xcoal's counsel then raised concerns about the Court having heard the contents of the Letter, given that this is a bench trial at which the Court will be the factfinder (*see, e.g., id.* at 65-66). Thereafter, the Court told Defendants to send the Letter immediately to Mr. Lucas, but not to send it to the Court. (*Id.* at 68; *see also id.* at 97) Subsequently, following the September 4 teleconference argument, the Court obtained from the parties a copy of the Letter and the envelope in which it was received, which has now been docketed. (*See* D.I. 125)

In brief, the allegations contained in the one-page Letter include: (i) Xcoal's Thrasher was "afraid" he would lose an earlier case in this Court so he settled it by executing a new Coal Sales Agreement ("CSA") with Bluestone, planning not to perform under the CSA but instead "to force Bluestone to default and collect the money [a $10 million guarantee] from Governor Justice;" (ii) Thrasher contrived not to accept shipments from Bluestone by obtaining "lab results [that] were false," which he could do because "Xcoal has someone inside SGS;" (iii) on previous occasions "Rick Taylor directed the lab to obtain false results" for Xcoal; and (iv) "Xcoal is a major shipper on NS [Norfolk Southern railway] and receives favored treatment including special rates." (*Id.*)

3

during the break after opening statements that Defendants had an issue to raise with the Court in

a sidebar but that Mr. Getty had refused to give Mr. Lucas any idea of what it was about:

> Before this sidebar was taking place, I asked Mr. Getty, is
> there anything he and I needed to talk about in advance of the
> sidebar, and he decline[d] to say we should have some discussion.
>
> . . . I am deeply troubled by this information being
> provided under those circumstances with me not being advised in
> advance to the factfinder in the course of a trial.

(*Id.* at 64-65)

In response, Mr. Getty apologized:

> . . . I have been so stunned by this that I just thought, let's
> just get to court and get it out all at once.  I mean, in hindsight, I
> probably should have told him something about it.  And for that, I
> apologize.
>
> There was – you know, I just, I may be a little rattled by
> this.  Even after all the years of practice, I have never experienced
> anything like this.

(*Id.* at 68)

The Court then took a recess of approximately an hour.  (*See id.* at 69-71)  Thereafter, the

parties both requested an adjournment of the trial until the next morning.  (*See, e.g.*, *id.* at 74-77)

Mr. Lucas expressed a desire for "additional time to consider" how to proceed, noting that the

Letter "addresses all three of my [fact] witnesses," some of whom are non-parties he does not

represent.  (*Id.* at 73-74)  Mr. Getty agreed, stating: "I think we need to at least have an

adjournment perhaps for the afternoon so we can sort of sort through this."  (*Id.* at 76)  The Court

granted the joint request, directing the parties to spend the afternoon considering the implications

of the Letter and to provide their positions by the evening as to how the Court should proceed.

(*See id.* at 81-85)

Before breaking for the day, the Court asked Mr. Getty: "I have been wondering over the

last hour, why didn't you bring this up before opening statement[s]?" (*Id.* at 78)  His response

was as follows:

> In hindsight, Your Honor, perhaps I should have.  I was so
> rattled by the whole thing, I literally saw it – I literally saw it, you
> know, ten minutes before openings were set to start and, you know
> in hindsight, perhaps I should have.  I wanted to sort of try and
> digest it, think about it, and that was the decision I made.  If it was
> a wrong decision, it was my decision, and, you know, I stand on it
> and apologize for it, but that's the way this – that's the way it
> happened.

(*Id.* at 78-79)  Mr. Getty confirmed that the first he had heard of the Letter was when he came

into the building where he was doing his trial presentation "shortly before the proceedings were

to begin" and that he had not seen the Letter "until ten minutes before" trial was set to begin.

(*Id.* at 79; *see also* September 4, 2020 teleconference argument ("Arg. Tr.") at 61 (Mr. Getty

specifying that he received Letter at 8:46 a.m. on morning trial began))[5]  Mr. Getty also

confirmed that he had read the Letter "before we went on the record" – that is, before opening

statements were delivered. (*Id.* at 79-80)

  The Court added the following for the parties to consider as they evaluated their

positions:

> Nobody has necessarily said this as an option, [but] I do
> think one option here is that this letter is just simply too late to

---

[5] Mr. Getty added as further explanation for the timing with which he had learned of the Letter:

> . . . I guess I wish I had not suggested that my secretary
> take yesterday off.  Because the letter came to the office yesterday
> [i.e., Monday, August 24, the day before trial began].  She didn't,
> you know, didn't locate it, you know, open it, and, you know, get it
> down here to us until this morning.
>
> And, you know, if I had had it yesterday, that we'd have
> probably, you know, handled it a little differently.

(Trial Tr. at 84)

> have an impact on this trial and that I strike it for all purposes.
> You know, [the Court could decide] it's not going to be used.  You
> know, [the Court could decide] discovery is closed and we all go
> forward, and I assure you I am very capable of ignoring and
> probably in time even forgetting this letter.
>
> . . . I am troubled, if not suspicious, by the circumstances
> and timing with which this letter has arisen, and if we go down the
> path of reopening discovery to try to figure out, you know, what
> merit, if any, there is to this letter, we may well have to further
> explore the timing and the circumstances with which this letter
> came into defendants' possession and when it was raised with
> plaintiff and with the Court.  So my guess is if we open this up,
> we're going to be opening up a lot and we're going to spend a lot
> of time on that.

(*Id.* at 82-83)

At 8:53 p.m. that night, the parties submitted a joint letter with their positions.  (D.I. 112)

Defendants requested "a short adjournment" of trial and 45 days in which to conduct "limited

discovery."  (*Id.* at 1)  In its portion of the joint letter, Xcoal reported: "With great reluctance, the

Plaintiff joins in the Defendants' request, which request raises ethical issues of counsel with

respect to non-party witnesses that will require additional time to address."  (*Id.* at 2)

Just before trial reconvened the next morning, Wednesday, August 26, Plaintiff submitted

a letter advising the Court it had made a new proposal to Defendants as to how the case should

proceed.  (*See* D.I. 113)  Trial that morning began with Mr. Lucas explaining the new approach

he had just shared with Mr. Getty.  (*See* Trial Tr. at 104-12)  Mr. Lucas' idea was that the Court

might "hold . . . in abeyance" Defendants' motion to adjourn the trial and to reopen discovery

while permitting party-affiliated witnesses to testify at trial as scheduled; the trial testimony of

non-party witnesses could be deferred until after the Court decided what to do about the Letter

(and until after further discovery, if allowed).  (*Id.* at 107-08)  Plaintiff did not have a definitive

view on whether the Letter should be permitted to be used with those party witnesses whose

testimony might imminently proceed. (*See id.* at 114)

Mr. Lucas also clarified what he conceded was the "cryptic" expression of Plaintiff's position in the joint letter of the night before. (*Id.* at 105) "[T]he problem here with the nonparty witnesses," he said, "is I don't represent these people.  I can't advise them . . . [and] perhaps they would want counsel of their own" to help them determine if they should have concerns with testifying in light of the allegations in the Letter. (*Id.*; *see also id.* at 109-10 (Mr. Lucas stating nonparties are "uninformed, unrepresented witness[es]" who may need "to make a determination as to whether or not they want to . . . testify under these circumstances")) After questioning from the Court, Mr. Lucas further stated that in his view "discovery is over" – notwithstanding Xcoal having, barely 12 hours earlier, "join[ed]" Defendants' request to reopen discovery. (*Id.* at 121-22)

Defendants opposed Xcoal's new position and faulted Plaintiff for reneging on an agreement the parties appeared to have reached just the night before. (*See id.* at 114-19) Defendants continued to insist "we need to have discovery" on the Letter before examining any witnesses, including Xcoal's Mr. Thrasher. (*Id.* at 116; *see also id.* at 126 ("[W]e are going to want to use that letter, use the discovery related to that letter in our cross-examination of Mr. Thrasher."))

After a recess, the Court explained that at least a brief adjournment of the trial was warranted, as "no party at this point is asking that I proceed with trial as if the anonymous letter was never received." (*Id.* at 92; *see also id.* ("[T]here is unanimous opposition to proceeding with trial as scheduled as if this letter was never received, and so I am not going to override the parties' joint position on that point.")) The Court further stated that the parties would have to use the adjournment to provide briefing on whether discovery should be reopened, and, if so, the

details of a discovery plan.[6]  (*Id.* at 92-93)

Subsequently, according to the schedule set out by the Court, the parties submitted letter briefs addressing Defendants' request to reopen discovery and the specific discovery they seek. (D.I. 116-19) Defendants continue to request a 45-day adjournment to conduct what they characterize as narrow discovery on the allegations in the Letter and how the Letter supports their case. (*See* D.I. 116, 119) Xcoal now "vigorously opposes any additional discovery" on the grounds that Defendants have failed to show "good cause." (D.I. 118 at 4; *see also* D.I. 117) On September 4, 2020, the Court heard extensive oral argument by teleconference on the issues addressed in the letter briefs. (*See* Arg. Tr.)

Order

Having considered the parties' submissions (*see, e.g.*, D.I. 112-14, 116-19, 124) and their arguments made during trial and during the September 4 teleconference, as well as the pertinent legal authorities, IT IS HEREBY ORDERED, for the reasons stated below, that:

1.     Defendants' motion to reopen discovery is DENIED.  The record before the Court does not establish good cause to reopen discovery at this late stage.

2.     The virtual bench trial will RESUME on September 15, 2020 and be held at some or all of the following dates and times, subject to the parties' time allocations: September 15, 9:00 a.m. to 6:00 p.m.; September 16, 9:00 a.m. to 1:00 p.m.; September 18, 9:00 a.m. to 4:00 p.m.; and, September 23, 9:00 a.m. to 6:00 p.m.

---

[6] The Court also instructed the parties to share the Letter with their witnesses in an effort to determine if those witnesses had any concerns with testifying, given the allegations in the Letter (some of which are directed at Xcoal's non-party witnesses). Both sides have since provided the Letter to their witnesses and reported that there are no objections from any witness to moving forward with testimony at trial. (*See* D.I. 117, 118) Mr. Lucas – who initially lamented that he was in an "impossible" situation going forward with the trial testimony of his witnesses (*see* Trial Tr. at 110) – now makes clear that he no longer has those concerns (*see* Arg. Tr. at 38-39).

8

     a.     There will be no additional opening statements.

     b.     Trial will continue with Xcoal calling its first witness.

     c.     The time each side has used so far for opening statements and argument during trial on the issues relating to the Letter will be deducted from the initial allocation of time given to each side.[7]

    3.     After meeting and conferring, the parties shall submit letters on the following issues: (a) the admissibility of the Letter, if either party intends to offer it into evidence at trial; (b) any other use of the Letter, if any, the Court should permit at trial; and, (c) whether and how Defendants are going to provide Xcoal timely and reasonable access to the original Letter and envelope in which it was received. The parties shall file simultaneous opening letter briefs, not to exceed five pages each, on September 10. The parties shall file simultaneous responsive letter briefs, not exceed three pages each, on September 11.

    4.     Xcoal's letters of August 31 and September 2 (D.I. 117, 118) are UNSEALED. Xcoal has not even attempted to meet its burden to show that its letters should not be publicly available. The Court continues to perceive no reason why any portion of the parties' discussion or the Court's consideration of the Letter should be under seal. (*See* D.I. 115; *see also* Arg. Tr. at 46-47 (Xcoal counsel acknowledging his position for keeping D.I. 117 and 118 under seal would be "same type of argument" Court has already rejected))

<u>Defendants Have Failed To Show Good Cause To Reopen Discovery After Trial Has Begun</u>

    The parties agree that Defendants' motion to reopen discovery is committed to the Court's discretion, guided by Federal Rule of Civil Procedure 16(b), which requires "good

---

[7] The time devoted to the issues during the September 4 teleconference will not be deducted from the parties' trial time.

cause" to modify the schedule, since fact discovery in this matter ended on May 31, 2019 (*see* D.I. 46) and expert discovery ended on July 22, 2019 (D.I. 42).

A "good cause standard under Rule 16(b) hinges on the diligence of the movant, and not on prejudice to the non-moving party." *Cornell Univ. v. Illumina, Inc.*, 2017 WL 89165, at *3 (D. Del. Jan. 10, 2017). The Court agrees with Defendants that there is "no set formula" to apply here. (Arg. Tr. at 6) The Court further agrees with Defendants that among the factors the Court should consider in this context are: (1) the good faith and diligence of the moving party; (2) the importance of the evidence; (3) the logistical burdens and benefits of re-opening discovery; and (4) the prejudice to the non-moving party. (*See* D.I. 116 at 1) (citing *Goldrich v. City of Jersey City*, 2018 WL 3360764, at *1 (D.N.J. July 10, 2018))[8]

Considering these factors, as well as the interests of judicial economy, the Court finds that Defendants have failed to demonstrate good cause to reopen discovery.[9]

---

[8] The cases cited by the parties, including those relied on by Defendants, illustrate the breadth of the Court's discretion in this context and the importance of focusing on the specific factual circumstances presented. *See, e.g., Wholesale Sports, Inc. v. Henle*, 2020 WL 924054, at *2 (S.D. Cal. Feb. 25. 2020) (stating standard for reopening discovery); *Groesbeck v. Bubmo Int'l Trust*, 2015 WL 1725978, at *3 (D. Utah Apr. 15, 2015) (reopening fact discovery to investigate allegations made in letter); *Wright v. Watkins & Shephard Trucking, Inc.*, 968 F. Supp. 2d 1092, 1096 (D. Nev. 2013) ("[T]he Court reopened discovery in response to an anonymous letter Plaintiffs received . . . ."); *Benay v. Warner Bros. Entm't, Inc.*, 2012 WL 13071728, at *1 (C.D. Cal. Feb. 14, 2012) ("[T]he Court authorized limited discovery for purpose of determining the origin, authenticity and relevance of the anonymous mailing."). None, however, presents the same constellation of factors as are now before the Court – an anonymous letter making allegations that overlap allegations that were already in the case is revealed to the Court after trial has begun – and none, of course, compels any particular result here.

[9] Because of how late Defendants' request to reopen discovery arises, the parties have submitted a joint pretrial order, in which they reported they "have completed discovery." (D.I. 87 at 6) Generally, a pretrial order may be amended "only to prevent manifest injustice." Fed. R. Civ. P. 16(e); *see also generally Colletti v. Fagin*, 1999 WL 126461, at *1 (S.D.N.Y. Mar. 10, 1999). Here, no party has addressed the "manifest injustice" standard. Because Defendants have failed to show good cause to reopen discovery, it follows that Defendants have likewise failed to show "manifest injustice" will result from the Court's refusal to amend the pretrial order to permit

<u>Defendants Have Not Shown The Requisite Diligence</u>

Defendants contend that "the lack of diligence factor . . . does not exist here." (D.I. 116 at 3) In their view, because Defendants did not have the Letter during discovery, and because it tracks (and somewhat expands upon) their theory of the case, there are well-founded avenues for proper discovery now that did not exist during the scheduled discovery period. (*See generally* Arg. Tr. at 7-11; *see also* D.I. 119 at 2 ("The Whistleblower Letter alleges specific, concrete, and highly material facts that Defendants previously had no reason to investigate.")) Thus, Defendants contend that any previous "failure" to pursue the discovery they now seek cannot be attributed to any lack of diligence but, instead, is the result of their prudent, non-abusive approach to discovery. (*See* D.I. 116 at 2)[10]

The Court disagrees with Defendants. In the Court's view, the new discovery Defendants now seek overlaps substantially with discovery they already pursued (or had a basis to pursue and chose not to) during the discovery period provided for in the scheduling order. That is, Defendants already had ample opportunity to pursue the discovery they now wish to obtain. "A request to re-open discovery may be denied if the parties already had ample opportunity to conduct discovery." *Wholesale Sports, Inc. v. Henle*, 2020 WL 924054, at *2 (S.D. Cal. Feb. 25, 2020); *see also* Fed R. Civ. P. 26(b)(2)(C)(ii) (providing that Court "must limit the frequency or extent of discovery . . . if it determines that . . . the party seeking discovery has had ample opportunity to obtain the information by discovery in the action").

---

more discovery.

[10] Defendants assert that their actions "in response to this letter evidence extreme diligence." (Arg. Tr. at 7) Whether Defendants have demonstrated diligence during the two weeks since they received the Letter is not at issue. The relevant question is whether Defendants could or should have engaged in a more diligent pursuit of discovery during the period in which the parties were ordered to take discovery.

The ample opportunity Defendants have already had to pursue discovery, and the reality that they could have exercised greater diligence in doing so, is evident from an examination of the new discovery they are now seeking to take. Defendants propose to serve three interrogatories and three document requests on Xcoal and to take at least two more hours of deposition of Mr. Thrasher. (*See* D.I. 116 at 4) But during the regular discovery period, the scheduling order permitted both sides to serve up to 20 requests for production (in response to which Xcoal produced almost 1,600 documents totaling more than 3,400 pages), and up to 20 interrogatories, and to take up to 42 hours of deposition testimony (which Defendants obtained from witnesses including Mr. Thrasher as well as Rick Taylor). (*See* D.I. 17; D.I. 54-56; D.I. 117 at 4) Defendants obtained discovery from Xcoal and Mr. Thrasher on allegations (repeated in the Letter) that Mr. Thrasher entered into the new Coal Supply Agreement ("CSA") with Defendants not in good faith but, instead, with intent to defraud Governor Justice, and that Norfolk Southern ("NS") provides Xcoal "favored treatment." (*See, e.g.*, D.I. 118 at 2-3) (summarizing certain discovery) Further, Mr. Thrasher will be a witness at trial and Defendants may ask him any appropriate questions on cross-examination.

Defendants also ask the Court to allow them "to subpoena NS, as its conduct is specifically implicated in the Whistleblower Letter." (D.I. 116 at 3) Relatedly, "the Court should allow Defendants to subpoena Rob Zehringer, who was Xcoal's primary point of contact at NS" and "may have played some role in NS's favorable treatment of Xcoal." (*Id.* at 4) Defendants claim that the Letter's allegations about "NS's involvement in the attempt by Mr. Thrasher and Xcoal to 'force' a default on the" CSA are "critical to Defendants' case." (*Id.* at 2) But Defendants have already obtained third-party discovery from NS. They subpoenaed NS and received numerous documents in response. (*See* D.I. 117 at 4) They even noticed a deposition

of NS but then decided not to take that deposition. (*See id.*) If NS is "critical" to Defendants'
case, Defendants should (and could) have done more to make that case during the year-long
period of discovery the Court already provided.

The analysis is similar with respect to the discovery Defendants now wish to take from
SGS, a coal-testing entity. Defendants subpoenaed SGS during fact discovery in May 2019,
requesting the production of, *inter alia*, "sampling and coal earmarked" for Xcoal and related
documents. (*Id.* at 3) It appears that following meet and confers between Defendants and SGS,
an agreement was reached, resulting in SGS producing hundreds of pages of responsive materials
(which are currently marked in the parties' joint trial exhibit list as Trial Ex. 363); moreover,
Defendants chose not to pursue a deposition of SGS. (*Id.*) All of this happened despite the fact
that, well before receiving the Letter, Defendants suspected SGS was conspiring with Xcoal in
some sort of fraudulent conduct, resulting in allegedly "bogus analysis" results. (*See, e.g., id.* at
3-4)[11] As Xcoal writes: "To the extent that Defendants had concerns – regardless how
unfounded – regarding SGS' analyses and/or Lab X's referee analysis, Defendants had ample
opportunity to take SGS' and/or Lab X's deposition, ***but never did so***." (D.I. 117 at 4)[12]

---

[11] For example, James C. Justice, III – President of Bluestone Sales Corp. and SCS, and also the
son of Defendant Governor Justice – volunteered at his deposition that he suspected Xcoal was
tampering with coal sample tests, with some involvement from SGS:

> My theory is that SGS sent the sample to [Lab X]. . . . I'd say that
> Thrasher has instructed [Lab X] to just put in some other coal to
> make sure that the ash content is high enough to be rejected.

Aug. 14, 2019 Deposition Tr. at 128-30 (quoted in D.I. 117 at 3-4).

[12] About an hour before the September 4 argument, Defendants submitted as "supplemental
authority" judicial opinions from 2014 and 2015 relating to criminal conduct (including bribery)
committed by former employees of SGS. (D.I. 124) (citing *United States v. Grigsby*, 598 Fed.
App'x 379 (6th Cir. 2015); *United States v. Stanley*, 2014 WL 2999292 (E.D. Tenn. July 2,
2014)) Defendants insist these cases provide greater credence to their need to pursue more
discovery from SGS. (*See, e.g.*, Arg. Tr. at 57) But these events (and the opinions describing

Defendants also make much of the Letter's allegations about Rick Taylor and seek a further deposition of Mr. Taylor. (*See, e.g.*, D.I. 119 at 2)  Mr. Taylor (according to Mr. Thrasher's deposition testimony) is a contractor "with experience working in the coal industry in Southern West Virginia" and sometimes acts as a "representative of Xcoal" to observe loadings of coal being sold to Xcoal. (D.I. 87 Ex. P (Xcoal MIL Reply Ex. 1) at 49, 54-55)  Defendants deposed Mr. Taylor during fact discovery, asking him about his involvement in testing the coal Defendants supplied to Xcoal. (*See generally* Arg. Tr. at 57-58, 67) (characterizing Taylor's testimony)  They now believe that the Letter provides a basis to explore whether Mr. Taylor's characterization of that involvement was false. (*See, e.g.*, *id.* at 60) ("We had no idea that Mr. Taylor, as the whistleblower says, was directing the lab to obtain false results.")  Mr. Taylor is on both parties' trial witness lists (*see* D.I. 87 Exs. H, J) and Defendants will be permitted to ask him all appropriate questions at trial.  The Court perceives nothing about the Letter's allegations about Mr. Taylor that shows Defendants lacked an adequate and ample opportunity to take discovery from him during the scheduled discovery period.

Defendants suggest that had they tried to pursue the specific allegations now contained in the Letter during fact discovery they would have drawn objections and would have been accused of discovery abuse.  They may be right.  It may also be that the Court would have sustained such objections.  But none of this means Defendants have demonstrated diligence in exploring their fraud allegations during discovery or have shown they lacked an ample opportunity at that time to take the discovery they now seek.  In sum, Defendants have not shown the requisite diligence needed to support a finding of good cause to reopen discovery now, after trial has begun.

---

them) were matters of public record and available to Defendants throughout the scheduled period of fact discovery.  They undermine rather than support Defendants' effort to show diligence.

### Defendants Have Not Shown The Letter To Be Important

To Defendants, the importance of the issues in the Letter cannot be overstated. (Arg. Tr. at 12) Yet their arguments as to the purported importance of the Letter are related to – and as unavailing as – their arguments about their own diligence. That is, Defendants characterize the Letter as important largely because, in their view, it renders certain discovery reasonable that, absent receipt of the Letter, would have been unwarranted. For example, Defendants write: "Without a prior basis *in fact*, any discovery targeted at these issues [contained in the Letter] would have amounted to no more than a fishing expedition and may arguably have violated Fed. R. Civ. P. 26(g) as being served for an improper purpose." (D.I. 116 at 2) (emphasis added)

But these contentions are based on a misunderstanding of the Letter. The Letter provides no established *facts*, only (to this point) unproven, anonymous *allegations*.[13] Therefore, in the Court's view, and contrary to Defendants' assertion, the Letter does not "provide[] a compelling basis for pursuing . . . lines of inquiry, which did not previously exist." (*Id.*) Instead, whatever discovery would have constituted an improper "fishing expedition" prior to receipt of the Letter remains just that to this day.

Of course, it may be that all of the statements in the Letter are entirely true and that reopening discovery might enable Defendants ultimately to prove their veracity by discovering

---

[13] The Court is certain from their overall argumentation that Defendants recognize the Letter's allegations are just that: allegations, not facts and not evidence. At certain points, however, Defendants stray and mistakenly suggest that the Letter's allegations have been proven true. For instance, Defendants wrote in their September 2 letter to the Court: "Prior to receiving the Whistleblower Letter, Defendants did not *know* that Xcoal had 'someone inside' the two testing companies. Nor did [they] *know* that Rick Taylor was the individual controlling those insiders and the fraudulent test results." (D.I. 119 at 2 (emphasis added); *see also id.* at 3 ("All of these allegations present *new evidence* of a direct link between the fraudulent intent of Mr. Thrasher at the time his company entered into the Coal Supply Agreement and Xcoal's performance (or lack thereof) on the contract.")) (emphasis added)

new admissible evidence they could then present at the resumed trial. Alternatively, it may be that the Letter is entirely false and was fabricated by someone seeking to disrupt the Court's orderly approach to resolving disputes between litigants. The Court is not in a position to know the likelihood of either of these possibilities (or any others). In the face of this uncertainty, the Court's task is to assess the importance of the Letter today and consider it, along with all the other pertinent considerations, in deciding whether, overall, there is good cause to reopen discovery. From that perspective, Defendants have not shown that the Letter is important in a way that would support reopening discovery at this very late stage of this case.

<u>Logistical Burdens Outweigh Any Benefits That Might Result From More Discovery</u>

The Court anticipates that numerous logistical complications would arise during a reopened discovery period. Overall, the burdens associated with the new discovery sought by Defendants would very likely outweigh whatever benefits might be derived from the additional discovery.

One logistical burden is the amount of time it would take to complete the discovery sought by Defendants. Contrary to Defendants' characterization, their new discovery is not "narrow" but, instead, is fairly broad.[14] Even Defendants appear to recognize that completing the full additional discovery they seek could (and the Court believes almost certainly would) take longer than 45 days. (*See, e.g.*, Arg. Tr. at 10, 17-18) (counsel stating, "I suspect we can do that within 45 days" but recognizing it may take longer)

One potential source of burden and delay is that at least some of the non-parties from whom Defendants wish to pursue additional discovery will require subpoenas, the issuance of

---

[14] The Court agrees with Plaintiff's description of the breadth of the new discovery sought by Defendants. (*See, e.g.*, D.I. 117 at 5; D.I. 118 at 4)

which may spawn motion to quash litigation, which could proceed (at an uncertain pace) in another District. (*See id.* at 17; *see also* D.I. 117 at 5 (advising "SGS will require a subpoena"); D.I. 118 at 5 (same for NS)) Another possible source of delay – and illustration of the type of logistical issue that would arise from reopening discovery – is the parties' dispute over access to the original Letter and envelope and their related dispute as to what forensic tests should be conducted (and by whom and with what participation by Plaintiff).[15]

Additionally, if discovery were to be reopened, Xcoal could be expected to press its view that it "should be entitled to information and discovery concerning Defendants' receipt and preservation of the Letter" (D.I. 118 at 5 n.7) (internal quotation marks omitted), and the Court would likely approve such discovery. Xcoal rightly calls out "the suspicious nature and extraordinarily coincidental timing of the Letter." (D.I. 117 at 1) Perhaps in recognition of these realities, Defendants themselves acknowledge that "Xcoal should be permitted to take some limited discovery about Defendants' receipt and preservation of the Letter." (D.I. 116 at 5 n.1) What Defendants mean by "limited discovery" is unclear. The Court expects this aspect of the renewed discovery might have to be extensive, potentially including under-oath statements from Defendants' counsel and others at the firms representing Defendants about their knowledge of, and contact with, the Letter and/or its apparent author, as well as sworn statements from

---

[15] Defendants told the Court that "Xcoal has demanded several times possession of the letter for forensic testing purposes." (D.I. 116 at 5) Xcoal claims this is a misrepresentation of its position, which it describes as a request "that the parties arrange for the original Letter to be preserved unaltered and delivered to a neutral third party for safekeeping . . . ." (D.I. 117 at 5; *see also* D.I. 118 at 4-5 (describing ongoing disputes over possession of Letter by Defendants rather than neutral third party)) By the instant Order, the Court is soliciting the parties' updated positions as to what should be done with the Letter, and will determine after reviewing the responses whether the Court needs to make any decisions in that regard. Were discovery to be reopened, it seems certain the Court would have no choice but to resolve any disputes relating to possession and handling of the Letter.

Defendants (and perhaps their employees) indicating what, if any, knowledge they have about the preparation, delivery, and receipt of the Letter. It is easy to envision disputes (possibly implicating attorney-client privilege or work-product protection) arising in connection with such discovery.

One or both sides might also request discovery in aid of efforts to learn the identity of the whistleblower.[16] Defendants have been candid about their intention to use whatever time elapses before the resumption of trial to conduct a "parallel" investigation aimed at identifying the whistleblower. (*See, e.g.*, Arg. Tr. at 17; *id.* at 4-5 (Defendants describing "two pathways to pursue truth")) Their process to this point has already included posting notices in newspapers asking the whistleblower to reveal him/herself. (D.I. 119 at 1) They have retained Milton E. Ahlerich, a security consultant with FBI experience, who has devised "a detailed forensic plan to identify the whistleblower," which "includes testing for and analyzing fingerprints and DNA, as well as analyses by a document examiner, postal inspector, and behavioral specialist." (D.I. 116 at 4-5) Mr. Ahlerich "also intends to compare the Whistleblower Letter to a similar anonymous letter that was sent to a McGuireWoods energy client in 2011," an experience Defendants believe somehow supports their position here. (D.I. 116 at 5) While Xcoal endorses the idea of proper forensic investigation of the Letter (*see, e.g.*, D.I. 118), Xcoal has raised concerns about some of the details of Mr. Ahlerich's plans and is unhappy about being excluded from the forensic process (*see* Arg. Tr. at 32-38). Xcoal also characterizes Defendants' comparison to the 2011 events in unrelated litigation as "seemingly bizarre." (D.I. 118 at 5) Here, again, it is not hard to imagine discovery disputes arising from some or all of these matters, potentially delaying

---

[16] Xcoal has suggested it has a suspicion as to who the anonymous writer of the Letter is (*see, e.g.*, Trial Tr. at 105), a suspicion that might have to be investigated if discovery were reopened.

the resumption of trial for quite some time.

For at least these reasons, the logistical burdens likely to be encountered in connection with the requested new discovery undermine Defendants' efforts to demonstrate good cause.

<u>Xcoal Would Be Unfairly Prejudiced From Another Trial Continuance</u>

Although the good cause standard focuses on the moving party's diligence, the Court may also "consider any prejudice to the party opposing the modification." *Dow Chem. Can., Inc. v. HRD Corp.*, 287 F.R.D. 268, 270 (D. Del. 2012), *aff'd* 587 F. App'x 741 (3d Cir. 2014); *see also* Arg. Tr. at 6 (defense counsel agreeing). Prejudice "may include the delay of a trial date." *Dow*, 287 F.R.D. at 270.

Defendants' request to reopen discovery is accompanied by (and would necessitate) a delay in resumption of trial. It is, in effect, the latest in a series of continuance requests made by Defendants, the last several of which have been opposed – and the most recent of which was denied.[17] Xcoal, which is ready for trial and wants to continue and complete trial, would be prejudiced by having to wait another 45 days (at minimum) to return to trial. The prejudice to Xcoal weighs strongly against reopening discovery.

<u>Judicial Economy</u>

In determining the most reasonable and appropriate exercise of its discretion, the Court

---

[17] Xcoal filed its complaint initiating this action on May 31, 2018. (D.I. 2) The Court's scheduling order set a fact discovery deadline of May 31, 2019, an expert discovery deadline of July 26, 2019, and a bench trial to begin on September 16, 2019. (D.I. 42, 46) On August 23, 2019, Defendants filed an unopposed request to continue trial (due to health issues of counsel), which the Court granted on August 26, 2019, setting a new trial date of March 19, 2020 (D.I. 63, 64). On February 6, 2020, Defendants again moved to continue trial, a request which was opposed by Xcoal. (D.I. 71) Despite Xcoal's objection, the Court, on February 21, 2020, rescheduled trial to begin on August 25, 2020. (D.I. 78) Then, on August 17, 2020, Defendants requested that trial be continued until it could be safely conducted in the courtroom, a request that was opposed by Xcoal and denied by the Court. (*See* D.I. 101, 104) (further describing scheduling issues that have arisen during this case)

19

finds it pertinent also to consider the interests of judicial economy. (*See generally* Arg. Tr. at 53-54) (Defendants' counsel acknowledging Court's interest in judicial economy and efficiency)

Defendants contend that judicial economy supports reopening discovery, as doing so would reduce the risk of the Court having to conduct two trials instead of just one. (*See id.*) Defendants reason that if the Court denies their request and then concludes trial without allowing discovery on the Letter, further information could emerge (perhaps as the result of Defendants' parallel investigation in search of the whistleblower) that should have been part of the record, which may prompt this Court to reopen the record (or could later persuade the Court of Appeals to order a new trial). (*See id.*) The Court recognizes this risk but finds it is significantly outweighed by other concerns of judicial economy, which favor continuing and completing trial as soon as possible.

All of the arrangements the parties and the Court have made for conducting trial – e.g., preparation of witnesses, arranging for the videoconferencing technology, allocating Court resources – are largely still in place. Additionally, this District hopes and expects to resume jury trials (after a six-month hiatus due to the ongoing impact of the global coronavirus pandemic) later this month; once that occurs, it is likely that the undersigned Judge will have to prioritize preparing for and presiding over the many jury trials, especially criminal trials, that have been continued over the past half year. The Court presently has a window to complete the virtual bench trial in this matter now. Finding space in the Court's calendar after Defendants' requested reopened discovery period is likely to be much more difficult.

Finally, the Court has concern that reopening discovery and further delaying this trial could send an undesirable message that the sudden appearance of anonymous, unauthenticated allegations ***after a trial has begun*** can derail the Court's careful efforts to manage its 600-plus

cases. All would agree that it should not be easy to deter a Court from completing a trial it has already begun. To the extent that reopening discovery and delaying resumption of trial might be misunderstood as an invitation for anonymous submissions near or during the start of trials, that misinterpretation would plainly harm judicial economy and severely hamper the Court's control over its schedule.

### Conclusion

That the parties are ready for trial is indisputable. (*See, e.g.*, D.I. 116) (Defendants confirming that they were "well prepared to try this case as of [August 25]") After all, trial has already begun. By resuming trial at the earliest available date on the Court's calendar, there is no chance of the parties' preparations becoming stale. Resuming trial soon also reduces the prejudice to Xcoal and minimizes the damage to the Court's calendar.

Accordingly, as ordered above, trial will resume a week from today, beginning on September 15. This provides sufficient time for the parties to brief any remaining disputes relating to the Letter (as noted above) and to refresh and again finalize their preparations for trial, before so much time passes that it becomes far more difficult to resume trial and find time for it in the Court's schedule.

September 8, 2020
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE