**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

XCOAL ENERGY & RESOURCES,   )
   )
       Plaintiff,   )
   )
    v.   )   C.A. No. 1:18-cv-819 (LPS)
   )
BLUESTONE ENERGY SALES   )
CORPORATION, SOUTHERN COAL   )
CORPORATION, and JAMES C. JUSTICE,   )
II,   )
   )
       Defendants.   )

**PLAINTIFF XCOAL ENERGY & RESOURCES'**
**OPENING POST-TRIAL BRIEF**

BUCHANAN INGERSOLL & ROONEY PC

Geoffrey G. Grivner (#4711)
919 North Market Street, Suite 990
Wilmington, Delaware 19801-3046
(302) 522-4200
(302) 522-4295 (facsimile)
*geoffrey.grivner@bipc.com*

Kevin P. Lucas (admitted *pro hac vice*)
Daniel C. Garfinkel (admitted *pro hac vice*)
Buchanan Ingersoll & Rooney, P.C.
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, Pennsylvania 15219
(412) 562-8350
(412) 562-1041 (facsimile)
*kevin.lucas@bipc.com*
*daniel.garfinkel@bipc.com*

Counsel for Xcoal Energy & Resources

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.  INTRODUCTION .................................................................................................. 1

II.  ARGUMENT ....................................................................................................... 2

    A.  Defendants Breached both the CSA and Guarantee. ................................. 2

        1.  Bluestone's Breaches Under the CSA ....................................... 2

        2.  Xcoal Properly Cancelled the CSA Under Article 10 Thereof. ................. 4

        3.  Bluestone's Repeated and Material Breaches of the CSA
           Substantially Impaired the Value of the Whole Contract. ......................... 5

        4.  The Delivery Schedules Were Reasonable and Bluestone Was
           Required to Comply with the Same. .......................................................... 7

        5.  Defendants SCC and Governor Justice Breached the Guarantee. ............. 8

    B.  Defendants' Claims and Affirmative Defenses Based in Fraud,
       Misrepresentation, and/or Fraudulent Inducement Should be Rejected by
       the Court ....................................................................................................... 9

    C.  Bluestone Abandons its Declaration of Force Majeure. ....................... 12

    D.  Defendants' Rule 52(c) Motion Should be Denied ................................. 13

        1.  Legal Standard ...................................................................... 13

        2.  It was Always Bluestone's Obligation to Obtain Empty Railcars
           from NS ................................................................................................... 14

              i.  The CSA, Transportation Contract and Siding Lease
                   Agreement. ................................................................................. 15

              ii.  The Parties' Course of Performance and the Custom and
                   Practice of the Industry. ........................................................... 17

        3.  Xcoal's Damage Claim is Proper Under the Law and Facts. ................... 19

              i.  Xcoal's Damage Claim. ............................................................ 19

              ii.  Defendants Waived the Unenforceability Argument ................... 21

              iii.  Article 10.3 is Valid and Enforceable. ..................................... 24

i

iv.   Even if Article 10.3 Were Unenforceable, Bluestone's
Motion Should be Denied and Xcoal Should be Permitted
to Recover its Actual Damages, which are the Same as
those Set Forth in Article 10.3. ................................................... 26

E.   Bluestone's Damage Claim Should be Rejected by the Court. ........................... 28

i.   The Lost Profits Sought by Defendants are Contractually
Barred. ........................................................................................... 28

ii.   Defendants Cannot Recover Lost Profits of Non-Parties. ............ 29

iii.   Even if Not Contractually Barred (which they are),
Defendants' Alleged Damages are Impermissibly Based
Upon Speculation and Conjecture. ............................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramowitz v. Tropicana A. City Corp.*,
  750 Fed. Appx. 109 (3d Cir. 2018)........................................................................3

*Accountable Health Sols., LLC v. Wellness Corp. Sols.*,
  333 F. Supp. 1133 (D. Kan. 2018)......................................................................29

*Amer Indus. Techs. v. Aero Tec Labs.*,
  Civil Action No. 92-281-MPT, 1994 U.S. Dist. LEXIS 6233 (D. Del. May 11,
  1994) .................................................................................................................20

*Arbitrium Handels AG v. Johnston*,
  No. 13506, 1996 Del. Ch. LEXIS 1 (Del. Ch. January 5, 1996) ...........................13

*Atl. Aviation Corp. v. Provident Life Acci. Ins. Co.*,
  No. 86-533-CMW, 1989 U.S. Dist. LEXIS 10261 (D. Del. Aug 2, 1989).............28

*ATSCO Holding Corporation v. Air Tool Service Company*,
  799 Fed. Appx. 310 (6th Cir. Dec. 31, 2019) ......................................................22

*Babby v. City of Wilmington Dep't of Police*,
  614 F. Supp. 2d 508 (D. Del. 2009).....................................................................23

*Bell v. Ramirez*,
  No. 13-cv-7916, 2014 U.S. Dist. LEXIS 174905 (S.D.N.Y. Dec. 9, 2014) ...........21

*Blunt v. Lower Merion Sch. Dist.*,
  767 F.3d 247 (3d Cir. 2014).................................................................................11

*Board of Trustees, Roofers Local No. 30 Combined Welfare Fund v. International
  Fidelity Insurance Company*,
  63 F.Supp.3d 459 (E.D. Pa. 2014) .......................................................................23

*Bridev One, LLC v. Regency Ctrs., L.P.*,
  Nos. 14C-07-115 (DCS), 14C-09-019 (DCS), 2016 Del. Super. LEXIS 679
  (Del. Super. Ct. Oct. 31, 2016) ........................................................................8, 9

*Carter v. United States*,
  2011 U.S. Dist. LEXIS 148631 (E.D. Pa. Dec. 27, 2011).....................................14

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l*,
  350 F. Supp. 2d 582 (D. Del. 2004).....................................................................30

*Comrie v. Enterasys Networks, Inc.*,
  837 A.2d 1 (Del. Ch. 2003)................................................................................17, 18

*Contreras v. City of Los Angeles*,
  No. CV11-1480, 2012 U.S. Dist. LEXIS 196465 (C.D. Cal. June 22, 2012),
  *aff'd* 603 F.App'x 530 (9th Cir. 2015).............................................................22, 24

*Dominguez v. Galaxy Recycling Inc.*,
  Civ. A. No. 12-7521, 2015 U.S. Dist. LEXIS 195390 (D.N.J. Dec. 10, 2015) ......................23

*Dow Chemical Canada Inc. v. HRD Corp.*,
  909 F.Supp.2d 350 (D. Del. 2012)........................................................................26

*In re Dryden Advisory Group, LLC*,
  No. 15-bk-00545MDF, 2015 Bankr. LEXIS 1954, *3 (Bankr. M.D. Pa. June
  15, 2015) ......................................................................................................27

*Duval v. Midwest Auto City, Inc.*,
  578 F.2d 721 (8th Cir. 1978) ..............................................................................14

*Eagle Indus., Inc. v. DeVilbliss Health Care, Inc.*,
  702 A.2d 1228 (Del. 1997) ........................................................................15, 16, 17

*EBC, Inc. v. Clark Bldg. Sys.*,
  618 F.3d 253 (3d Cir. 2010)................................................................................14

*Englebrick v. Worthington Indus.*,
  944 F. Supp. 2d. 899 (C.D. Cal. 2013) ..................................................................13

*First Fed. Sav. Bank v. CPM Energy Sys. Corp.*,
  C.A. No. 88C-MY-249, 1991 Del. Super. LEXIS 77 (Del. Super. Ct. Mar. 12,
  1991) ..........................................................................................................9

*In re Frescati Shipping Co., Ltd.*,
  886 F.3d 291 (3d Cir. 2018)................................................................................22

*G.B. "Boots" Smith Corp. v. Cobb*,
  911 So. 2d 421 (Miss. 2005)...............................................................................30

*Gaffney v. Riverboat Services of Indiana, Inc.*,
  451 F.3d 424 (7th Cir. 2006) ..............................................................................14

*Gulf Oil Corp. v. F.E.R.C.*,
  706 F.2d 444 (3d Cir. 1983)................................................................................12

*Jeddo Coal Co. v. Rio Tinto Procurement (Singapore) PTD Ltd.*,
  No. 3:16-cv-621, 2020 U.S. Dist. LEXIS 23266 (W.D. Pa. Feb. 10, 2020)..........................25

*Lubrizol Corp. v. Exxon Corp.*,
   871 F.2d 1279, 1283 (5th Cir. 1989) ..................................................................11

*M&G Polymers USA, LLC v. Carestream Health, Inc.*,
   No. 07C-11-242 PLA, 2010 Del. Super. LEXIS 161 (Del. Super. Apr. 21,
   2010) ...............................................................................................................29

*Malcor Group, Inc. v. Application Link, Inc.*,
   No. 99AP-776, 2000 Ohio App. LEXIS 2924 (Ohio App. 10th Dist. June 30,
   2000) .................................................................................................................8

*Metrocall or Delaware v. Continental Cellular Corp.*,
   437 S.E.2d 189 (Va. 1993)................................................................................12

*Microchip Tech. Inc. v. Aptiv Servs. US LLC*,
   No. 17-cv-01194, 2020 U.S. Dist. LEXIS 158507 (D. Del. Sept 1, 2020)............29

*Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.*,
   965 F. Supp. 1003 (W.D. Mich. 1997), *aff'd* 165 F.3d 27 (6th Cir. 1998).............6

*In re Nat'l Rural Util. Coop. Fin. Corp.*,
   467 B.R. 59 (Bankr. D. Del. 2011) .....................................................................11

*New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development
   Agency of the City of Atlantic City*,
   68 F.Supp.3d 545 (D.N.J. 2014) .......................................................................22

*Newco, Inc. v. Cessna Aircraft Co.*,
   No. 97-1208, 1997 U.S. App. LEXIS 31792 (4th Cir. Nov. 12, 1997) ...................3

*NewCSI, Incorporated v. Staffing 360 Solutions, Incorporated*,
   865 F.3d 251 (5th Cir. 2017) ............................................................................21

*Noble v. Krizman Enters.*,
   692 Fed. Appx. 256 (6th Cir. 2006).....................................................................25

*Norman v. Elkin*,
   726 F. Supp. 2d 464 (D. Del. 2010).....................................................................2

*In re Oberdick*,
   490 B.R. 687 (Bankr. W.D.Pa. 2013) ................................................................14

*OptimisCorp v. Waite*,
   C.A. No. 8773-VCP, 2015 Del. Ch. LEXIS 222 (Del Ch. Aug 26, 2015) .............30

*Pace Commc'ns, Inc. v. Moonlight Design, Inc.*,
   31 F.3d 587 (7th Cir.1994) ..............................................................................21

*Peterson v. Highland Music*,
    140 F.3d 1313 (9th Cir. 1998) ......................................................................24

*Pig Improvement Co. v. Middle States Holding Co.*,
    943 F. Supp. 392 (D. Del. 1996)...................................................................28

*Poly-America, L.P. v. GSE Lining Tech., Inc.*,
    383 F.3d 1303 (Fed. Cir. 2004)....................................................................30

*Promotion in Motion, Inc. v. Beech-Nut Nutrition Corp.*,
    No. 09-1228, 2011 U.S. Dist. LEXIS 145953 (D.N.J. Dec. 20, 2011).....................................6

*Research & Trading Corp. v. Pfuhl*,
    No. 12527, 1992 Del. Ch. LEXIS 234 (Del. Ch. Nov. 19, 1992)...........................................20

*Resources Investment Corp. v. Enron Corp.*,
    669 F. Supp. 1038 (D. Colo. 1987).................................................................12

*Rhoades v. Stein*,
    Civ. A. No. 93-4699, 1995 U.S. Dist. LEXIS 7765 (E.D. Pa. June 1, 1995) .........................23

*Ric-Man Constr., Inc. v. Neyer, Tiseo & Hindo Ltd.*,
    No. 329159, 2017 Mich. App. LEXIS 79 (Mich. Ct. App. Jan 17, 2017)............................29

*S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc. No. 96C-02-086-WTQ*,
    1997 Del. Super. LEXIS 217 (Del. Super. May 21, 1997) ........................................24

*Salamone v. Gorman*,
    106 A.3d 354 (Del. 2014) ......................................................................15

*Seven Invs., LLC v. AD Capital, LLC*,
    32 A.3d 391 (Del. Ch. 2011)................................................................11, 12

*In re Snelson*,
    305 B.R. 255 (Bankr.N.D. Tex. 2003) ...........................................................21

*Sprague Energy Corp. v. Levco Tech Inc.*,
    No. 3:09-cv-29, 2009 U.S. Dist. LEXIS 39526 (D. Conn. May 11, 2009) .........................25

*Stroud v. Forest Gate Dev. Corp.*,
    Nos. 20063-NC, 20064-NC, 2004 Del. Ch. LEXIS 66 (Del. Ch. May 5, 2004) ...................12

*Sun-Times Media Group, Inc. v. Black*,
    954 A.2d 380 (Del.Ch. 2008)...................................................................18

*Sunline Comm. Carriers, Inc. v. CITGO Petrol. Corp.*,
    206 A.3d 836 (Del. 2019) ......................................................................15

*Universal Music Invs. v. Exigen, Ltd.*,
  C.A. No. N13C-10-300, 2014 Del. Super. LEXIS 514 (Del. Super. Aug 25,
  2014) .............................................................................................................................9

*Valhal Corp. v. Sullivan Assocs.*,
  44 F.3d 195 (3d. Cir. 1995)...........................................................................................28

*VICI Racing, LLC v. T-Mobile USA, Inc.*,
  763 F.3d 273 (3d Cir. 2014).........................................................................................12

**Statutes**

6 Del. C. § 1-303(a) ..........................................................................................................18

6 Del. C. § 1-303(c) ..........................................................................................................19

6 Del. C. § 2-503(1)(b) ......................................................................................................19

6 Del. C. § 2-612 .................................................................................................................6

6 Del. C. § 2-612 .................................................................................................................6

6 Del. C. § 2-612(1) ............................................................................................................5

6 Del. C. § 2-612(3) ............................................................................................................6

6 Del. C. § 2-713 ..........................................................................................................21, 27

6 Del. C. § 2-717 ...............................................................................................................20

6 Del. C. § 2-718 ......................................................................................................24, 25, 27

**Rules**

Fed. R. Civ. P. 8(c)(1) .......................................................................................................21

Fed. R. Civ. P. 12(b)(6)................................................................................................22, 24

Fed. R. Civ. P. 12(h)(2)(C) .........................................................................................21, 22

Fed. R. Civ. P 16(e) ...........................................................................................................27

Fed. R. Civ. P. 52(c) ...............................................................................................13, 14, 21

Local Rule 16.3 .................................................................................................................23

**Other Authorities**

1 Hawkland UCC Series § 1-303:3 ....................................................................................18

1 Hawkland UCC Series § 1-303:4.................................................................................19

1 Hawkland UCC Series § 2-503:2.................................................................................19

1 Hawkland UCC Series § 2-503:3.................................................................................19

15 Williston on Contracts § 45:25 (4th ed.)......................................................................6

Pursuant to this Court's Order of September 26, 2020 (D.I. 145), Plaintiff Xcoal Energy & Resources ("Xcoal") respectfully submits its Opening Post-Trial Brief on all issues, including the motion to dismiss and motion for judgment as a matter of law made by Defendants Bluestone Energy Sales Corporation ("Bluestone"), Southern Coal Corporation ("SCC"), and Governor James C. Justice, II ("Governor Justice") (collectively, "Defendants").

## I.     <u>INTRODUCTION</u>

Both before and after the start of this litigation, Defendants' excuses for not timely supplying Xcoal with the quantity and quality of coal required have by far exceeded the number of trains (4) actually loaded between November 2017 and May 2018.  These excuses have come, and they have gone.  In May 2018 and in its pretrial filings, Bluestone claimed that its obligation to supply 30,000 tons of coal to Xcoal was excused due to a force majeure event.  By the time this trial reconvened on September 15, 2020, this excuse had apparently been abandoned in favor of new ones.  ***For the first time***, Defendants pointed to a contract between Xcoal and Norfolk Southern Railway ("NS") as requiring Xcoal to obtain empty railcars for loading at Bluestone's Bishop facility.  This contract (which was not even identified as a separate trial exhibit) provides no such thing, and the parties' actual performance under the CSA makes clear that Bluestone was responsible for obtaining empty railcars.  It is just another attempt by Defendants to evade their obligations to Xcoal, this time asserted by new lead counsel as part of Defendants' seemingly ever-changing trial strategy.[1]

---

[1] Another example of Defendants' shifting claims and assertions can be found in connection with Defendants' closing, during which counsel blithely stated that the much litigated October 2017 compliance dispute was a "red herring" that the Court need not address because it predated the CSA and "it has little or nothing to do with anything.  The October 29th train is outside the terms of the contract...."  (Tr. 1005).  This non-compliant loading, however, cannot be so easily dismissed.  (*See* Xcoal's Proposed Findings of Fact ("PFF") § V.A).

The avalanche of ever-changing excuses proffered by Defendants both before and after the start of this litigation, however, should not obscure the ***actual and fundamental reason*** that Xcoal only received 23,701.60 tons of the (i) 210,000 tons scheduled for loading during November 2017 through May 2018 and (ii) 720,000 total tons required under the CSA – ***Bluestone manifestly failed to mine and stockpile sufficient quantities of compliant coal to satisfy its contractual obligations to Xcoal.*** It is as simple as that, and Defendants utterly failed to prove otherwise at trial.

Accordingly, for the reasons that follow and those set forth in Xcoal's accompanying Proposed Findings of Fact, this Court should (i) find in Xcoal's favor on its claims and defenses; (ii) rule against Defendants on all of their claims and defenses; and (iii) award Xcoal damages in the total amount of $6,814,105.30, plus pre-judgment and post-judgment interest at applicable rates, and attorneys' fees, expenses, and costs in an amount to be determined.

## II.    ARGUMENT

### A.    Defendants Breached both the CSA and Guarantee.

In order to prevail on a breach of contract claim, the moving party must prove that (1) a contract existed; (2) the defendant breached the contractual obligations; and (3) the breach resulted in damage to the plaintiff. *Norman v. Elkin*, 726 F. Supp. 2d 464, 477 (D. Del. 2010). Except as otherwise provided therein, the CSA is governed by the provisions of the Uniform Commercial Code ("UCC") as adopted in Delaware. (PFF ¶ 53).

#### 1.    Bluestone's Breaches Under the CSA

As set forth in Xcoal's Proposed Findings of Fact, Bluestone repeatedly and materially breached the CSA from the outset. These breaches include, *inter alia*, the following:

- Bluestone loaded only 23,701.60 tons of the 210,000 tons of coal that it was required to supply Xcoal with under the CSA during the period November 2017 through May 31, 2018. (Joint Statement of Undisputed Facts ("SUF") ¶ 16, 30;

2

SUF § V).

- Coal supplied under the CSA was required to be sampled "by certified, bias tested mechanical sampling system, upon loading...."  (SUF ¶ 23).  Such a system was installed but never operational at Bishop during the term of the CSA.  (PFF § XI).

- The first loading of coal failed to comply with the quality specifications under the CSA and Xcoal exercised its right thereunder to reject the loading.  (PFF ¶¶ 65-68).

- Under Article 3.4 of the CSA, Xcoal "or its representative shall have the right..., to make visits to the mine, processing facility and Delivery Point... in order to observe the mining, stockpiling, loading of coal for delivery..." (PFF ¶ 28). During the term of the CSA, Bluestone refused to grant Xcoal representatives Standard Labs and John T. Boyd Company access to the Bishop facilities in order to observe the mining, stockpiling, and loading of coal for delivery.  (PFF ¶¶ 99, 162).

- On December 11, Bluestone purported to suspend loadings under the CSA because (i) Xcoal did not accept and pay for a split-loading in December; and (ii) Xcoal had not yet issued the true-up payment for the three November loadings.  (PFF ¶ 89). This purported suspension was unjustified and without support under the CSA because (i) a "shipment" under the CSA must consist of "one (1) unit train of up to 110 railcars", and not part of a unit train; (ii) the subject true-up payment was not yet due; and (iii) Bluestone failed to adhere to the notice and cure requirements under the CSA.  (PFF ¶¶ 42, 85, 90).  Accordingly, the suspension constitutes a breach of the CSA.[2]

- On February 13, Bluestone reiterated that it "will continue to suspend" performance under the CSA (which suspension was improper in the first instance) due to Xcoal's exercise of its rights under Article 3.4 and 5.3 of the CSA (which rights Bluestone disputed) to have representatives on site at the Bluestone facility to observe the mining, stockpiling, and sampling of coal for the CSA.  (PFF ¶ 99).

- Bluestone repeatedly refused to load coal on the dates scheduled by Xcoal.  (*See, e.g.,* PFF ¶ 82, § VIII).

- Bluestone failed to timely load the quantity and quality of coal on dates scheduled by Xcoal and consented to by Bluestone, including in January and May 2018. (PFF § X).

- Bluestone failed to mine and stockpile sufficient coal to satisfy its obligation to load

---

[2] A party's improper suspension of performance will excuse the other party's performance.  *See, e.g., Newco, Inc. v. Cessna Aircraft Co*., No. 97-1208, 1997 U.S. App. LEXIS 31792, at *6 (4th Cir. Nov. 12, 1997); *Abramowitz v. Tropicana A. City Corp*., 750 Fed. Appx. 109, 114 (3d Cir. 2018).  Accordingly, although Xcoal continued to fully perform under the CSA it was no longer obligated to do so during the period in which Bluestone purportedly suspended performance.

30,000 tons of coal per month under the CSA.  (PFF § IX).

- Bluestone failed to provide adequate assurances of performance in response to Xcoal's request for same, including by failing to provide in November 2017 verification and support as to the quantity of contract compliant coal available for loading, and the location of all such coal.  (PFF ¶ 75).

- Pursuant to Article 8.1(d) of the CSA, Bluestone represented, warranted, and agreed that it "shall not enter into any agreements that would interfere with the due and timely performance of all of its obligations under the [CSA]."  (PFF ¶ 86). In breach of this provision, Bluestone loaded coal for third parties in such manner as to interfere with its performance under the CSA, including by loading for Integrity 35 railcars of a 65-railcar train permitted by Xcoal (*i.e.,* the split-train loading).  (PFF ¶¶ 82-86).

- Bluestone materially misrepresented the quantity of coal available to load for Xcoal, including in May 2018.  (*See, e.g.,* PFF ¶¶ 164-65).

- On May 19, Bluestone declared force majeure.  Bluestone, however, did not suffer a legitimate force majeure event under the CSA, and also failed to comply with the notice requirements under the CSA.  (PFF § X; § II.C, below).

Despite Bluestone's repeated, material, and ongoing breaches of the CSA, Xcoal continued to perform all of its obligations thereunder and continued to seek performance through the end of May 2018.  That includes, *inter alia,* timely paying for all coal loaded and accepted by Xcoal, timely scheduling load dates, and providing NS permits for the scheduled load dates. (PFF § V).  Indeed, it was to ***Xcoal's benefit for Bluestone*** to load the coal required under the CSA, as Xcoal's purchase and resale of the coal was the manner in which Xcoal intended to collect the monies it felt were due and owing from Defendants' breach of the parties' prior CSA. (PFF ¶¶ 15-18, 194).  It was only after Xcoal had determined that it "had exhausted virtually every possibility to get Bluestone to ship coal" that it cancelled the CSA.  (PFF ¶ 114).  As set forth below, Xcoal's cancellation of the CSA was proper under its terms and applicable law.

## 2.     Xcoal Properly Cancelled the CSA Under Article 10 Thereof.

On December 4, 2017, Xcoal for the first time issued to Bluestone a notice of default under the CSA for only loading 195 of the 325 railcars of coal scheduled for the month of

November.  (PFF ¶ 104).  Thereafter, Xcoal issued a separate notice of default for each missed load date during the period December 2017 through April 2018.  *Id*.  Bluestone failed to cure each of the defaults noticed during this time period.  (PFF ¶ 113).

In a last ditch effort to obtain performance under the CSA, Xcoal agreed to schedule May loadings **on the specific dates selected and requested by Bluestone** – *i.e.,* May 2, 5, 9, 14, and 20.  (PFF ¶¶ 100-02). Bluestone, however, failed to make four of the five scheduled and required May loadings.  (PFF ¶ 103).  Xcoal issued notices of default for each of the missed loadings. (PFF ¶¶ 103, 107).  Nevertheless, as of May 31, 2018, Bluestone's failure to deliver four of the five scheduled shipments remained "uncured" for a period in excess of seven days, and each constituted an Event of Default under Article 10.1(d) of the CSA.  (PFF ¶ 113).

As a result of these and other previous Events of Default under the CSA, on May 31, 2018, Xcoal formally notified Bluestone in writing that it was exercising its rights both under Article 10.2(a) and applicable law to cancel the CSA effective that day, thereby "terminat[ing], accelerat[ing], and liquidat[ing] the Parties' respective obligations" thereunder.  (PFF ¶ 114). Xcoal also notified Bluestone that it was exercising its right under Article 10.2(b) and applicable law to withhold payment of the price balance amount with respect to the single May loading.  *Id*.

### 3.    Bluestone's Repeated and Material Breaches of the CSA Substantially Impaired the Value of the Whole Contract.

In addition to being proper under the CSA, Xcoal's cancellation of the CSA was also in accord with applicable law pertaining to installment contracts for the sale of goods.  Specifically, the CSA provides for the delivery of coal in equal consecutive monthly shipments of 30,000 tons (SUF ¶ 16), and therefore clearly constitutes an installment contract under Section 2-612(1) of the UCC.  *See* 6 Del. C. § 2-612(1) (defining an "installment contract" as one which "requires or authorizes the delivery of goods in separate lots to be separately accepted...").

Under Section 2-612(3) of the UCC, "[w]henever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole."  6 Del. C. § 2-612(3).  In such circumstance, the non-breaching party is entitled to cancel the contract.  *See, e.g., Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.*, 965 F. Supp. 1003, 1015 (W.D. Mich. 1997), *aff'd* 165 F.3d 27 (6th Cir. 1998).

The determination of whether nonconformity in one or more installments substantially impairs the value of the whole contract "is dependent upon the cumulative effect of the seller's performance based on the totality of the circumstances, which may include the cumulative effect of a series of nonconforming installments." 15 Williston on Contracts §45:25 (4th ed.). *See also* 6 Del. C. § 2-612, cmt. 6 ("defects in prior installments are cumulative in effect...").  A seller's failure to comply with delivery deadlines for installments can constitute substantial impairment, particularly where (as is the case here pursuant to Article 3.5 of the CSA), time is of the essence (PFF ¶ 31). 15 Williston on Contracts § 45:25 (4th ed.).  Similarly, where quality standards in an installment contract for the sale of goods are set forth with specificity, a seller's failure to satisfy the standards can also constitute a substantial impairment.[3]  Whether the non-conformity in any given installment justifies cancellation as to the future depends, not on whether such non-conformity indicates an intent or likelihood that the future deliveries will also be defective, but whether the non-conformity substantially impairs the value of the whole contract.  *See* U.C.C. § 2-612, cmt. 6.

It is undisputed that "a total of 23,701.60 tons of coal was supplied by Bluestone and

---

[3] 6 Del. C. § 2-612, cmt. 4 ("Substantial impairment of the value of an installment can turn not only on the quality of the goods but also on such factors as time, quantity, assortment, and the like."). *See also Promotion in Motion, Inc. v. Beech-Nut Nutrition Corp.*, No. 09-1228, 2011 U.S. Dist. LEXIS 145953, at *9 (D.N.J. Dec. 20, 2011).

accepted by Xcoal" under the CSA.  (SUF ¶ 30).  This total represents just a fraction of the

210,000 tons of coal that Bluestone was required to supply under the CSA during the period

November 2017 through May 31, 2018.  (SUF ¶ 16).  Stated another way, Xcoal only received 4

of the required 35 loadings during this time period.  Bluestone's cumulative failure to supply

coal under the CSA alone substantially impaired the CSA's value to Xcoal, thereby justifying its

cancellation of the same.  As set forth above, however, there were numerous ***additional*** material

breaches and defaults providing even further justification for the cancellation.

### 4.    The Delivery Schedules Were Reasonable and Bluestone Was Required to Comply with the Same.

Defendants contend that the delivery schedules provided by Xcoal were unreasonable,

and that the same could be readily declined by Bluestone.  This is supported neither by the CSA

nor the parties' conduct.

First, Bluestone was well aware that Xcoal required loadings to be close together so that

the coal being provided by Bluestone could be placed on a vessel.  (PFF ¶ 144).  Notably, before

entering into the CSA, Mr. Jay Justice did not raise any objections to October loadings separated

by a day each (*i.e.,* October 19, 21, 23, 25, and 27).  Instead, he responded to the schedule

provided by stating "[w]e will be ready."  (PFF ¶¶ 55, 145).  Bluestone also confirmed a

similarly spaced schedule for loadings in January.  (PFF ¶¶ 92, 149).  Moreover, there is no

dispute that Bluestone could stockpile sufficient coal at the stacker and should have been able to

load that coal in the time scheduled.  (PFF ¶¶ 150-54)

Second, Bluestone's claim that it was not required to comply with Xcoal's load schedule

is similarly infirm.  Article 3.5 of the CSA provided that Xcoal "shall advise" Bluestone of load

dates on or before the 20th day of the month preceding the scheduled loading.  (PFF ¶ 31).  This

lead time provided Bluestone with sufficient time to stockpile the coal required for the loadings.

Given the context in which the term was used, it was clearly intended to notify Bluestone of its loading obligations, and not simply as a "recommendation" that it could reject out of hand. *See Malcor Group, Inc. v. Application Link, Inc.*, No. 99AP-776, 2000 Ohio App. LEXIS 2924, at *7 (Ohio App. 10th Dist. June 30, 2000) (looking to the plain and ordinary meaning of the word "advise" where it was not defined in a lease agreement and finding it to mean "to give information or notice to").

Third, Xcoal would be remiss not to again point out that, irrespective of the loading dates chosen by Xcoal or agreed by the parties, Bluestone repeatedly failed to load coal as scheduled, including in May when Xcoal agreed to schedule loadings on dates spread out between May 2 and May 20, as selected by Bluestone. (PFF § V.D.)

### 5. **Defendants SCC and Governor Justice Breached the Guarantee.**

Under Delaware law, a guaranty is "an agreement to pay the debt of another in the event that the primary debtor defaults." *Bridev One, LLC v. Regency Ctrs., L.P.*, Nos. 14C-07-115 (DCS), 14C-09-019 (DCS), 2016 Del. Super. LEXIS 679, at *37 (Del. Super. Ct. Oct. 31, 2016). Where a guarantor fails to pay its obligations under the guaranty, the guarantor is in breach of the guaranty. *See, e.g., Id.*

SCC and Governor Justice executed the Guarantee for "value received, and in consideration of, and in order to induce," *inter alia*, Xcoal to enter into the CSA. (PFF ¶ 54.) Xcoal would not have entered into the CSA had SCC and Governor Justice not entered into the corresponding Guarantee. (PFF ¶¶ 11, 20, 54.) Pursuant to the Guarantee, SCC and Justice:

    (i)        guaranteed the "full and prompt payment and performance of all obligations" of Bluestone under the CSA, subject to a $10 million cap,

    (ii)      agreed to indemnify Xcoal against losses sustained and expenses incurred in enforcing its rights and remedies under the CSA or Guarantee,

    (iii)    "expressly waive[ed] all defenses which might constitute a legal or

8

equitable discharge of a surety or guarantor, and agree[d] that [the Guarantee] shall be valid and unconditionally binding upon Guarantors…"; and

(iv)     "expressly waive all defenses which might constitute a legal or equitable discharge of a surety or guarantor, and agree[d] that [the Guarantee] shall be valid and unconditionally binding upon Guarantors…."  (PFF ¶ 54).[4]

In accordance with the terms of the Guarantee, Xcoal issued written notice to the Guarantors (*i.e.,* SCC and Governor Justice) advising that Xcoal intended to exercise its rights against them as provided in the Guarantee with respect to Bluestone's failure to perform its obligations under the CSA unless such failures were remedied within the applicable time period provided under the Guarantee.  (PFF ¶ 104).  Five such notices were dated May 3, 6, 10, 15, and 21, 2018, with each identifying both Bluestone's failure to deliver coal on the preceding day and its other coal delivery failures under the CSA.  *Id.*  None of the failures identified in the notices were cured within ten (10) business days upon the Guarantors' receipt of the same, or otherwise.  *Id.*  Accordingly, under applicable law, SCC and Governor Justice both breached the Guarantee, and Xcoal is entitled to recover thereunder.

**B.     Defendants' Claims and Affirmative Defenses Based in Fraud, Misrepresentation, and/or Fraudulent Inducement Should be Rejected by the Court.**

Defendants assert fraud, misrepresentation, and fraudulent inducement as both affirmative defenses and claims against Xcoal in a futile effort to sidestep their obligations under

---

[4] Guarantees that contain language obligating the guarantor to payment without recourse to any defenses or counterclaims (*i.e.,* guarantees that are absolute and unconditional and without recourse to any defenses or counterclaims) are consistently upheld by the courts.  *See First Fed. Sav. Bank v. CPM Energy Sys. Corp.*, C.A. No. 88C-MY-249, 1991 Del. Super. LEXIS 77, at *5 (Del. Super. Ct. Mar. 12, 1991) ("It is also uncontroverted that a party, by virtue of a guarantee, can waive any rights and defense [that] the principal may have regarding the enforcement of the obligation as long as the waiver is clear and unequivocal."); *see also Universal Music Invs. v. Exigen, Ltd.*, C.A. No. N13C-10-300, 2014 Del. Super. LEXIS 514, at *3 (Del. Super. Aug 25, 2014) (finding the guaranty enforceable because, by its terms, it forbids revocation and is supported by sufficient consideration).

the CSA and Guarantee.

As an initial matter, Defendants all but ignored their fraud claims and defenses at trial, leading the Court to ask the following question:  "I don't know if you all had mentioned fraud. Is your fraud counterclaim still before me?"  (Tr. 1011).  Although Defendants' counsel did not withdraw the fraud claims and defenses, his response that "the nub of this case is breach of contract" is telling.  *Id*.  Indeed, Defendants manifestly failed to establish that, as alleged in Count II of their Counterclaims, Xcoal never intended to perform under the CSA.  The testimony at trial was just the opposite, as Mr. Thrasher testified that Xcoal was expressly relying on the parties performing under the CSA, and that Xcoal entered into the CSA for that very purpose. (PFF ¶¶ 15-18).  Defendants failed to establish otherwise, and never even really tried, as the facts would not allow it.

Defendants' seeming abandonment of their fraud claims and defenses is likely rooted not just in the lack of evidence in support thereof, but also in the fact that ***Defendants unequivocally released any such claims and defenses*** pursuant to the Fundamental Terms of Settlement ("Fundamental Terms") and Settlement Agreement and Mutual Release ("Settlement Agreement").  Following Mediation of the prior litigation before this Court, the parties executed the Fundamental Terms dated August 18, 2017.  (SUF ¶¶ 1-4).  Paragraph 1(d) thereof provides that the parties were mutually releasing all claims, including "all claims or assertions on any legal or equitable basis whatsoever ***(e.g., lack or failure of consideration, misrepresentation, fraud, mistake, etc.) that this Settlement or any prior settlement of any or all the Lawsuits is invalid or subject to challenge or rescission."***  (SUF ¶ 6) (emphasis added).

As contemplated in Paragraph 1(c) of the Fundamental Terms, the parties subsequently entered into the Settlement Agreement, whereby:

> It was further "expressly acknowledged and agreed by each of the Parties that the Released Claims specifically include any and all possible claims, defenses or assertions on any legal or equitable basis whatsoever (***including but not limited to lack or failure of consideration, misrepresentation, fraud, mistake, etc.***) that their settlement, this Settlement Agreement, the Settlement Documents [defined to include the CSA and Guarantee], ***and/or the dismissal of the Current Lawsuits pursuant to Section 5 herein or their prior settlement of the 2012 Lawsuit is invalid or subject to challenge or rescission.***"

(SUF, ¶ 11) (emphasis added).

In direct contravention of the Fundamental Terms and Settlement Agreement, Defendants assert fraud-based claims and defenses in an attempt to invalidate and/or rescind the CSA and Guarantee. (*See* D.I. 29, Counterclaim—Count II and First and Third Affirmative Defenses). These are precisely the kinds of claims and defenses the parties expressly released, and such releases are valid and enforceable under applicable law. The Settlement Agreement expressly provides that Delaware law applies. (PFF ¶ 20).

Pursuant to Delaware law, in construing a release, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document. *Seven Invs., LLC v. AD Capital, LLC*, 32 A.3d 391, 400 (Del. Ch. 2011). Where the language of the release is clear and unambiguous, it will not lightly be set aside. *Id.* Moreover, courts recognize the enforceability of releases executed by sophisticated parties.[5] As the court in *Seven Invs.* recognized, parties may execute releases that extinguish claims for fraud in the inducement, as settlement "would be impossible if a party could later

---

[5] *See, e.g., In re Nat'l Rural Util. Coop. Fin. Corp.*, 467 B.R. 59, 73 (Bankr. D. Del. 2011) (in granting injunctive relief, the court noted that the parties were sophisticated litigants who entered into the releases with the advice of counsel and the public interest is served by granting relief to Plaintiffs inasmuch as "parties to releases are entitled to rely on the bargains they make"); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 282 (3d Cir. 2014) ("a settlement agreement may release all claims arising out of the transaction with which the release was concerned even if they are not yet known; and broad releases are valid at least when negotiated between sophisticated parties") (citing *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1283 (5th Cir. 1989)).

rescind a release based on the same or similar fraud allegations." *Id*. at 399-400.  *See also Metrocall or Delaware v. Continental Cellular Corp.*, 437 S.E.2d 189, 194-95 (Va. 1993) (holding that "[e]ven fraud cases can be settled," rejecting a request to rescind the settlement of a fraud claim, and holding that a party could not claim that it reasonably relied upon alleged misrepresentations of a party it had previously alleged to be dishonest).

Both the Fundamental Terms and Settlement Agreement are valid agreements executed by sophisticated parties represented by legal counsel, and each document unambiguously releases the exact types of claims and defenses raised by Defendants in this case.

**C.**      **Bluestone Abandons its Declaration of Force Majeure.**

A contractual force majeure clause is a provision that excuses nonperformance due to circumstances beyond the control of the parties.  *See generally VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 287 (3d Cir. 2014).  Application of a force majeure provision, as with any other contractual provision, starts with the words chosen by the drafters.  *Stroud v. Forest Gate Dev. Corp.*, Nos. 20063-NC, 20064-NC, 2004 Del. Ch. LEXIS 66, at *28 (Del. Ch. May 5, 2004).  To use the clause as an excuse to nonperformance, the event must have been beyond the party's control and without its fault or negligence. *Gulf Oil Corp. v. F.E.R.C.*, 706 F.2d 444, 452 (3d Cir. 1983).  The nonperforming party has the burden of proof.  *Id*.

Bluestone has utterly failed to satisfy its burden of establishing that it suffered a legitimate force majeure event under the CSA.  (PFF § X).[6]  In fact, Defendants' decision ***to not introduce any testimony or other evidence*** regarding Bluestone's May 19 declaration of force

---

[6] Bluestone also failed to comply with the notice requirements in Article 9 of the CSA.  (PFF¶¶ 109-12).  Courts have held that a failure to give proper notice of a claimed force majeure event, as required under the contract, precludes assertion of the claim.  *See, e.g., Resources Investment Corp. v. Enron Corp.*, 669 F. Supp. 1038, 1043-44 (D. Colo. 1987) (buyer's failure to comply with notice requirements in asserting force majeure claims was fatal to those claims).

majeure is an implicit admission it lacked any basis in law or fact.  Rather, Bluestone's force

majeure declaration (which was one day before the final scheduled May load date) was nothing

more than a desperate attempt to escape its May loading obligations, even though those loading

obligations were to take place *on dates specifically selected by Bluestone*.

That Defendants were willing to utterly fabricate a force majeure declaration is

informative as to the weight which should be given to Defendants' other claims and defenses in

this case, including the credibility of their witnesses.  *See, e.g., Englebrick v. Worthington Indus.*,

944 F. Supp. 2d. 899 (C.D. Cal. 2013) (dismissing plaintiff's declaratory judgment action against

insurance company due to plaintiff misrepresentations during discovery and only admitting to

same at the time of trial); *Arbitrium Handels AG v. Johnston*, No. 13506, 1996 Del. Ch. LEXIS

1, *43 (Del. Ch. January 5, 1996) (finding that defendants' established deception stripped them

of any legitimate claim to credibility).

**D.      Defendants' Rule 52(c) Motion Should be Denied.**

During trial, Defendants moved under Rule 52(c) to strike and dismiss Xcoal's breach of

contract case on the bases that (i) Xcoal, rather than Bluestone, was obligated to obtain empty

railcars; and (ii) Xcoal may not recover damages as provided for under Article 10.3 of the CSA

for the reasons previously stated in Defendants' Motion to Dismiss (D.I. 139).  For the reasons

that follow, Defendants' Motion should be denied.

**1.      Legal Standard**

Rule 52(c) provides in pertinent part as follows:

> If a party has been fully heard on an issue during a nonjury trial and the court
> finds against the party on that issue, the court may enter judgment against the
> party on a claim or defense that, under the controlling law, can be maintained or
> defeated only with a favorable finding on that issue. The court may, however,
> decline to render any judgment until the close of the evidence.

In determining whether or not to grant judgment under Rule 52(c), "the district court

13

applies the same standard of proof and weighs the evidence as it would at the conclusion of the trial." *Carter v. United States,* 2011 U.S. Dist. LEXIS 148631, at *2 (E.D. Pa. Dec. 27, 2011). "Accordingly, the court does not view the evidence through a particular lens or draw inferences favorable to either party" and "should also make determinations of witness credibility where appropriate…" *Id.* A trial court's factual findings in ruling on a Rule 52(c) motion are reviewed for clear error and its legal conclusions are subject to de novo review. *EBC, Inc. v. Clark Bldg. Sys.,* 618 F.3d 253, 273 (3d Cir. 2010). In evaluating a Rule 52(c) motion, the court is to consider the entire record, and not just the record at the time the motion is made.[7]

### 2.   It was Always Bluestone's Obligation to Obtain Empty Railcars from NS.

Defendants contend that the CSA and Xcoal's Transportation Contract with NS unambiguously require that Xcoal obtain empty railcars from NS for loading at Bishop. Although the language of the agreements at issue (including also the NS Siding Lease Agreement governing the track at the Bishop loadout) are not entirely unambiguous on this issue, ***it is certain*** that the language does not unambiguously support Defendants' contention. This was the case when Defendants first asserted this argument at the end of Xcoal's case, and it is even more certain in light of the entire trial record. Indeed, not only are the terms of the pertinent agreements entirely consistent with Xcoal's position that the obligation to obtain empty railcars rests squarely with Bluestone, but the parties' course of performance and custom and practice in

---

[7] *See e.g. Gaffney v. Riverboat Services of Indiana, Inc.,* 451 F.3d 424, 451 n. 29 (7th Cir. 2006) (rejecting the defendant's contention that the record should be evaluated when the Rule 52(C) was made at the close of the plaintiffs case, rather than as a whole, as unsupported by case law and Rule 52(C); *Duval v. Midwest Auto City, Inc.,* 578 F.2d 721, 723-24 (8th Cir. 1978) (once a defendant introduces evidence on its own behalf, sufficiency of evidence is tested on appeal by reviewing the entire record, even when the trial judge reserved ruling on the motion when made); and *In re Oberdick,* 490 B.R. 687, 697 (Bankr. W.D.Pa. 2013) (where defendants knew the judge was taking their Rule 52(c) motion under advisement and nevertheless elected to put on a case, they cannot then prevent the Court from considering the entire trial record).

the industry unequivocally confirm the same.

        **i.**        **The CSA, Transportation Contract and Siding Lease Agreement.**

When construing a contract, the Court is to use the objective theory of contracts, which requires that contracts be interpreted as they would be understood by an objective, reasonable third party. *Salamone v. Gorman,* 106 A.3d 354, 367–68 (Del. 2014). When a contract is clear and unambiguous, the Court should give effect to the plain meaning of its terms without resorting to extrinsic evidence. *Sunline Comm. Carriers, Inc. v. CITGO Petrol. Corp.,* 206 A.3d 836, 846 (Del. 2019). However, when there is uncertainty about the meaning of terms within the contract, the Court must consider extrinsic evidence to determine the proper construction of the ambiguous terms. *Eagle Indus., Inc. v. DeVilbliss Health Care, Inc.,* 702 A.2d 1228, 1232–33 (Del. 1997).

Under Article 2.1 of the CSA, "[Bluestone] shall sell ***and deliver*** and [Xcoal] shall purchase and ***take delivery*** of Coal...." (PFF ¶ 131) (emphasis added). The CSA makes clear that title passes from Bluestone to Xcoal "***after*** the Shipment has been ***properly loaded into railcars*** at [the mine]." *Id.* (emphasis added). Therefore, until the coal has been properly loaded into the railcars, the responsibility for and title to the coal lies with Bluestone.

Section 3.5 of the CSA sets forth more details about the logistics of the loading process. In particular, it states that Xcoal bears the responsibility for scheduling the dates of loading and the routing and method of shipment, but that "***[Bluestone] shall cause Coal sold hereunder to be properly loaded into railcars*** for delivery to [Xcoal] in accordance with the Transportation Provisions of the applicable rail contract of [Xcoal] with [NS]." (PFF ¶ 131) (emphasis added). Consistent with title remaining with Bluestone until the completion of loading, under Article 3.5, Bluestone is responsible for loading the coal onto railcars. That Article 3.5 also provides that such loadings shall be in accord with, and therefore not result in the violation of Xcoal's

contractual relationships with NS, does not somehow place the burden on Xcoal to obtain empty

railcars.  And the Transportation Contract does not provide otherwise.

Both Messrs. Hamilton and Thrasher testified that the Transportation Contract governs

the movement of loaded railcars *from* Bishop to the port, and *not* the movement of empty

railcars *to* Bishop.  (PFF ¶¶133, 136).  Indeed, the buyer, in this case Xcoal, does not pay NS for

the transportation of empties to the loadout.  (PFF ¶¶ 136-37).  Mr. Hamilton also made clear

that NS will not take directions or instruction from the buyer (i.e., Xcoal) and that it is "the

producer's responsibility to order the empties when they were ready for them."  (PFF ¶ 122).

Defendants point to the language in Paragraph 19 that "NS shall issue the necessary

permits and supply or cause to be supplied the necessary cars" for loading, and language in

Paragraph 13 that NS's Coal Transportation Management System ("CTMS") is to be used to

schedule and permit shipments.  (PFF ¶ 134).  Neither provision addresses whether the buyer or

producer is to order trains, and Mr. Hamilton expressly rejected the notion that either provision

requires Xcoal to obtain the trains.  With respect to Paragraph 19, Mr. Hamilton reiterated that

"if Bishop doesn't order the cars in, we have no way of knowing they have the coal to go in the

cars.  And we didn't – we never deliver empties unless we can fill them up.... [Bluestone] may be

loading trains for Integrity.  They may be loading trains for themselves.  They have to schedule

those cars to go to Bishop."  (PFF ¶ 135).  And Mr. Hamilton observed that whether there was

sufficient coal at Bishop to load was an acute and recurring problem at Bishop.  *Id*.  He also

testified that the CTMS system referenced in Paragraph 13 is used for obtaining permits, not the

coordination of sending empty railcars.  *Id*.

Notably, absent from Defendants' arguments on this issue is any mention of the Siding

Lease Agreement ("SLA") which expressly addressees the treatment of empties at Bishop.  As

Mr. Hamilton explained, the purpose of the SLA is to enable the mine producer to locate and move empty railcars on the NS track for loading. (PFF ¶ 140). Pursuant to the SLA, NS leased the land and track at the siding at the Bishop mine to Justice Energy Company. (PFF ¶ 139). Therein, the parties explicitly agreed as to their respective liability relating to empties delivered to and located at Bishop.

> All carload shipments consigned to or in the care of Industry for delivery on the Track shall be deemed to have been fully and completely delivered as soon as the car or cars containing such shipment shall have been placed on the Track and detached from the engine or train by which it was moved, and Railway shall thereupon be relieved of any further liability therefor....

(PFF ¶ 141). Accordingly, the SLA addresses when the "delivery" of empty railcars to Bishop is full and complete, who is responsible for the cars once delivered (the producer), and when NS is relieved of liability related to the empty cars (when the cars are detached from the engine or train by which they were delivered). (*Id.*).

In short, consistent with the SLA, Bluestone is responsible for the procurement of empty railcars, the movement of those railcars on the Bishop track to facilitate loading, and the loading of the railcars. Title and responsibility for the railcars does not pass until those railcars are loaded and re-coupled to an NS engine, at which point the train's movement is then governed by Xcoal's Transportation Contract with NS.

        **ii.**       **The Parties' Course of Performance and the Custom and Practice of the Industry.**

Where a contract's terms are ambiguous or "fairly susceptible of different interpretations," the court may consider extrinsic evidence to uphold, to the extent possible, the reasonable shared expectations of the parties at the time of contracting. *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003) (citations omitted). The extrinsic evidence the court may consider in such a circumstance includes "overt statements and acts of the parties, the

business context, prior dealings between the parties, business custom and usage in the industry." *Id*. (citations omitted).  As none of the contracts at issue expressly states which party is required to obtain empty railcars, the court should look to the parties' course of performance under the CSA and custom and practice of the industry, each of which confirm that it was Bluestone's obligation to obtain empty railcars from NS.

Under 1-303 of the UCC, a course of performance refers to a sequence of conduct between the parties to a particular transaction if (1) the contract requires repeated performance of an action, and (2) the other party, with knowledge of the requirement to act and the opportunity to object, nonetheless accepts the performance or acquiesces in it without objection. 6 Del. C. § 1-303(a). While a single act is insufficient to establish a course of performance, a single act is relevant and admissible to show the parties' intent. 1 Hawkland UCC Series § 1-303:3, ¶ 2. Course of performance is considered the most important factor in interpreting ambiguous or implied terms. *Sun-Times Media Group, Inc. v. Black,* 954 A.2d 380, 398 (Del.Ch. 2008).

The parties' course of performance under the CSA was clear – Bluestone obtained the railcars from NS.  Bluestone made clear at the outset that "[w]e do the scheduling."  (PFF ¶ 125). Moreover, it in fact did "do the scheduling" for each of the four trains of empty railcars delivered to Bishop in October and November 2017 by directly requesting the trains from NS.  (PFF ¶ 126).  In fact, Bluestone repeatedly acknowledged in correspondence with Xcoal that it was directly ordering empty railcars from NS.  (PFF ¶ 127).  Rather than contending this was not its obligation, Bluestone instead sought Xcoal's "assistance" in complying with Bluestone's obligation to obtain empties from NS.  *Id*.  Bluestone never once contested that it was obligated to obtain railcars until January 11, 2018.  (PFF ¶ 130).  But again, by that date it had already been obtaining (or purportedly attempting to obtain) railcars from NS for months.

18

The parties' course of performance is also entirely consistent with industry practice, otherwise known as "usage of trade." Under Section 1-303, a "'usage of trade' is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." 6 Del. C. § 1-303(c). Such a usage can be used to construe a contract even where the parties may have been ignorant of it. 1 Hawkland UCC Series § 1-303:4, ¶ 2. As the testimony of Messrs. Hamilton and Thrasher demonstrates, it is long-held custom and practice that the producer, not the buyer, must order the railcars. (*See* PFF ¶¶ 122-24). By way of illustration, Mr. Hamilton testified that "***the producer has the responsibility to order the trains" and "that's just the way it's always been handled..., not just Bluestone, Bishop, but every producer***." (PFF ¶ 124) (emphasis added). In fact, not only did Bluestone order empty railcars directly from NS for Xcoal loadings, but it also did so for third party loadings. (PFF ¶ 128).[8]

### 3.     Xcoal's Damage Claim is Proper Under the Law and Facts.

#### i.     Xcoal's Damage Claim.

Xcoal filed its Complaint on May 31, 2018 (D.I. 2). Therein, Xcoal stated that it was seeking damages pursuant to Article 10.3 of the CSA, which provides:

> If the Seller is the cause of an Event of Default..., in addition to other damages available at law, Seller, and or its Guarantor, shall be liable to Buyer for damages equal to the number of tons of Coal remaining to be delivered under this

---

[8] Defendants' counsel cited to Section 2-503(1)(b) of the UCC as requiring Xcoal to supply railcars. This provision, however, does not apply to contracts such as the CSA. "Section 2-503(1) sets forth the seller's tender of delivery requirements when the seller has not agreed to ship the goods via carrier...." 2 Hawkland UCC Series § 2-503:2, ¶ 1. Section 2-503(1) applies to circumstances where the seller is delivering the goods in person to the buyer's place of business. *Id.,* ¶ 3. When a seller agrees to use a common carrier, such as a railway, and the tender occurs when the goods are delivered to the common carrier, the contract is not governed by Section 2-503(1). 2 Hawkland UCC Series § 2-503:3, ¶¶ 1–2. The CSA expressly provides that delivery is to occur and title is to pass at Bluestone's place of business, not Xcoal's. (PFF ¶ 29). Accordingly, UCC § 2-503(1)(b) is inapplicable.

Agreement, multiplied by the Buyer's Discount.

(*See* PFF ¶ 51).  Subsequently, Xcoal submitted its damage claim as Exhibit L to the Proposed

Pretrial Order filed with the Court in August 2019.  (D.I. 66-12).  Therein, Xcoal calculated its

damages based upon Article 10.3 as follows:

> [I]n order to determine Xcoal's damages, the total number of tons that were not
> supplied by Bluestone under the CSA (*i.e.,* 696,298.40) must be multiplied by the
> Buyer's Discount of $9.88 per ton, which results in a total of $6,879,428.19.
> Pursuant to Article 10.2(b) of the CSA and applicable law, Xcoal withheld
> payment of the price balance amount of $65,322.89 that otherwise would have
> come due under Article 7 with respect to a May 9-10 loading of coal. As a result,
> Xcoal's damage claim against the Justice Parties is $6,814,105.30, plus pre-
> judgment and post-judgment interest at applicable rates. This amount is due and
> owing pursuant to both the CSA and Guarantee.

*Id*.[9]  Xcoal also seeks attorneys' fees, expenses and costs in an amount to be determined after

trial pursuant to the Guarantee, which requires SCC and Governor Justice to "indemnify Xcoal

against any losses Xcoal may sustain and expenses it may incur" in enforcing its rights and

remedies under the CSA and/or Guarantee.  *Id*.[10]  When the parties filed an updated Proposed

Pretrial Order on July 9, 2020, Xcoal reasserted the exact same damage claim.  (D.I. 88-12).

On September 14, 2020, Defendants, via new lead counsel, ***for the first time*** asserted

during trial that Article 10.3 of the CSA should be deemed unenforceable as an invalid "penalty

provision," thereby invalidating Xcoal's damage claim and allegedly leaving it unable to satisfy

the damages element of its breach of contract claim.  (D.I. 139).  Defendants raised this issue via

---

[9] Additionally, under UCC Section 2-717, a buyer properly withholds payment on outstanding
invoices for goods delivered so that the outstanding balance can be applied as an offset to its
damages.  *See Amer Indus. Techs. v. Aero Tec Labs*., Civil Action No. 92-281-MPT, 1994 U.S.
Dist. LEXIS 6233, at *88 (D. Del. May 11, 1994).

[10] Costs and fees may be shifted by contract, it being well-settled that a provision by which one
party undertakes to pay counsel fees of the other in the event of his own breach is not void
against public policy.  *See Research & Trading Corp. v. Pfuhl*, No. 12527, 1992 Del. Ch. LEXIS
234, *40 (Del. Ch. Nov. 19, 1992).

a Motion to Dismiss purportedly pursuant to Rule 12(h)(2)(C), which Rule contemplates the possibility of a party raising a "failure to state a claim" defense "at trial."  As set forth below, citing to this Rule does not excuse Defendants' failure to assert this defense as an affirmative defense or otherwise prior to the start of trial.  Defendants' reasserted this argument in their Rule 52(c) Motion.

Defendants' Motions should be denied because (i) the defense has been waived; (ii) Article 10.3 is valid and enforceable; and (iii) even if Article 10.3 were deemed to be unenforceable, Xcoal may recover under UCC Section 2-713.

### ii.      Defendants Waived the Unenforceability Argument

Given that Defendants raised this argument for the first time after trial had started, it is unsurprising that there is ample authority providing that such argument was long-ago waived.

First, such argument was waived because it was never asserted as an affirmative defense (D.I. 29), and the December 14, 2018 deadline for filing a motion to amend the pleadings has long since passed.  (*See* D.I. 17).  Under Rule 8(c)(1), "[i]n responding to a pleading a party must affirmatively state any avoidance or affirmative defense...."  Courts have held that a party's contention that a contractual damages provision is void as a penalty constitutes an affirmative defense, and will be waived if not raised as such.[11]  In order to avoid waiver, it must be established

---

[11] *See, e.g., New CSI, Incorporated v. Staffing 360 Solutions, Incorporated,* 865 F.3d 251, 259-260 (5th Cir. 2017) (alleged illegality of a liquidated damages clause is an affirmative defense that a defendant must raise in its responsive pleading or it is waived); *Pace Commc'ns, Inc. v. Moonlight Design, Inc.,* 31 F.3d 587, 594 (7th Cir.1994) (argument that a liquidated damages provision is an unenforceable penalty is an affirmative defense to which the defendant has burden of persuasion);  *In re Snelson,* 305 B.R. 255, 262 (Bankr.N.D. Tex. 2003) (assertion that liquidated damages clause was an unenforceable penalty is an affirmative defense which is waived if not plead); and *Bell v. Ramirez,* No. 13-cv-7916, 2014 U.S. Dist. LEXIS 174905, at *7-8 (S.D.N.Y. Dec. 9, 2014) ("The assertion that a liquidated damages clause is in fact an unenforceable penalty is an affirmative defense.").

that the defense was raised at a "pragmatically sufficient time" and that the opposing party would not be prejudiced if the defense were allowed. *In re Frescati Shipping Co., Ltd.*, 886 F.3d 291, 313 (3d Cir. 2018). "A District Court's holding that an affirmative defense has been waived is reviewed for abuse of discretion." *Id.*

The holding in *Contreras v. City of Los Angeles*, No. CV11-1480, 2012 U.S. Dist. LEXIS 196465 (C.D. Cal. June 22, 2012), *aff'd* 603 F.App'x 530 (9th Cir. 2015), is instructive. As is the case here, the defendants in *Contreras* filed a Rule 12(b)(6) motion to dismiss for failure to state a claim during trial, citing to Rule 12(h)(2)(C) as authorizing it do so. In denying the motion to dismiss, the court observed that the delay in raising the defense was "inexplicable" and that defendants' claim that plaintiff was not prejudiced was "absurd" as "[b]oth Plaintiff and the Court have expended a tremendous amount of time, energy, and resources in pursuing and adjudicating this action" *Id.* at *9-10.

Here, Defendants most certainly did not raise their new-found defense that Article 10.3 is invalid as a penalty at a "pragmatically sufficient time." Although Xcoal's May 31, 2018 Complaint indicates that Xcoal was seeking damages under Article 10.3, Defendants raised this argument for the first time in their September 14, 2020 Motion to Dismiss, which was filed during the trial and less than a day before Xcoal's first witness took the stand. There is no conceivably valid reason Defendants could not have previously raised the defense, and courts have deemed affirmative defenses waived even when asserted in a much less delinquent manner.
[12] Additionally, were the Court to now reject Xcoal's damage claim (which it should not), Xcoal

---

[12] *See e.g., ATSCO Holding Corporation v. Air Tool Service Company,* 799 Fed. Appx. 310, 312-313 (6th Cir. Dec. 31, 2019) (defendants waived right to present affirmative defense by failing to plead it in their answer and where plaintiff first received notice after the close of discovery at the final pre-trial conference); *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency of the City of Atlantic City,* 68 F.Supp.3d 545, 555 (D.N.J. 2014) (waiving

would suffer significant prejudice.  Had Defendants timely raised this defense, Xcoal would have

pursued a different trial strategy.  By way of illustration, Xcoal would have taken the

precautionary measure of including an alternative damage claim in its pretrial filing, and it also

would have retained an expert and presented that expert's testimony on the alternative damage

claim.  (*See* PFF ¶ 192).  Xcoal never did so because Defendants never before challenged Article

10.3's enforceability.  "The purpose of raising an affirmative defense in an Answer is to put a

party on notice and allow them to shape their litigation strategy accordingly." *Dominguez v.

Galaxy Recycling Inc.,* Civ. A. No. 12-7521, 2015 U.S. Dist. LEXIS 195390, at *6 (D.N.J. Dec.

10, 2015).

Second, Defendants separately waived the defense (and any other issues) by failing to

include it in their pretrial submission to the Court, as "[l]egal theories and issues not raised in the

pretrial are considered waived."  *Babby v. City of Wilmington Dep't of Police*, 614 F. Supp. 2d

508, 510-11 (D. Del. 2009).  Furthermore, Local Rule 16.3 states that parties must disclose in the

proposed pretrial order "[a] statement of the issues of law which any party contends remain to be

litigated" and "[a] brief statement of what the defendant intends to prove as defenses."

Defendants have clearly failed to do this with respect to their "new" argument, and as discussed

above there is no justification for such failure.  Defendants misleadingly cite to Xcoal's

---

argument that agreement was illegal when contention was raised for the first time in summary
judgment briefing, agreeing that the plaintiff "had no prior notice of this defense, nor the
opportunity to conduct the discovery and legal research invariably required to prove and/or disprove
such theory" and that "[d]efendants point to no reason why the illegality defense could not have
been raised in their Answers and Counterclaims long ago.); *Board of Trustees, Roofers Local No.
30 Combined Welfare Fund v. International Fidelity Insurance Company,* 63 F.Supp.3d 459,
473-74 (E.D. Pa. 2014) (unpled affirmative defense waived where raised for the first time in
response to motion for summary judgment); *Rhoades v. Stein,* Civ. A. No. 93-4699, 1995 U.S.
Dist. LEXIS 7765, *6 (E.D. Pa. June 1, 1995) (denying defendant's request to amend answer to
assert illegality affirmative defense where the affirmative defense was first raised in a motion for
summary judgment after the close of discovery).

Statement of Issues of Law as Xcoal previously "rais[ing]" and "recognize[ing]" this issue.  (D.I. 129, p. 2).  The cited paragraph of Xcoal's filing does no such thing, as it simply recognizes that Xcoal is entitled to recover contractually-provided for measure of damages.  (*See* 88-6, ¶ 7). Again, at no point did Defendants suggest otherwise.

Finally, "[m]ost defenses... may be waived as a result of the course of conduct pursued by a party during litigation."  *Peterson v. Highland Music,* 140 F.3d 1313, 1318 (9th Cir. 1998).  For well over two years Defendants pursued their claims and defenses in this litigation without ever having raised this issue before, and have therefore also waived the defense via their conduct.[13] And, as held previously in this case, a lack of reasonable diligence in past pleadings cannot be cured by replacement counsel.  (*See* D.I. 59) (denying motion for leave to file amended counterclaims).

### iii.    Article 10.3 is Valid and Enforceable.

Even if not waived, Defendants' newly asserted defense fails under applicable law. Delaware law recognizes and permits mutually-agreed damage provisions, and such provisions are presumptively enforceable.  *See S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc. No. 96C-02-086-WTQ,* 1997 Del. Super. LEXIS 217, at *9 (Del. Super. May 21, 1997) Therefore, the burden of proof is on the party opposing a damages provision.  *Id*.  As this case concerns a contract for the sale of goods, it is necessary to examine UCC Section 2-718:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

---

[13] *See Contreras,* 2012 U.S. Dist. LEXIS 196465, at *9, (denying Rule 12(b)(6) motion to dismiss filed after the commencement of trial as defendant had waived defense by its conduct in indicating "their intent not to assert" it through not including the defense in its Memorandum of Contentions of Fact and Law nor the Pretrial Conference Order among other conduct.).

6 Del. C. § 2-718.

Xcoal entered into the CSA as a means to recover a portion of the damages it had suffered from non-performance under the CSA that was the subject of the prior settled litigation. (PFF ¶¶ 15-18).  The measure of Xcoal's recovery was the "Buyer's Discount", which represents a $9.88 discount per ton from the agreed-upon market price for the coal being supplied by Bluestone.  *Id.*  Such a recovery is clearly "reasonable in light of the anticipated or actual harm caused by the breach," as this is the ***exact amount*** of Xcoal's actual harm caused by Bluestone's failure to perform.

It is also reasonable in light of the "difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy."  Calculating Xcoal's losses in the event of Bluestone's breach would be difficult, as there are few coals similar in quality to that specified under the CSA and it would be difficult to predict how any replacement would be used in blends or Xcoal's other shipments (PFF ¶ 194).  Further, courts have upheld liquidated damage provisions in contracts for the sale of commodities in light of the inherent difficulty in anticipating losses due to market vagaries.[14] The purpose of this provision, which was not in the parties' prior CSA, was to clarify what Xcoal could recover under the CSA and to approximate Xcoal's actual harm in the event of default by Bluestone.  (PFF ¶ 189).

---

[14] *See Jeddo Coal Co. v. Rio Tinto Procurement (Singapore) PTD Ltd.*, No. 3:16-cv-621, 2020 U.S. Dist. LEXIS 23266, at *45-46 (W.D. Pa. Feb. 10, 2020) (upholding contractual provision providing non-breaching party with $30 per ton for each ton of coal not purchased, and noting that such a damage provision is designed to address market vagaries, "where losses are difficult to anticipate, calculate or assess."); *Sprague Energy Corp. v. Levco Tech Inc*., No. 3:09-cv-29, 2009 U.S. Dist. LEXIS 39526, at *33 (D. Conn. May 11, 2009) (upholding a liquidated damages clause in contract for petroleum products, and noting that because of the volatility of the oil market and the nature of the product actual damages would be difficult to quantify and prove); *Noble v. Krizman Enters.*, 692 Fed. Appx. 256 (6th Cir. 2006) (holding that a liquidated damages clause in an oil and gas lease, given market fluctuations, was reasonable).

Defendants, however, contend that Article 10.3 is invalid as a penalty because it purportedly provides Xcoal with an express right to recover both "actual damages" and the specific amount provided therein.  (D.I. 169, p. 2).  This is not, however, what the provision provides.  Rather, it states that "in addition to *other damages available at law*, [Defendants], shall be liable to [Xcoal] for damages equal to the number of tons of Coal remaining to be delivered under this Agreement, multiplied by the Buyer's Discount of $9.88 per ton."  (PFF ¶ 51).  To the extent that actual damages and liquidated damages are not concurrently recoverable under applicable law, the phrase "in addition to other damages available at law" would necessarily not include actual damages, as they would be *unavailable* at law.

Additionally, as Xcoal made clear well over a year ago in its pretrial damage statement, Xcoal *is not seeking* damages under Article 10.3 and actual damages.[15]

### iv.   Even if Article 10.3 Were Unenforceable, Bluestone's Motion Should be Denied and Xcoal Should be Permitted to Recover its Actual Damages, which are the Same as those Set Forth in Article 10.3.

Defendants' seek the dismissal of Xcoal's breach of contract claim on the basis that Article 10.3 is unenforceable. (D.I. 129).  However, even where a damages provision is deemed unenforceable, the claimant may still recover actual damages.  *See, e.g., Dow Chemical Canada Inc. v. HRD Corp.,* 909 F.Supp.2d 350, 360 (D. Del. 2012).

As noted above, Defendants' decision to blindside Xcoal during trial with its newly-

---

[15] Xcoal will await receipt of Defendants' Brief and respond to any case law cited therein as appropriate.  In their initial Motion, however, Defendants place particular emphasis on an unpublished Connecticut state trial court case.  *Webster Ins., Inc. v. Levine,* 2009 Conn. Super. LEXIS 3431 (Conn. Super. April 29, 2009).  In addition to not applying Delaware law, unlike here, where the provision at issue fairly and precisely calculates Xcoal's actual damages and Defendants failed to even contest the provision until during trial, the court in *Webster* invalidated before trial a "disgorgement provision" which would have permitted plaintiffs to recover not just profits or net revenues, but also all earnings or gross revenues received as a result of the alleged breach.

minted argument that Article 10.3 is unenforceable deprived Xcoal of the opportunity to seek actual damages as an alternative to damages under Article 10.3.  Accordingly, if necessary, in order to avoid manifest injustice, Xcoal should be permitted to amend its request for damages in Exhibit L to the Final Pretrial Order to include actual damages as an alternative remedy.  *See* Fed. R. Civ. P 16(e) (a final pretrial order may be modified in order to prevent manifest injustice).

Furthermore, Xcoal submits there is sufficient evidence in the record to determine its actual damages if necessary.[16]  Specifically, UCC Section 2-713 provides in pertinent part that the measure of damages for a non-breaching seller is "the difference between the market price at the time when the buyer learned of the breach and the contract price, together with incidental and consequential damages...."  6 Del. C. § 2-713.  With the exception of its exclusion of incidental and consequential damages, the CSA provides for precisely this recovery by Xcoal.

The market price may fluctuate based upon the adjusted Market Index, but the contract price in the CSA is structured to also fluctuate in tandem with that market price, save for the $9.88 per ton "Buyer's Discount."  Accordingly, the difference between contract price and market price under the CSA is always $9.88 per ton.

In sum, whether calculated under Article 10.3 or Section 2-718 of the UCC, Xcoal's damages total **6,814,105.30** – *i.e.*, the total number of tons that were not supplied by Bluestone

---

[16] Xcoal has no desire to burden this Court with additional trial proceedings.  However, in the event that the Court were to (i) deem Article 10.3 unenforceable and (ii) conclude that there is insufficient evidence in the record to calculate Xcoal's actual damages, Xcoal would have little practical choice but to move to reopen trial to present additional evidence of actual damages so as to avoid severe prejudice caused by Defendants' last-minute argument. *See, e.g., In re Dryden Advisory Group, LLC,* No. 15-bk-00545MDF, 2015 Bankr. LEXIS 1954, *3 (Bankr. M.D. Pa. June 15, 2015) ("a trial court may grant a motion to reopen the record for the submission of additional evidence after trial.").

under the CSA (696,298.40), multiplied by the Buyer's Discount of $9.88 per ton

($6,879,428.19), minus the price balance for the May 10 loading properly withheld ($65,322.89).

**E.**     **Bluestone's Damage Claim Should be Rejected by the Court.**

**i.**     **The Lost Profits Sought by Defendants are Contractually Barred.**

Limitation of liability clauses are routinely enforced under the UCC when contained in

sales contracts negotiated by sophisticated parties. *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d

195, 203 (3d. Cir. 1995). The party claiming that a limitation of liability provision in a

commercial contract is unconscionable bears a heavy burden of proof. *See Pig Improvement Co.*

*v. Middle States Holding Co.*, 943 F. Supp. 392, 401-02 (D. Del. 1996).

The recovery of lost profits is expressly barred under the CSA, which provides that

"[n]either party shall be liable under this Agreement for consequential, incidental, punitive,

exemplary or indirect damages, lost profits, or business interruption damages, whether by statute,

in tort or in contract, under any indemnity provision or otherwise." (PFF ¶ 52).

Defendants have suggested that the term "lost profits" in Article 10.4 refers only to

indirect lost profits (*i.e.* from third parties), and not the profit that Bluestone would have

allegedly made by selling the coal to Xcoal under the CSA. Such a reading is inconsistent with

the express language of Article 10.4 and the structure of Article 10 of the CSA generally. Profits

lost from a third party due to breach of contract constitute "consequential damages". *Atl.*

*Aviation Corp. v. Provident Life Acci. Ins. Co.*, No. 86-533-CMW, 1989 U.S. Dist. LEXIS

10261, *21 (D. Del. Aug 2, 1989). Section 10.4 of the CSA bars the recovery of consequential

damages by either party. Section 10.4 also bars direct damages between the parties in the form

of "lost profits." If the express limitation on recovery of lost profits in Section 10.4 meant only

third party lost profit as Defendants suggest, it would be superfluous. By specifically referring to

both consequential damages and to lost profits, the CSA limits the recovery of third party lost

profits and also direct lost profits as between the parties.[17]

Defendants also suggest that if Article 10.4 prevents its recovery of lost profits, then it bars any recovery by Bluestone and renders the CSA "illusory." This is simply not the case. By way of illustration, Bluestone was permitted to terminate and suspend performance under the express terms of the CSA. And upon termination, Bluestone could sell the coal not delivered to Xcoal (and still in its possession) to another buyer or buyers and seek the difference.

### ii.      **Defendants Cannot Recover Lost Profits of Non-Parties.**

An aggrieved seller bears the burden of presenting non-speculative evidence as to the extent of the loss. *M&G Polymers USA, LLC v. Carestream Health, Inc.*, No. 07C-11-242 PLA, 2010 Del. Super. LEXIS 161, at *118 (Del. Super. Apr. 21, 2010). Here, the only named Defendants are Bluestone, SCC, and Governor Justice. It is undisputed, however, that Bluestone did not realize any profits under the CSA, as any alleged profits would have instead been earned by non-party entities. (PFF ¶ 197).

Defendants cannot recover lost profits incurred by non-parties to this litigation and the agreements at issue. An action must be prosecuted in the name of the real party in interest. *Ric-Man Constr., Inc. v. Neyer, Tiseo & Hindo Ltd.*, No. 329159, 2017 Mich. App. LEXIS 79 (Mich. Ct. App. Jan 17, 2017). It is well established that separation between distinct legal entities will be respected. Accordingly, the lost profits of one entity cannot be recovered by a separate legal entity. *See Microchip Tech. Inc. v. Aptiv Servs. US LLC*, No. 17-cv-01194, 2020 U.S. Dist. LEXIS 158507, at *10 (D. Del. Sept 1, 2020) (noting that related entity and affiliate lost profits

---

[17] *See Accountable Health Sols., LLC v. Wellness Corp. Sols.*, 333 F. Supp. 1133, 1155 (D. Kan. 2018) (finding that an agreement governed by Delaware law that contained a limitation of liability for consequential damages and separately for "lost profit" barred direct lost profit damages between the contracting parties).

are not recoverable); *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004) (owners had to take the "burdens with the benefits" of separate companies and were not allow to claim lost profits of non-litigant affiliated companies).

### iii.     Even if Not Contractually Barred (which they are), Defendants' Alleged Damages are Impermissibly Based Upon Speculation and Conjecture.

Damages based upon mere speculation or conjecture are not recoverable at law. *OptimisCorp v. Waite*, C.A. No. 8773-VCP, 2015 Del. Ch. LEXIS 222, 282 (Del Ch. Aug 26, 2015).  The report on which Defendants rely for their lost profits claim is manifestly deficient for the reasons set forth in the Expert Report of Raymond Bummer.  (PFF ¶ 197).By way of illustration, Bluestone's damages expert assumed a production cost which he obtained from an "Executive Strategic Plan" for the Bishop operations.  *Id*.  Not only is the reasoning/information underlying the "Plan" entirely unclear, but the Plan itself is not even in the trial record.  *Id*.  In fact, there is no support in the record for the alleged production costs.  *Id*.  The lost profits claim also fails to account for the fact that Bluestone retained possession of the coal on which it is claiming lost profits.[18]  For these illustrative reason, and the others stated in Mr. Bummer's Report, Mr. Heighton's conclusions and calculations are speculative, unreliable, and Defendants' damage claim should be rejected.  *See, e.g., Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l*, 350 F. Supp. 2d 582, at 592, 597 (D. Del. 2004) (expert's unverified and untested projections were disregarded as unreliable, rendering the damages claim too speculative to permit recovery).

---

[18] *See G.B. "Boots" Smith Corp. v. Cobb*, 911 So. 2d 421 (Miss.  2005) (seller would be unjustly enriched if awarded lost profits and he kept possession of the clean fill that was to be supplied).

Dated:  October 13, 2020            BUCHANAN INGERSOLL & ROONEY PC


                                    */s/ Geoffrey G. Grivner*
                                    Geoffrey G. Grivner (#4711)
                                    919 North Market Street, Suite 990
                                    Wilmington, Delaware 19801-3046
                                    (302) 522-4200
                                    (302) 522-4295 (facsimile)
                                    *geoffrey.grivner@bipc.com*

                                    Kevin P. Lucas (admitted *pro hac vice*)
                                    Daniel C. Garfinkel (admitted *pro hac vice*)
                                    Buchanan Ingersoll & Rooney, P.C.
                                    Union Trust Building
                                    501 Grant Street, Ste. 200
                                    Pittsburgh, Pennsylvania 15219
                                    (412) 562-8350
                                    (412) 562-1041 (facsimile)
                                    *kevin.lucas@bipc.com*
                                    *daniel.garfinkel@bipc.com*

                                    Counsel for Xcoal Energy & Resources

31