**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| XCOAL ENERGY & RESOURCES,<br><br>*Plaintiff/Counterdefendant,*<br><br>v.<br><br>BLUESTONE ENERGY SALES<br>CORPORATION, ET AL.,<br><br>*Defendants/Counterclaimants.* | C.A. No. 1:18-cv-819-LPS |

## <u>DEFENDANTS/COUNTERCLAIMANTS' POST-TRIAL BRIEF</u>

OF COUNSEL:

Richard A. Getty (admitted pro hac vice)
THE GETTY LAW GROUP PLLC
The Offices at City Center
100 West Main Street, Suite 200
Lexington, KY 40507

George Terwilliger (admitted pro hac vice)
McGUIRE WOODS LLP
2001 K Street N.S., Suite 400
Washington, D.C. 20006

John D. Wilburn (admitted pro hac vice)
Brooks H. Spears (admitted pro hac vice)
McGUIRE WOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102

Ryan D. Frei (admitted pro hac vice)
McGUIRE WOODS LLP
Gateway Plaza, 800 East Canal Street
Richmond, VA 23219

Dated:  October 13, 2020

POTTER ANDERSON & CORROON LLP
    John Anderson Sensing (#5232)
    Jennifer Penberthy Buckley (#6264)
    Tracey E. Timlin (#6469)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    (302) 984-6000 – Telephone
    jsensing@potteranderson.com
    jbuckley@potteranderson.com
    ttimlin@potteranderson.com

*Attorneys for Bluestone Energy Sales Corp.,*
*Southern Coal Corp., and James C. Justice, II*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................. 2

I    Xcoal's Affirmative Case Fails Because the CSA Provision on Which It Relies for Its Damages Claim Is Invalid as a Matter of Law. ......................................... 2

II    Xcoal Committed the First Material Breach of the CSA by Failing to Accept and Pay for 30,000 Tons of Coal in November 2017. ........................................... 6

    A.    The CSA obligated Xcoal to provide empty railcars to be loaded by Bluestone. ......................................................................................... 7

        1.    Articles 3.5 and 3.6 of the CSA made Xcoal responsible for providing empty railcars. ................................................... 7

        2.    The Transportation Contract, as incorporated into the CSA, provided Xcoal with an exclusive right to order empty railcars from NS. ........................................................................ 9

    B.    Alternatively, the UCC obligated Xcoal to provide empty railcars. ................. 11

    C.    Xcoal admits that it failed to provide empty railcars to Bluestone. .................... 12

    D.    Xcoal's "course of dealing" theory has no legal or factual basis. ...................... 13

    E.    The record evidence contradicts Xcoal's "course of performance" theory. ........ 13

III    Bluestone Satisfied Its Tender Obligation for Delivery of the Requisite Coal............... 16

    A.    Bluestone had the capability to deliver 30,000 tons of coal per month. ............. 17

    B.    Bluestone tendered delivery of the coal by stockpiling the coal at the mine pit. ............................................................................................. 17

    C.    Bluestone provided notice to Xcoal that the coal was ready for loading............ 19

    D.    Bluestone eventually scaled back operations based on Xcoal's breach. ............. 20

IV    Xcoal's November 2017 Breach Abrogated Any Further Obligations by Bluestone. ...................................................................................................... 21

    A.    The lack of a mechanical sampling system is not a material breach of the CSA. ........................................................................................... 22

    B.    Any denial of Xcoal's purported right to have representatives at the mine is not a material breach of the CSA. ...................................................... 23

    C.    The October 29, 2017 train was not a material breach of the CSA. ................... 24

V    Bluestone Proved Its Actual Damages. .............................................................. 25

    A.    Heighton's expert report calculates and proves Bluestone's lost profits. ........... 25

    B.    Bummer's criticisms of Heighton's analysis lack any legal or factual basis. ....... 27

**TABLE OF CONTENTS**
(continued)

**Page**

C.      Xcoal misinterprets Article 10.4's bar on indirect damages................................ 29

CONCLUSION ........................................................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AgroFresh Inc. v. MirTech, Inc.*,
    257 F. Supp. 3d 643 (D. Del. 2017) ........................................................................8

*Atkins v. Robbins, Salomon & Patt, Ltd.*,
    97 N.E.3d 210 (Ill. App. Ct. 2018) .......................................................................28

*Bettius & Sanderson, P.C. v. Nat'l Union Fire Ins. Co.*,
    839 F.2d 1009 (4th Cir. 1988) ..............................................................................28

*BioLife Solutions, Inc. v. Endocare, Inc.*,
    838 A.2d 268 (Del. Ch. 2003) ...............................................................................21

*Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*,
    No. N17C-06-170-PRW ...........................................................................................9

*In re Buffalo Coal Co.*,
    424 B.R. 738 (N.D. W. Va. 2010) .........................................................................30

*Canters Deli Las Vegas, LLC v. FreedomPay, Inc.*,
    __ F. Supp. 3d __, No. 19-3030, 2020 WL 2494701 (E.D. Pa. May 14, 2020) .....................30

*Carey v. Estate of Myers*,
    No. S11C-10-029, 2015 WL 4087056 (Del. Super. Ct. July 1, 2015)....................................21

*Cent. Ill. Pub. Svc. Co. v. Atlas Minerals, Inc.*,
    965 F. Supp. 1162 (C.D. Ill. 1997) .......................................................................14

*Chicago Bridge & Iron Co. v. Westinghouse Elec. Co.*,
    166 A.3d 912 (Del. 2017) ........................................................................................7

*Clouding IP, LLC v. Google Inc.*,
    61 F. Supp. 3d 421 (D. Del. 2014) (Stark, C.J.) .................................................10

*Conley v. Dan-Webforming Int'l A/S (Ltd.)*,
    No. 91-401 MMS, 1992 WL 401628 (D. Del. Dec. 29, 1992)................................6

*Delaware Bay Surgical Svcs., P.C. v. Swier*,
    900 A.2d 646 (Del. 2006) ........................................................................................5

*E.I. du Pont de Nemours & Co. v. Shell Oil Co.*,
    498 A.2d 1108 (Del. 1985) ......................................................................................8

*Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*,
    343 F. Supp. 3d 789 (N.D. Ill. 2018) ...................................................................30

*Empire Fin. Svcs., Inc. v. Bank of N.Y. (Del.)*,
    No. 00C-09-235 SCD, 2007 WL 1991179 (Del. Super. Ct. June 19, 2007) ..........................26

*Faw, Casson & Co., LLP v. Halpen*,
    No. CIV.A. 00C-01-015, 2001 WL 985104 (Del. Super. Ct. Aug. 7, 2001) ...........................4

*Guerrieri v. Cajun Cove Condominium Council*,
    No. 04C-08-022 THG, 2007 WL 1520039 (Del. Super. Ct. Apr. 25, 2007) ..........................27

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*,
    No. CIV 08-1101, 2009 WL 3672452 (D.N.M. Oct. 2, 2009) ...............................................13

*Illingworth v. Bushong*,
    656 P.2d 370 (Or. Ct. App. 1982) ..........................................................................3

*Intel Corp. v. Broadcom Corp.*,
    173 F. Supp. 2d 201 (D. Del. 2001) ........................................................................5

*Jarro Bldg. Indus. Corp. v. Schwartz*,
    281 N.Y.S.2d 420 (N.Y. App. Div. 2d 1967) ...........................................................3

*Johnson v. GEICO*,
    No. 06-408-RGA, 2014 WL 2708300 (D. Del. June 16, 2014)...............................................23

*Lefemine v. Baron*,
    573 So.2d 326, 329 (Fla. 1991).............................................................................3

*M&G Polymers USA, LLC v. Carestream Health, Inc.*,
    No. 07C-11-242 PLA, 2009 WL 3535466 (Del. Super. Ct. Aug. 5, 2009) ....................27, 28

*M&G Polymers USA, LLC v. Carestream Health, Inc.*,
    No. 07C-11-242 PLA, 2010 WL 1611042 (Del. Super. Ct. Apr. 21, 2010)....................29, 30

*Matthews v. E.I. DuPont De Nemours & Co.*,
    682 F. App'x 148 (3d Cir. 2017) ...........................................................................7

*MCA Television Ltd. v. Pub. Interest Corp.*,
    171 F.3d 1265 (11th Cir. 1999) ............................................................................4

*MRPC Christiana LLC v. Crown Bank*,
    No. N15C-02-010-EMD, 2017 WL 6606587 (Del. Super. Ct. Dec. 26, 2017) ......................11

*Novel Drug Sols., LLC v. Imprimis Pharms., Inc.*,
    No. 18-539(MN), 2018 WL 4795627 (D. Del. Sept. 26, 2018)...............................................10

iv

*Palm Beach Int'l, Inc. v. Salkin*,
  No. 10-60995, 2010 WL 5418995 (S.D. Fla. Dec. 23, 2010) ................................................3

*Paul v. Deloitte & Touche, LLP*,
  974 A.2d 140 (Del. 2009) ........................................................................................................5

*Pauley Petroleum, Inc. v. Continental Oil Co.*,
  231 A.2d 450 (Del. Ch. 1967) .................................................................................................9

*Preferred Bus. Svc., Inc. v. Bruny's Bail Bonds, Inc.*,
  No. CPU4-11-003581, 2012 WL 5874348 (Del. Ct. Common Pleas Nov. 14,
  2012) ......................................................................................................................................17

*Rhone-Poulenc Basic Chems. Co. v Am. Motorists Ins. Co.*,
  616 A.2d 1192 (Del. 1992) ....................................................................................................11

*Rose Stone & Concrete, Inc. v. Broome Cnty.*,
  76 A.D.2d 998 (N.Y. App. Div. 3d 1980) .............................................................................16

*S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc.*,
  No. 96C-02-086-WTQ, 1997 WL 817883 (Del. Super. Ct. May 21, 1997) ...........................5

*Sisters of Providence in Wash. v. A.A. Pain Clinic, Inc.*,
  81 P3d 989 (Alaska 2003) ......................................................................................................28

*Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*,
  No. 7844-VCP, 2013 WL 1821608 (Del. Ch. May 1, 2013) .................................................30

*SpePharm AG v. Eisai Inc.*,
  No. 1:19CV00965-RGA, 2019 WL 4194298 (D. Del. Sept. 4, 2019) .....................................7

*Town of Cheswold v. Cent. Del. Bus. Park*,
  188 A.3d 810 (Del. 2018) ........................................................................................................7

*Valero Mktg. & Supply Co. v. Kalama Int'l*,
  51 S.W.3d 345 (Tex. App. 2001) .....................................................................................11, 12

*vMedex, Inc. v. TDS Operating, Inc.*,
  No. 18-1662 (MN), 2020 WL 4925512 (D. Del. Aug. 21, 2020) ..........................................25

*Wai Feng Trading Co. v. Quick Fitting, Inc.*,
  No. 13-033WES, 2018 WL 6605927 (D.R.I. Dec. 17, 2018) .................................................4

*Wang Labs., Inc. v. Lee*,
  1989 WL 40916 (Del. Super. Ct. Apr. 19, 1989) ..................................................................11

*Webster Ins., Inc. v. Levine*,
  No. X06CV074016194S, 2009 WL 5698072 (Conn. Super. Ct. Apr. 29, 2009) ................4, 6

*Wilmington Hous. Auth. v. Pan Builders, Inc.*,
   665 F. Supp. 351 (D. Del. 1987) ............................................................................4

**Statutes**

Del. Code § 1-303(a), (b), (c), (f) ...........................................................13, 14, 18, 22

Del. Code § 2-301 ...............................................................................................6

Del. Code § 2-503(1), (1)(b) ...........................................................7, 11, 16, 19

Del. Code § 2-507(1) ...........................................................................................16

Del. Code § 2-609(1) ...........................................................................................21

Del. Code § 2-612(2) ...........................................................................................25

Del. Code § 2-703 ...............................................................................................21

Del. Code § 2-708(2) ...........................................................................................25

**Other Authorities**

Fed. R. Civ. P. 12(h)(2)(C) ...................................................................................2

## TRIAL EXHIBIT INDEX

Trial Ex. 4 ................................................................................ 3, 6, 7, 8, 9, 18, 21, 22, 25, 26, 29
Trial Ex. 5 ................................................................................................................ 9, 24
Trial Ex. 61 ................................................................................................................ 22
Trial Ex. 66 ......................................................................................................... 19, 21
Trial Ex. 67 ................................................................................................................ 19
Trial Ex. 71 ......................................................................................................... 18, 20
Trial Ex. 73 ................................................................................................................ 20
Trial Ex. 80 ................................................................................................................ 22
Trial Ex. 81 ................................................................................................................ 25
Trial Ex. 94 ................................................................................................................ 25
Trial Ex. 95 ................................................................................................................ 25
Trial Ex. 101 .............................................................................................................. 20
Trial Ex. 105 .............................................................................................................. 20
Trial Ex. 106 .............................................................................................................. 15
Trial Ex. 115 ....................................................................................................... 20, 21
Trial Ex. 121 .............................................................................................................. 23
Trial Ex. 122 .............................................................................................................. 20
Trial Ex. 128 ..................................................................................................... 14, 15, 20
Trial Ex. 138 .............................................................................................................. 20
Trial Ex. 139 .............................................................................................................. 23
Trial Ex. 152 ................................................................................................................ 8
Trial Ex. 158 .............................................................................................................. 23
Trial Ex. 165 .............................................................................................................. 13
Trial Ex. 177 ................................................................................................................ 9
Trial Ex. 183 .............................................................................................................. 13
Trial Ex. 186 ....................................................................................................... 20, 23
Trial Ex. 202 ..................................................................................................... 13, 15, 20
Trial Ex. 203 ....................................................................................................... 13, 15
Trial Ex. 204 .............................................................................................................. 13
Trial Ex. 205 ................................................................................................. 12, 13, 15, 20
Trial Ex. 207 ................................................................................................. 13, 15, 16, 20
Trial Ex. 209 .............................................................................................................. 16
Trial Ex. 211 .............................................................................................................. 23
Trial Ex. 213 .............................................................................................................. 13
Trial Ex. 215 .............................................................................................................. 13
Trial Ex. 216 ....................................................................................................... 16, 20
Trial Ex. 217 .............................................................................................................. 13
Trial Ex. 232 .............................................................................................................. 20
Trial Ex. 260 .............................................................................................................. 20
Trial Ex. 261 .............................................................................................................. 20
Trial Ex. 305 .............................................................................................................. 23
Trial Ex. 323 ....................................................................................................... 23, 24
Trial Ex. 336 .............................................................................................................. 18
Trial Ex. 395 ..................................................................................................... 9, 10, 14

Trial Ex. 396 .................................................................................................................. 26, 27
Trial Ex. 398 ........................................................................................................................ 17
Trial Ex. 401 ............................................................................................................. 9, 24, 27, 28
Trial Ex. 403 ................................................................................................................. 6, 13, 14
Trial Ex. 417 ........................................................................................................................ 14

Defendants/Counterclaimants Bluestone Energy Sales Corporation ("Bluestone"), Southern Coal Corporation ("Southern Coal"), and James C. Justice, II ("Governor Justice") (collectively, "Defendants"), pursuant to the Court's Oral Order of September 28, 2020 (D.I. 145), submit the following post-trial brief, seeking entry of judgment in their favor and against Plaintiff/Counterdefendant Xcoal Energy & Resources ("Xcoal").

## INTRODUCTION

The Coal Supply Agreement between Bluestone and Xcoal was short-lived.  In the first month of the two-year contractual term, Xcoal failed to purchase 30,000 tons of coal from Bluestone, as it was required to do.  Bluestone, on the other hand, took every commercially reasonable effort to sell 30,000 tons to Xcoal during that initial month.  It bought the necessary equipment, hired staff, developed a mine plan, and spent $60,000 per day in operational costs. During this time, Bluestone's stackers at its loadout facility were literally overflowing with coal, and Bluestone promptly loaded the three trains that Xcoal provided.  However, these three trains carried only 18,000 tons of the 30,000 tons that Xcoal was required to buy for that month, meaning that the CSA was materially breached at the outset.

Xcoal was responsible for this breach because it failed to provide five trains for loading—an obligation that was solely Xcoal's under the CSA.  Whereas Bluestone was responsible to ensure the trains were "loaded," Xcoal was responsible for "the scheduling, routing and method" of the trains.  This division of contractual responsibilities made sense in light of the parties' respective relationships with the railroad.  Xcoal, the railroad's freight-paying customer, had a Transportation Contract with Norfolk Southern ("NS") that required NS to "supply or cause to be supplied the necessary cars for loading" at Bluestone's mine.  The CSA specifically references Xcoal's Transportation Contract while also referring to "Buyer's railcars."  Bluestone, by contrast,

had no contractual right to compel NS to supply railcars for loading coal under the CSA.  The repeated demands for railcars made by Bluestone, but unrequited by NS, underscore this point.

Even if the CSA were silent on the obligation to provide railcars, the Delaware Uniform Commercial Code makes clear that Xcoal, as the buyer, was obligated to furnish facilities reasonably suited to its receipt of the coal.  In the context of the CSA, these facilities included empty railcars, which were essential to Xcoal's receipt of the coal.  For its part, Bluestone tendered delivery by making the additional 12,000 tons of coal available and offering to load it upon the arrival of trains.  But the final step of loading became impossible when Xcoal, as it admitted at trial, failed to take any actions whatsoever to place empty railcars at the mine.

This fundamental problem persisted for the next six months, during which time Xcoal provided only two of the thirty trains that the CSA required.  At all relevant times, Bluestone remained willing and able to sell coal under the CSA, if only Xcoal had provided the trains for loading.  Indeed, the undisputed testimony and the commercial incentives demonstrate Bluestone's eagerness and motivation to comply with the CSA and earn substantial profit from the sale of 30,000 tons per month.  Because Xcoal refused to engage in those transactions, Bluestone is entitled to judgment in its favor and its expected profits under the CSA.

## ARGUMENT

**I**     **Xcoal's Affirmative Case Fails Because the CSA Provision on Which It Relies for Its Damages Claim Is Invalid as a Matter of Law.**

Xcoal cannot recover under Article 10.3 of the CSA because no court has ever upheld an "in addition to other damages" provision such as this.[1]  The language on which Xcoal relies for its damages claim provides as follows:

---

[1] In accordance with Fed. R. Civ. P. 12(h)(2)(C), Bluestone raised Xcoal's failure to state a claim at trial.  D.I. 139.

2

> If Seller is the cause of an Event of Default which is not cured within the period(s) provided for in this Agreement, *in addition to other damages available at law*, Seller, and or its Guarantor, shall be liable to Buyer for damages equal to the number of tons of Coal remaining to be delivered under this Agreement, multiplied by the Buyer's Discount.

Trial Ex. 4 § 10.3 (emphasis added).  Courts analyzing similar provisions have unanimously held that they are invalid as a matter of law.

For instance, in *Palm Beach Int'l, Inc. v. Salkin*, No. 10-60995, 2010 WL 5418995, at *3 (S.D. Fla. Dec. 23, 2010), the contract purportedly allowed the seller to recover liquidated damages *in addition to* "all legal remedies at law or equity."  The district court held that the liquidated damages provision, "when viewed in conjunction with the contractual language that follows, must be construed as a penalty." *Palm Beach*, 2010 WL 5418995 at *7.  The court observed that Florida law does not even allow contracts to give parties the *option* to recover liquidated damages as an alternative to actual damages.  *See id.* (citing *Lefemine v. Baron*, 573 So.2d 326, 329 (Fla. 1991)).  Extrapolating from this, the court explained that a contractual right to recover liquidated damages *in addition to* actual damages is "even more penal in nature" and thus invalid as a matter of law. *See id.*

Similarly, in *Jarro Bldg. Indus. Corp. v. Schwartz*, 281 N.Y.S.2d 420, 421-22 (N.Y. App. Div. 2d 1967), the contract purportedly allowed the non-breaching party to recover a liquidated amount as well as actual damages.  Although the court ultimately determined that the provision was of the "optional" variety rather than the more penal "in addition to" variety, it still refused to enforce it.  *See Jarro*, 281 N.Y.S.2d 420 at 426.  Critically, the court explained that: "If appellant here could recover *both* liquidated damages and actual damages, there would be *no question* that the 'liquidated damages' provision was a penalty."  *Id.* at 422 (emphasis added); *see also Illingworth v. Bushong*, 656 P.2d 370, 373 n.3 (Or. Ct. App. 1982) (citing *Jarro* for proposition that "such contract provisions are not valid with respect to liquidated damages").

In *Webster Ins., Inc. v. Levine*, No. X06CV074016194S, 2009 WL 5698072, at *2 (Conn. Super. Ct. Apr. 29, 2009), the contract at issue allowed recovery of liquidated damages "in addition to any other legal and equitable remedies and/or contractual rights the [plaintiffs] may have." (Brackets in original).  In deeming the liquidated damages provision invalid, the court explained as follows:

> In short, as a result of Levine's violation of the contract, this provision entitles the plaintiffs to receive actual damages as a legal remedy under their contract rights, in addition to receiving all the revenues earned by Levine from the violation.  As a matter of law, a contract provision that authorizes the non-breaching party to recover both actual damages and all revenues earned as a result of the breach constitutes an invalid penalty, unenforceable as a matter of public policy. . . . [T]he plaintiffs cannot recover a stipulated sum as liquidated damages and also recover actual damages. . . . Certainly, a contract provision that plainly authorizes such a recovery cannot be upheld.

*Webster*, 2009 WL 5698072 at *2; *see also Wai Feng Trading Co. v. Quick Fitting, Inc.*, No. 13-033WES, 2018 WL 6605927, at *14 (D.R.I. Dec. 17, 2018) (citing *Webster* for proposition that a liquidated damages provision is an unenforceable penalty if it allows "the non-breaching party to recover both the so-called liquidated damages, as well as actual damages resulting from the breach").

This Court should reach the same result.  Article 10.3 violates two fundamental tenets of contract law: "First, it allows the provision to act as a deterrent to breach by holding the promisor in terrorem . . . . Second, it violates contract law's clear prohibition on double recovery, by allowing the non-breaching party to recover twice for the same wrong."  *MCA Television Ltd. v. Pub. Interest Corp.*, 171 F.3d 1265, 1272 (11th Cir. 1999) (internal quotation marks and citation omitted).  These same two policies undergird Delaware contract law.  *See Wilmington Hous. Auth. v. Pan Builders, Inc.*, 665 F. Supp. 351, 353-54 (D. Del. 1987) ("But if the purpose of such a provision is not to compensate the non-breaching party and is instead to punish the breaching party or ensure his performance, the provision is void as a penalty."); *Faw, Casson & Co., LLP v.*

*Halpen*, No. CIV.A. 00C-01-015, 2001 WL 985104, at *3 (Del. Super. Ct. Aug. 7, 2001) (describing the potential for liquidated damages provision to have "an unlawful *in terrorem* purpose and effect") (italics in original); *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (holding that contract damages "should not act as a windfall").

Because Article 10.3 allows Xcoal to recover the penalty amount "in addition to" actual damages, it seeks to deter breach and compel performance by Bluestone rather than to compensate Xcoal.  *See Delaware Bay Surgical Svcs., P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006) ("[A] 'penalty' is a sum inserted into a contract that serves as a punishment for default, rather than a measure of compensation for its breach.").  Further, Xcoal's own *ad damnum* asserts that its damages are "not limited to" the penalty amount, and include "such other and further damages and relief as is just and proper."  D.I. 2 at 18.  Likewise, Xcoal's initial disclosures identify five categories of damages, including both the penalty amount and "all other damages to which Xcoal is entitled under applicable law . . . ."  D.I. 142-1 at 8.  Xcoal's explicit recognition of the "in addition to" language comports with the Court's obligation to "interpret the agreement in a manner that gives effect to all of its provisions."  *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 221 (D. Del. 2001).

Finally, Xcoal cannot escape the unenforceability of Article 10.3 by simply disavowing any claim for actual damages.  Trial Tr. at 726:17-20.  Under Delaware law, a penalty provision is "void as against public policy and recovery is limited to actual damages."  *S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc.*, No. 96C-02-086-WTQ, 1997 WL 817883, at *2 (Del. Super. Ct. May 21, 1997).  More to the point, at least one court has explicitly rejected this identical argument:

> The plaintiffs' argument that they are not in fact seeking a recovery of both liquidated damages and actual damages also fails to meet the difficulty.  The issue

is not whether the plaintiffs' present litigation position is reasonable, but whether the liquidated damages provision is reasonable as executed.  The plaintiffs cannot retrospectively make the terms of the provision palatable by now asserting that they did not plan on enforcing the provision as it is written.  The acceptance of such a position would effectively allow such provisions that violate public policy to flourish until confronted by the prospect of litigation and the reality of unenforceability.

*Webster*, 2009 WL 5698072 at *3.  For these reasons, the Court should hold that Article 10.3 is invalid and unenforceable, regardless of whether Xcoal is seeking actual damages.

## II  Xcoal Committed the First Material Breach of the CSA by Failing to Accept and Pay for 30,000 Tons of Coal in November 2017.

As to the parties' competing contract claims, Xcoal's claim fails and Bluestone's counterclaim should prevail for the same reason: Xcoal failed to accept and pay for 30,000 tons of coal in November 2017, which was its primary obligation under the CSA.  There is no dispute that the CSA obligated Xcoal to purchase 30,000 tons of coal from Bluestone in the contract's initial month.  Trial Ex. 4 §§ 3.1, 3.2; Trial Tr. at 325:8-12; *see also* 6 Del. Code § 2-301 ("The obligation . . . of the buyer is to accept and pay in accordance with the contract.").  Nor is there any dispute that Xcoal failed to satisfy its obligation.  Trial Ex. 403 (November 2017 (Part II); Trial Tr. at 366:24-367:4.

Despite this, Xcoal takes the opposite position.  Asked by the Court to identify the first breach, counsel for Xcoal said "the failure of the defendants to make compliant 5 or 30,000 ton deliveries during November."  Trial Tr. at 1019:6-11.  This argument overlooks two applicable rules of law.  First, to recover on its affirmative claim, Xcoal bears the burden of proving that it satisfied all conditions precedent to Bluestone's performance.  *See Conley v. Dan-Webforming Int'l A/S (Ltd.)*, No. 91-401 MMS, 1992 WL 401628, at *22 (D. Del. Dec. 29, 1992) ("For plaintiffs to recover any damages under Delaware law, they first must show freedom from fault with respect to performance of dependent promises, counterpromises or conditions precedent.") (internal

quotation marks omitted).  Second, Bluestone's only obligation was to "tender" delivery of the coal, which does not—and could not—require loading coal into railcars that Xcoal failed to provide.  *See* 6 Del. Code § 2-503(1) ("Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him or her to take delivery.").  The real issue for decision, therefore, is whether Xcoal was legally obligated to provide trains before Bluestone incurred an obligation to load them.

### A.    The CSA obligated Xcoal to provide empty railcars to be loaded by Bluestone.

The CSA required Xcoal to provide trains for Bluestone to load.  "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Matthews v. E.I. DuPont De Nemours & Co.*, 682 F. App'x 148, 151 (3d Cir. 2017).  "In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract." *Chicago Bridge & Iron Co. v. Westinghouse Elec. Co.*, 166 A.3d 912, 913-14 (Del. 2017).  "The court must construe a contract as a whole and attempt to harmonize all of its clauses." *SpePharm AG v. Eisai Inc.*, No. 1:19CV00965-RGA, 2019 WL 4194298, at *4 (D. Del. Sept. 4, 2019) (internal quotation marks omitted).  "Other documents or agreements can be incorporated by reference where a contract is executed which refers to another instrument and makes the conditions of such other instrument a part of it." *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 818 (Del. 2018) (internal brackets and quotation marks omitted).

### 1.    Articles 3.5 and 3.6 of the CSA made Xcoal responsible for providing empty railcars.

When read together, Articles 3.5 and 3.6 of the CSA compel the conclusion that Xcoal was responsible for providing the railcars.  Article 3.5 of the CSA made Xcoal responsible for "the scheduling, routing and method of Shipments of Coal."  Trial Ex. 4 § 3.5.  "Shipment," in turn, is

contractually defined as a "train."   Trial Ex. 4 § 4.2.   Thus, Xcoal was responsible for the scheduling, routing, and method of the five 65-railcar trains for a given month.   Trial Tr. at 144:18-20 ("It was determined that the mine-loading site could only load 65 cars in a specific shipment. So to get 30,000 tons per month, it required five shipments per month.").

By contrast, Article 3.5 limits Bluestone's obligation to ensuring that the railcars are "loaded" with coal, so long as it received proper instructions within a certain time before the arrival of "*Buyer's* railcars."   Trial Ex. 4 § 3.5 (emphasis added).   This phrase—"Buyer's railcars"—is subject to "the cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions."   *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del. 1985).   From an objective viewpoint, the phrase must be construed to mean that Xcoal controlled the railcars before they arrived at the mine.

Bluestone was also required to complete its loading obligation within a certain time "after rail cars *have been placed* at the mine," or else reimburse Xcoal for any demurrage charged by the railroad.   Trial Ex. 4 § 3.6 (emphasis added); *see also* Trial Ex. 152 ("As a reminder, under Section 3.6 of the [CSA], all demurrage or other charges incurred by Xcoal as a result of Bluestone's failure to load coal on a timely basis will be for Bluestone's account.").   This language, especially when read in the context of Article 3.5's reference to "Buyer's railcars" and Xcoal's status as NS's freight-paying customer, indicates that Xcoal was responsible for ordering the trains.   If it were otherwise, Bluestone would control the triggering event for its twelve-hour load time—an unreasonable result to which no buyer in Xcoal's position would have agreed.   *See AgroFresh Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 656 (D. Del. 2017) ("An interpretation is unreasonable if it produces an absurd result or one that no reasonable person would have accepted when entering the contract.") (internal quotation marks omitted).   Additionally, if Bluestone was responsible for

ordering the trains from NS, then its obligation to reimburse Xcoal for demurrage would be superfluous. *See Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, No. N17C-06-170-PRW CCLD, 2019 WL 1877400, at \*12 (Del. Super. Ct. Apr. 26, 2019) ("And contract construction resulting in superfluous verbiage is strongly disfavored."). When these provisions are read together and harmonized, the only reasonable interpretation is that Xcoal was responsible for ordering the trains and ensuring their arrival at the mine.

### 2. The Transportation Contract, as incorporated into the CSA, provided Xcoal with an exclusive right to order empty railcars from NS.

Bluestone's loading obligation was also to be performed "in accordance with the Transportation Provisions of the applicable *rail contract of Buyer with Norfolk Southern*." Trial Ex. 4 § 3.5 (emphasis added). In addition to this express incorporation of the Transportation Contract into the CSA, the identical effective dates of both documents suggest that Xcoal intended them to be read together. The CSA was retroactively amended to have an effective date of November 1, 2017. Trial Ex. 5; Trial Tr. at 29:9-11; Trial Tr. at 145:2-9; Trial Tr. at 213:15-25; Trial Tr. at 306:6-8; Trial Ex. 401 at 6-7. The same is true of the Transportation Contract. Trial Ex. 395, NS0000127; Trial Tr. 342:13-18. Ernie Thrasher ("Thrasher"), Xcoal's CEO, also admitted that the two documents were interrelated. Trial Tr. at 343:18-21 ("Q. Do you agree with me that the transportation agreement relates to Xcoal's obligations to perform under the CSA? A. Yes, but there may – it does, yes."). Further, he demanded that Bluestone load coal "in strict accordance with . . . the applicable Norfolk Southern transportation provisions." Trial Ex. 177 at 2. Given all this, the CSA and the Transportation Contract must be read together. *See Pauley Petroleum, Inc. v. Continental Oil Co.*, 231 A.2d 450, 456 (Del. Ch. 1967).

The Transportation Contract plainly and unambiguously required NS to "supply or cause to be supplied the necessary cars for loading Commodity at the designated Origin(s)" upon

payment from Xcoal.  Trial Ex. 395 § 19, NS0000133.  "Commodity" refers to the coal, and "Origin" refers to the Bishop mine.  Trial Ex. 395 § 1, NS0000127 and App'x A; Trial Tr. at 331:9-15.  This straightforward language is susceptible to only one interpretation, namely, that Xcoal held a contractual right to compel NS to place railcars at the mine for loading under the CSA.

Attempting to avoid this plain language, Thrasher testified that "Xcoal cannot tell Norfolk Southern to put cars at the mine," and that the Transportation Contract is limited to "the movement of coal from the mine to the port."  Trial Tr. at 331:16-332:11.  Thrasher acknowledged, however, that his testimony contradicted the plain language of the Transportation Contract.  Trial Tr. at 332:24-333:1 ("Q. Well, it doesn't say that in this contract; right?  A. No, the contract – I'm sorry, it says what it says.  I can't, I can't change what it says.").

In an effort to sidestep this obvious contradiction, Thrasher testified that "the intent of this paragraph" is different from its plain meaning.  Trial Tr. at 333:9-16.  But that position does not comport with the law.  *See Novel Drug Sols., LLC v. Imprimis Pharms., Inc.*, No. 18-539(MN), 2018 WL 4795627, at *3 (D. Del. Sept. 26, 2018) ("If contractual language is plain and clear on its face, i.e., it conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent.") (internal quotation marks, brackets, and ellipsis omitted); *Clouding IP, LLC v. Google Inc.*, 61 F. Supp. 3d 421, 431 (D. Del. 2014) (Stark, C.J.) ("The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.") (internal quotation marks omitted).

Compounding the problem, Thrasher also offered an evasive, confusing response when asked directly about the conflict between his testimony and the plain language of the Transportation Contract.  Trial Tr. at 335:5-9 ("Q. Okay.  So your reading of this paragraph is it

only applies to loaded cars going to the port, not empty cars coming to the mine; is that right?  A.
No.  What I'm saying is if Norfolk Southern has to put in empty cars to get them loaded.").

In light of all this, the Court should give no weight to Thrasher's testimony and assess his
overall credibility accordingly.  *See, e.g.*, *MRPC Christiana LLC v. Crown Bank*, No. N15C-02-
010-EMD, 2017 WL 6606587, at *8 (Del. Super. Ct. Dec. 26, 2017) ("The Court did not find the
testimony of Mr. C. Patel to be overly credible or helpful.  Mr. C. Patel was not always responsive
to the questions asked . . . .  Moreover, some of the testimony of Mr. C. Patel seemed contrary to
the evidence adduced at the Trial and the plain language of controlling documents.").
Additionally, the Court should hold that the CSA obligated Xcoal to provide empty railcars before
Bluestone incurred any loading obligation.

### B.    Alternatively, the UCC obligated Xcoal to provide empty railcars.

Even if the CSA did not specify which party was responsible for ordering railcars, the UCC
filled this gap.[2]  *See Wang Labs., Inc. v. Lee*, 1989 WL 40916, at *2 (Del. Super. Ct. Apr. 19, 1989)
("The U.C.C. is in general terms a 'gap-filler,' so that when a contract is silent to certain issues,
the U.C.C. fills in the gaps.").   Specifically, where the contracting parties have not agreed
otherwise, "the *buyer* must furnish facilities reasonably suited to the receipt of the goods."  6 Del.
Code § 2-503(1)(b) (emphasis added).  Courts have interpreted this UCC provision as obligating
buyers to provide proper means for loading and transportation to allow sellers to complete the
delivery of goods.  *See, e.g.*, *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 352 (Tex.
App. 2001) (interpreting Texas's identical version of the UCC provision to conclude that buyer,

---

[2] There is no reasonable interpretation that Article 3.5 somehow obligated *Bluestone* to provide
trains, and therefore ambiguity is not an issue in this case.  *See Rhone-Poulenc Basic Chems. Co.
v Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("A contract is not rendered ambiguous
simply because the parties do not agree upon its proper construction.  Rather, a contract is
ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different
interpretations or may have two or more different meanings.").

"as a matter of law, had the responsibility of supplying a vessel suited to taking physical possession of the methanol").

Like the buyer in *Valero*, Xcoal was required to provide empty railcars before Bluestone could complete its delivery of the coal.  There is no dispute that the presence of railcars at the Bishop site was essential to Bluestone's ability to meet its delivery obligation. When asked whether there were any alternative means of delivering coal other than empty railcars at the loadout, Bluestone's CEO, Jay Justice ("Justice"), replied: "No, sir.  Only railcars at the facility." Trial Tr. at 812:21-24.  Justice summed up this point in correspondence with Thrasher: "If the rail road won't provide cars there is nothing that we can do.  The mine is ready to load when cars arrive."  Trial Ex. 205.  For the month of November 2017, Justice explained: "Well, we were expecting five trains, and we were only provided three trains.  And so we only had the opportunity to load approximately 18,000 tons."  Trial Tr. at 839:1-6.  Because coal could not be loaded or delivered without the trains, the UCC obligated Xcoal to furnish those trains to Bluestone.

### C.     Xcoal admits that it failed to provide empty railcars to Bluestone.

If the Court concludes that Xcoal owed an obligation to provide railcars to Bluestone, the breach of that obligation is an undisputed fact.  Thrasher repeatedly testified that, other than allegedly obtaining permits, Xcoal took no actions whatsoever to provide empty railcars for the loading of coal.  *See* Trial Tr. at 354:5-12 ("Xcoal's actions to get empty railcars delivered ends with the permitting process."); Trial Tr. at 360:25-361:10 ("Xcoal's interaction or engagement or ability to do anything ends with getting the permits."); Trial Tr. at 375:11-18 ("Other than obtaining a permit, I don't know if there were any other actions, but, again, that is the limit of

Xcoal's engagement in getting empty cars."). Thus, Xcoal admittedly breached any obligation it owed to provide empty railcars.[3]

**D.    Xcoal's "course of dealing" theory has no legal or factual basis.**

During the trial, counsel for Xcoal argued repeatedly that the parties' "course of dealing" determines the responsibility for ordering trains. Trial Tr. at 732:5-12; Trial Tr. at 733:17-21; 735:22-736:1; Trial Tr. at 737:16-19; Trial Tr. at 738:2-25; Trial Tr. at 1020:3-8. However, "course of dealing" is defined as "a sequence of conduct concerning *previous transactions* between the parties to a particular transaction . . . ." 6 Del. Code § 1-303(b) (emphasis added); *see also Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, No. CIV 08-1101, 2009 WL 3672452, at *8 (D.N.M. Oct. 2, 2009) (explaining that the Delaware UCC provision "indicates that only previous transactions 'between the parties'—the parties to the contract—can constitute the basis for a 'course of dealing'"). Here, the parties to the CSA—Bluestone and Xcoal—were not involved in any previous transactions. And even if they had been, Xcoal failed to present a scintilla of evidence about which party was responsible for ordering trains under any earlier coal supply agreement. Therefore, course of dealing plays no role in the analysis.

**E.    The record evidence contradicts Xcoal's "course of performance" theory.**

Counsel for Xcoal also argued that the Court should consider the parties' "course of performance" in determining who had the ability to order trains. Trial Tr. at 735:22-736:1. However, the facts do not support—and actually contradict—a course of performance theory.

---

[3] This same breach occurred not only in November 2017, but also in each subsequent month. For example, in January 2018, Bluestone accepted Xcoal's proposed load dates. Trial Ex. 165; Trial Ex. 183. Xcoal, however, failed to provide a single train on any of those dates. Trial Ex. 403. This failure is particularly egregious in light of Bluestone's repeated requests for trains. Trial Ex. 202; Trial Ex. 205; Trial Ex. 207. Rather than responding in a commercially reasonable manner, Xcoal continued to notice defaults for Bluestone's purported failure to load coal into trains that were not there. Trial Ex. 203; Trial Ex. 204; Trial Ex. 213; Trial Ex. 215; Trial Ex. 217.

A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:

(1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

(2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

6 Del. Code § 1-303(a).

In November 2017, the first month of the CSA, there had been no "sequence of conduct" to establish any course of performance. The first train arrived at Bluestone on November 11, 2017, Trial Ex. 403 (November 2017 (Part II)), but Bluestone did not order it. Trial Ex. 417. The second train arrived at Bluestone on November 18, 2017, Trial Ex. 403 (November 2017 (Part II)), but again Bluestone did not order it. Trial Ex. 417. Even if Bluestone ordered the third train that arrived in November, "a single instance of conduct does not amount to course of performance." *Cent. Ill. Pub. Svc. Co. v. Atlas Minerals, Inc.*, 965 F. Supp. 1162, 1176 (C.D. Ill. 1997).

Contrary to Xcoal's argument, the record evidence overwhelmingly establishes that Bluestone was *unable* to order trains from NS. For instance, Bluestone's vice president of coal sales, Steven Sarver ("Sarver"), requested trains for November 3, 13, and 29, as well as December 10, none of which NS delivered. Trial Ex. 417; Trial Ex. 403 (November 2017 (Part II)); Trial Ex. 403 (December 2017). Sarver also requested trains on November 13, 14, and 15, but once again NS did not provide them. Trial Ex. 128; Trial Ex. 403 (November 2017 (Part II)). In an e-mail to NS, Sarver lamented that "[r]epeated calling does me no good . . . ." Trial Ex. 395, NS0000001. Sarver testified that Bluestone had no "authority or the practical ability to order railcars to be delivered to the Bishop operations in connection with the loading of coal for Xcoal," Trial Tr. at 983:12-16, and that the most he could do was "rattle the chains a little bit to try to get railcars." Trial Tr. at 984:5-7.

14

Kristopher Sandlin, Sarver's primary point of contact at NS, confirmed to Sarver that Xcoal, as the freight-paying customer, Trial Tr. at 390:1-4, was the only party with the ability to order empty railcars to the mine.  Trial Tr. at 984:13-19.  By contrast, NS did not take any marching orders from Bluestone.  Trial Tr. at 984:9-12.  This is consistent with Justice's testimony that "[t]he person paying the rail provider is the person that is in charge of running that show, and so that's, that's just how it works."  Trial Tr. at 830:10-12.  It is also consistent with the understanding of Xcoal's own consultant, Rick Taylor ("Taylor"), who believed that Xcoal was responsible for ordering the trains.  Trial Tr. at 569:16-21 ("Q. And more specifically, your understanding is that Mr. Popivchak was responsible for ordering the railcars from Norfolk Southern to travel to Bishop for loading; is that right?  A. That's – that was my, that was my understanding, yes.").

Finally, Bluestone repeatedly objected to any understanding that it possessed the ability to order trains from NS without Xcoal's assistance.  As early as November 6, 2017, less than a week into the CSA, Justice demanded that Xcoal "[p]lease send the trains!"  Trial Ex. 106.  Similarly, on November 15, 2017, Sarver told Xcoal that "[a]ny assistance you can provide regarding NS empties for your next BISHOP train [would be] greatly appreciated."  Trial Ex. 128.

These same demands continued into the subsequent months.  On January 8, 2018, Justice asked Xcoal to "[p]lease help push NSRR to get us the cars."  Trial Ex. 202.  Rather than responding in good faith, Thrasher callously sent a notice of default the following day based on Bluestone's failure to load a train that was not there.  Trial Ex. 203.  On January 10, 2018, Justice again asked Xcoal to "[p]lease assist us in pushing the rail road to get these needed cars."  Trial Ex. 205.  Once again, Thrasher simply noticed a default the following day, even though no train had arrived.  Trial Ex. 207.  After receiving this unfounded notice, Justice replied: "Clearly I have

told you that XC has not gotten NSRR to provide cars.  XC is paying the freight so it is XC that

has this responsibility."  Trial Ex. 207.

   Later that month, Justice again notified Thrasher that "Xcoal is solely responsible for all

aspects of rail transportation of the Coal under the Agreement."  Trial Ex. 209.  Justice further

conveyed that:

> You and I both know how this works.  XC has the freight contract with NSRR not
> Bluestone.  So XC is paying the freight, contracting with NS to provide cars to
> Bluestone.  NS would not bring cars to a mine without payment, credit, and a
> contract for rail service in place.  None of which Bluestone has on the XC
> shipments.

Trial Ex. 216.  This correspondence between the parties proves "a significant difference in their

understanding" about the responsibility for ordering trains, which precludes a course of

performance finding.  *Rose Stone & Concrete, Inc. v. Broome Cnty.*, 76 A.D.2d 998, 999-1000

(N.Y. App. Div. 3d 1980).

### III  Bluestone Satisfied Its Tender Obligation for Delivery of the Requisite Coal.

   Bluestone fully satisfied its obligation to load 18,000 tons of coal in the three trains that

Xcoal furnished in November 2017.  Trial Tr. at 899:16-19.  On the other hand, Bluestone had no

obligation to load coal into the two trains that never arrived.  As to these additional 12,000 tons of

coal, Bluestone's obligation was limited to the *tender* of delivery.  *See* 6 Del. Code § 2-507(1)

("*Tender* entitles the seller to acceptance of the goods and to payment according to the contract.")

(emphasis added).  "A tender of delivery of the goods is a step *before* actual transfer of physical

possession of the goods to the buyer."  2 Hawkland UCC Series § 2-503:01 (emphasis added).

"Tender of delivery requires that the seller put and hold conforming goods at the buyer's

disposition and give the buyer any notification reasonably necessary to enable him or her to take

delivery."  6 Del. Code § 2-503(1).  Xcoal failed to meet its burden of proving that Bluestone

breached this obligation. *See Preferred Bus. Svc., Inc. v. Bruny's Bail Bonds, Inc.*, No. CPU4-11-003581, 2012 WL 5874348, at *6 (Del. Ct. Common Pleas Nov. 14, 2012).

### A.    Bluestone had the capability to deliver 30,000 tons of coal per month.

Xcoal's own expert opined that Bluestone had the capability to deliver the requisite coal under the CSA.  During his testimony, Hubert L. Payne, PE ("Payne") confirmed his opinion that "the mine had the total capacity and the storage facilities to *easily* supply the requirements under the CSA."  Trial Tr. at 690:20-23 (emphasis added); Trial Ex. 398 at 22.  Payne also opined that "the quantity of coal that Bluestone was supplying to other customers from the loadout was small enough that it should not have impacted Bluestone's ability to load and deliver Coal in a timely manner under the CSA."  Trial Ex. 398 at 22.  He confirmed this same point in his testimony.  Trial Tr. at 692:12-18.  Likewise, Justice testified that Bluestone had the capability to mine 1,000 to 1,400 tons of coal per day, as well as the capability to transport that coal from the pit to the loadout.  Trial Tr. at 813:25-814:6.  Bluestone's capability to tender delivery of the coal is undisputed.

### B.    Bluestone tendered delivery of the coal by stockpiling the coal at the mine pit.

In November 2017, Bluestone was "cocked and ready to go and had coal piled up, and we wanted to load it and get paid for it."  Trial Tr. at 838:1-3.  Expanding on this, Justice explained:

> Well, we were—you know, we were geared up.  We spent money to get the mine up and running, to be able to perform for Xcoal, and we were real excited about it.  And, you know, we were ready to go.  And really just right off the bat, Xcoal began to breach the agreement several times and ultimately didn't take the coal and denied us the opportunity to sell the tons on the contract.

Trial Tr. at 806:22-807:3.  "I think it's important to know," Justice testified, "that we were real excited about this.  We thought this was a great opportunity for us."  Trial Tr. at 814:18-20.  Justice confirmed that Bluestone had sufficient coal stockpiled at the mine to load a full train as early as November 3—"we had a lot of coal piled up," he explained.  Trial Tr. at 854:11-14.  In fact,

Bluestone was so eager to sell coal and had so much stockpiled that it offered to load ten trains for Xcoal, instead of five, for the initial month of November 2017.  Trial Ex. 71.

This practice of stockpiling coal was consistent with Article 3.4 of the CSA, which expressly required Bluestone to keep coal in "segregated stockpiles at the mine," among other places.  Trial Ex. 4 § 3.4.  As Justice explained, "we'll stockpile the coal on the mine site in two categories: either direct coal or coal to be washed."  Trial Tr. at 873:21-25.

Stockpiling coal at the mine pit was also consistent with usage of trade in the coal mining industry.  *See* 6 Del. Code § 1-303(c) ("A 'usage of trade' is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question.").  Justice explained that, "at any point in time that you go to any, any of our mines, *or for that matter any other mine that I have ever been to*, you are going to find coal in the pit, stockpiled on the mine site that that has not yet been hauled to its final destination."[4]  Trial Tr. at 874:1-5 (emphasis added).

In an attempt to prove that Bluestone breached its obligation to tender the coal, Xcoal called Taylor to testify about his observations at Bishop.  Taylor consulted for Xcoal for a period of approximately eight months, during which time he never visited the Red Fox mine, Trial Tr. at 576:20-22, and only visited the Bishop surface mine on two or three occasions, Trial Tr. at 581:8-12.  The rest of Taylor's visits were limited to the loadout, from where he could not see any stockpiles of coal at the surface mine.  Trial Tr. at 578:1-11; Trial Tr. at 584:1-585:2.  Indeed, Taylor admitted that his observations and reports did not account for any coal stockpiled at the surface mine.[5]  Trial Tr. at 585:3-9; Trial Tr. at 591:19-22; Trial Tr. at 593:1-4.

---

[4] Justice has been involved in the coal business for more than 20 years.  Trial Tr. at 803:16-19.

[5] Notably, Taylor participated in a helicopter fly-over of the Bishop mine, arranged by Xcoal, during which video footage was taken.  Trial Ex. 336; Trial Tr. at 576:23-577:4.  Even Taylor had

Still, Xcoal introduced into evidence coal production reports for the Bishop and Red Fox mines, as published by the Mine Safety and Health Administration ("MSHA").  Trial Exs. 392A & B.  But those reports suffer from the same shortcoming as Taylor's reports, in that they failed to account for stockpiled coal.  Taylor conceded as much during his testimony:

> Q.      And as to the Bishop operations specifically, and the Red Fox operation specifically, MSHA reports do not necessarily reflect stockpiled coal that could be at the surface mine at any point in time; correct?
>
> A.      As far as I know, the information that MSHA – that information is supplied by the mine, as far as I know.  And that would – and most of the time when – years ago when I did it, we, we usually turned in tonnage that we sold, not tonnage that we mined.  Yes.
>
> . . .
>
> Q.      Correct.  Such that the information that companies that you worked with would have reported to MSHA was sold tonnage; correct?
>
> A.      Right.

Trial Tr. at 597:25-598:19.  Payne admitted the same thing.  Trial Tr. at 697:17-20; Trial Tr. at 699:17-20.  At bottom, Xcoal has fallen well short of proving by a preponderance of the evidence that Bluestone failed to hold the requisite coal at Xcoal's disposition.

### C.      Bluestone provided notice to Xcoal that the coal was ready for loading.

Bluestone's tender obligation also required it to "give the buyer any notification reasonably necessary to enable him or her to take delivery."  6 Del. Code § 2-503(1).  To the extent any notification was "reasonably necessary," Bluestone provided it.  On October 26, 2017, Bluestone advised Xcoal that "[t]he dates we can load are Nov 15, Nov 17, Nov 20, Nov 22, and Nov 27th."  Trial Ex. 66.  Xcoal then agreed to those load dates.  Trial Ex. 67.  Over the course of the next

---

to admit that the footage conclusively shows a stockpile of coal at the surface mine.  Trial Tr. at 581:22-583:14 ("Q. Okay.  Now that is what we refer to as a 'stockpile'; right, sir?  A. Yes, sir.").

month, Bluestone repeatedly notified Xcoal that it was ready to load.  Trial Ex. 71 ("We can and are prepared to load now the 5 October permits.  We can load the 5 November permits on the dates I sent yesterday.  So a total of all 10 permits."); Trial Ex. 73 ("[W]e will load and hold until information on Monday to Waybill."); Trial Ex. 101 ("We continue to stand ready to load."); Trial Ex. 105 ("We stand ready to ship. . . . We want to ship the coal in spec and on time to XC."); Trial Ex. 115 ("The mine stands ready to load on these dates."); Trial Ex. 122 ("I want to be very clear that Bluestone stands ready to perform . . . ."); Trial Ex. 128 ("We stand ready to load as soon as empties arrive.").

Bluestone provided similar notices in the subsequent months.  Trial Ex. 138 ("We can load on December 8, 15, 21, 23 and 30."); Trial Ex. 202 ("Bishop is ready to load in the morning."); Trial Ex. 205 ("The mine is ready to load when cars arrive."); Trial Ex. 207 ("Bluestone continues to be ready to load when cars are provided."); Trial Ex. 216 ("We have coal piled up on the ground. The stackers are full and running over.  Coal is in the pit and cannot be hauled because the stackers are overflowing."); Trial Ex. 232 ("We are prepared to load on these suggested dates . . . ."); Trial Ex. 260 ("[W]e accept the attached loading dates."); Trial Ex. 261 ("Coal continues to pile up at the Bishop facility and is ready to load.").  In light of this overwhelming evidence, Bluestone easily satisfied any notification obligation that it had.

### D.    Bluestone eventually scaled back operations based on Xcoal's breach.

Given Xcoal's failure to buy the requisite coal from the outset of the CSA, Bluestone could not sustain its "capital intensive" operations without the corresponding revenues.  Trial Tr. at 815:4.  Bluestone was burning cash at a rate of $60,000 per day.  Trial Tr. at 820:2-5.  And as Justice testified, "if you don't have anywhere to sell the coal, don't have anybody to take the coal, that situation gets pretty dire in a heartbeat."  Trial Tr. at 843:4-6.  Accordingly, on December 11, 2017, Bluestone sought adequate assurances and suspended its performance.  Trial Ex. 186; *see*

*also* 6 Del. Code § 2-609(1) (allowing a seller to suspend performance while adequate assurances are sought); *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) ("A party is excused from performance under a contract if the other party is in material breach thereof."). Payne confirmed that this was a commercially reasonable approach by Bluestone.  Trial Tr. at 691:6-10 ("A lack of coal sales would *definitely* be a reason one would consider reducing production.") (emphasis added).  Nevertheless, Justice testified that he had "no reservations at all" that Bluestone could have ramped production back up if Xcoal began complying with its contractual obligations.  Trial Tr. at 874:6-16.

## IV    Xcoal's November 2017 Breach Abrogated Any Further Obligations by Bluestone.

Xcoal's failure to accept and pay for all 30,000 tons of coal in November 2017 amounted to a material breach that abrogated any further obligations Bluestone had under the CSA.[6]  "It is well settled that, the party first guilty of a material breach cannot complain if the other party subsequently refuses to perform.  Material breach acts as a termination of the contract going forward, abrogating any further obligations to perform by the non-breaching party."  *Carey v. Estate of Myers*, No. S11C-10-029, 2015 WL 4087056, at *20 (Del. Super. Ct. July 1, 2015) (internal brackets and quotation marks omitted).  The same holds true under the UCC.  *See* 6 Del. Code § 2-703.  Nevertheless, Xcoal raises several other alleged breaches by Bluestone, none of which amounts to an actual or material breach.[7]

---

[6] There is no dispute that the failure to exchange the full 30,000 tons of coal in November 2017 was a material breach by one party or the other.  Trial Tr. at 1019:6-11; D.I. 2 ¶¶ 54, 77, 79, 88. Indeed, by November 10, 2017, Xcoal had already demanded adequate assurances that Bluestone would provide "timely delivery of 30,000 net tons" for the month of November.  Trial Ex. 115.

[7] The first technical breach occurred on October 20, 2017, when Xcoal failed to provide load dates for the following month.  Trial Ex. 4 § 3.5; Trial Ex. 66.

**A.      The lack of a mechanical sampling system is not a material breach of the CSA.**

The CSA imposed no obligation on Bluestone to install a mechanical sampling system at the mine.  To the contrary, Article 5.2(a) required that the coal "shall be sampled" by third-party SGS, not Bluestone, using a "bias tested mechanical sampling system."  Trial Ex. 4 § 5.2(a).  In fact, Article 5.2(a) never even mentions—much less *obligates*—Bluestone to do anything.  Trial Ex. 4 § 5.2(a).  It does, however, obligate Xcoal to pay for all costs related to determining the quality of the coal.  Trial Ex. 4 § 5.2(a).  Thus, if either party had an obligation to pay for the installation of a mechanical sampling system, it was Xcoal.

Moreover, at the time it executed the CSA, Xcoal knew that no mechanical sampling system was in place at the Bishop mine and could not have reasonably believed otherwise.  Bluestone made no representation or warranty that such a system was in place.  Trial Ex. 4 § 8.1.  Further, Bluestone explicitly advised Xcoal that such a system was not in place *before* Xcoal signed the CSA.  Trial Ex. 61; Trial Tr. at 304:8-11.  Indeed, Thrasher admitted that, during the entire contractual term, he was fully aware that no functioning mechanical sampling system was in place at the mine.  Trial Tr. at 306:9-13.

Even if Bluestone had represented that it had a mechanical sampling system in place at the mine, Xcoal's course of performance waived any right to rely on that representation.  *See* 6 Del. Code § 1-303(f).  As early as October 30, 2017, Xcoal willingly proposed and accepted the use of a non-mechanical sampling method.  Trial Ex. 80; Trial Tr. at 193:13-194:9.  Xcoal also accepted and paid for four train loads that were sampled using a method other than mechanical sampling.  Trial Tr. at 303:10-304:7 ("Q. And Xcoal did not reject any of those trains because of any perceived violation of the testing requirements of the coal supply agreement, did they?  A. No, sir. . . . Q. Okay.  Well, with regard to whether it was top car or flow sample, Xcoal did not reject any of those four trains based on a failure to properly sample the coal or test the coal; correct?  A.

You're correct.  Yes, sir.").  Xcoal similarly accepted the testing results from samples taken by methods other than mechanical sampling.  Trial Tr. at 307:7-10 ("Q. And with respect to the sampling and testing that your contractor did at your request, you accepted the results of all of that testing; am I right?  A. Yes, sir, that's correct.").

Finally, the mechanical sampling system is not material to this dispute.  First, Xcoal never rejected or declined to order coal from Bluestone because of the mechanical sampling system.  Trial Tr. at 306:20-23; Trial Tr. at 308:5-10; *see also Johnson v. GEICO*, No. 06-408-RGA, 2014 WL 2708300, at *1 (D. Del. June 16, 2014) ("To prove a breach of contract claim, the Plaintiff must establish . . . that the breach of the contract was the proximate cause of damages.").  Second, following Thrasher's October 30, 2017 proposal of the alternative system at the port, the issue of the mechanical sampling system never arose again in a single communication between the parties or in any of Xcoal's many notices of default.  Trial Exs. 1-417.  Third, the mechanical sampling system is not even mentioned in Xcoal's termination letter.  Trial Ex. 323.  For these reasons, any lack of a mechanical sampling system was no breach at all, let alone a material one.

### B.      Any denial of Xcoal's purported right to have representatives at the mine is not a material breach of the CSA.

To the extent Article 3.4 of the CSA provided Xcoal with a right to have representatives at the mine, no material breach of that provision occurred.  Bluestone permitted Taylor to visit the mine on 40 occasions.  Trial Tr. at 580:6-8 ("Q. Nobody from Bluestone ever denied any request by you personally to visit the Bishop operations; is that correct?  A. They did not.").  Likewise, SGS was present for each of the loadings.  Trial Ex. 121; Trial Ex. 139; Trial Ex. 158; Trial Ex. 186; Trial Ex. 305.  On January 13, 2018, Thrasher demanded that an additional testing company, Standard Labs, be present for any future loadings, which Bluestone allowed.  Trial Ex. 211; Trial Tr. at 200:21-24.  Still another purported representative, John T. Boyd Company ("Boyd"), was

permitted to drive by the processing plant and loadout areas at the mine, Trial Tr. at 516:3-6, although it was eventually asked to leave.   After that occurred—which was well past Xcoal's November 2017 breach—Xcoal never mentioned Boyd again in its correspondence with Bluestone, in its notices of default, or in its termination letter.  Trial Ex. 323.  In fact, Xcoal's complaint does not even mention Boyd or any other representatives being denied access.  D.I. 2. Thus, there was no breach—material or otherwise—of Article 3.4.

### C.      The October 29, 2017 train was not a material breach of the CSA.

The October 29, 2017 loading was not within the scope of the CSA, whose term was amended to begin on November 1, 2017.  Trial Ex. 5; Trial Tr. at 29:6-11 ("You know, it might come as a surprise to you, Your Honor, going in, but I think you probably need to hear this and I think it will help your understanding as you go forward.  The contract, the new coal supply agreement – its actual term ran from November of 17, 2017, to the end of May of 2018."); Trial Tr. at 145:2-9 ("Ultimately it was November 1st.  Originally it was intended to be October 1st, but we weren't able to start – Bluestone wasn't able to start on October 1st, so it was amended to start on November 1st."); Trial Tr. at 213:15-25 ("Q. Exhibit No. 5 is, in fact, an amendment to the [CSA] that was entered into by the parties at the time to change the start date or the start date under the agreement from October 1, 2017 to November 1, 2017.  Do you see that?  A. Yes, sir."); Trial Tr. at 306:6-8 ("Q. Okay.  And the commencement date of the contract was November 1st, 2017; is that right?  A. That's correct.  Yes, sir."); Trial Ex. 401 at 6-7 ("Under the terms of the CSA, Bluestone agreed to supply Xcoal with 720,000 net tons of coal . . . for the 24 month period from November 1, 2017 through October 31, 2019.").  Because the October 29, 2017 loading was not governed by the CSA, it has no relevance to this case.

Even assuming the loading was governed by the CSA, it did not amount to a material breach.  To the contrary, the UCC obligated Xcoal to accept and pay for the train.  A buyer can

reject an installment of goods only if the installment "cannot be cured."  6 Del. Code § 2-612(2).

If the seller provides adequate assurance of a cure, "the buyer must accept that installment."  *Id.*;

*see also id.* UCC Comment 5 ("Under subsection (2) an installment delivery must be accepted if

the non-conformity is curable and the seller gives adequate assurance of cure.").

Here, the dry ash content level of the 65-railcar train was purportedly 9.9%, slightly above

the contractual maximum of 9.5%.  Trial Ex. 81; Trial Ex. 4 at Exhibit A.  Justice immediately

offered to cure this alleged defect by attaching another 45 railcars, as permitted under Article 4.2

of the CSA, to reduce the composite ash.  Trial Ex. 94.  He further advised that four other labs had

obtained composite scores of less than 9.5%.  Trial Ex. 94.  Rather than accepting this cure, or

even proposing an alternative, Thrasher tersely responded: "There is nothing further to discuss

regarding these sixty-five railcars."  Trial Ex. 95.  As UCC Comment 5 makes clear, § 2-612(2)

requires "reasonable action by a buyer in regard to discrepant delivery," as well as the buyer's

"cooperation."  Because Xcoal did not reasonably cooperate, it had no right to reject the train.

**V       Bluestone Proved Its Actual Damages.**

Finally, Bluestone should prevail because it also proved the damages element of its claim.

"The elements of a breach of contract claim are (1) a contractual obligation, (2) a breach of that

obligation by the defendant, and (3) resulting damage to the plaintiff."  *vMedex, Inc. v. TDS

Operating, Inc.*, No. 18-1662 (MN), 2020 WL 4925512, at *5 (D. Del. Aug. 21, 2020).  Bluestone

has established that Xcoal had obligations to provide trains and purchase 30,000 tons of coal per

month, and that it breached those obligations.  *See supra* Argument § II.  Therefore, the only

remaining element of its affirmative claim is damages.

**A.       Heighton's expert report calculates and proves Bluestone's lost profits.**

Bluestone proved lost profits in accordance with 6 Del. Code § 2-708(2), which provides

that "the measure of damages is the profit (including reasonable overhead) which the seller would

have made from full performance by the buyer . . . ."[8]  Profit, in turn, equals revenues minus costs. *See Empire Fin. Svcs., Inc. v. Bank of N.Y. (Del.)*, No. 00C-09-235 SCD, 2007 WL 1991179, at *4 (Del. Super. Ct. June 19, 2007) ("It is axiomatic that a claim for lost profits requires evidence of lost revenues, minus the costs associated with generating those revenues.").

Bluestone proved the profits it would have earned on the balance of the CSA through the report of its expert accountant, Aaron J. Heighton, CPA/ABV, CVA ("Heighton").  Trial Ex. 396. Heighton first calculated the average monthly price per ton of coal for October 2017 through August 2019 using the Platt's Index.  Trial Ex. 396, Exhibit I.  Next, he used the average monthly price to calculate the price per ton of the coal to be bought and sold under the CSA.  Trial Ex. 396, Exhibit II; Trial Ex. 4 § 6.  Then, he multiplied the CSA price per ton times 30,000 tons for each month from November 2017 through October 2019, which resulted in the expected gross profit for each month.  Trial Ex. 396, Exhibit II.  After that, he subtracted Bluestone's monthly operating costs from each month's gross profit, which resulted in the net profit for each month.[9]  Trial Ex. 396, Exhibit II.  Heighton then subtracted the net profits earned by Bluestone on its four shipments of coal to Xcoal in November 2017 and May 2018.  Trial Ex. 396, Exhibit III.  Finally, he subtracted net profits earned by Bluestone on shipments of coal to third parties during the term of the CSA.  Trial Ex. 396, Exhibit IV.  These calculations resulted in lost profit damages of $41,913,505.04, exclusive of any interest.  Trial Ex. 396, Exhibit V.

---

[8] Because the contract price under Article 6 of the CSA was less than the market price after applying "Buyer's Discount," Subsection (1) of § 2-708 would be inadequate to put Bluestone in as good a position as performance would have done.

[9] Although the testimony establishes costs of $1.8 million per month, Trial Tr. at 819:22-820:5, Heighton took a slightly more conservative approach by using costs of $1.95 million per month, resulting in lesser net profits.  Trial Ex. 396, Exhibit II.

**B.     Bummer's criticisms of Heighton's analysis lack any legal or factual basis.**

Rather than offering its own calculation of Bluestone's profits, Xcoal provided the rebuttal report of its expert accountant, Raymond L. Bummer, CAP/ABV/CFF, CFE, CFA ("Bummer"), who merely critiqued Heighton's analysis.  Trial Ex. 401.  Bummer opined that Heighton should have deducted the profits that Bluestone could have earned by reselling the coal to a third party.  But even if Bluestone should have resold the coal to mitigate its damages, the burden of proving that defense falls squarely on Xcoal.  *See Guerrieri v. Cajun Cove Condominium Council*, No. 04C-08-022 THG, 2007 WL 1520039, at *8 (Del. Super. Ct. Apr. 25, 2007) ("Even if the doctrine of mitigation of damages should apply, Council had the burden of proving plaintiffs failed to mitigate their damages.").  Neither Xcoal nor Bummer proffered a scintilla of evidence to support this defense.

Bummer also criticizes Heighton for using the cost data provided to him by Bluestone management.  But Delaware courts have approved this practice.  *See M&G Polymers USA, LLC v. Carestream Health, Inc.*, No. 07C-11-242 PLA, 2009 WL 3535466, at *6-7 (Del. Super. Ct. Aug. 5, 2009).  As Heighton explained, he did not merely regurgitate a dollar amount, but instead he performed his own careful review and analysis of the information provided:

> The data and information related to the projected production costs were provided by the management of BLUESTONE and were reviewed by me.  The data provided by BLUESTONE included an executive strategic plan for the Bishop Operations which provided for an estimated per ton cost for production of $50.41.  The information I have relied upon for the determination of damages included in this report and provided by management is $65 per ton which was arrived at by adjusting upward the $50.41 for an estimated cost of depreciation, interest and other costs not included in the executive strategic plan figures.  I have considered all of the information provided and have determined that it appears the $65 per ton as stated by management is reasonable.

Trial Ex. 396 at 4-5.  Notably, moreover, Xcoal "has not provided contrary evidence that a party's self-reported profit or expense data is not reasonably relied upon by experts in performing

economic damages analyses for lost profits." *M&G Polymers*, 2009 WL 3535466 at *6. In fact, Bummer did not review a single treatise or other authoritative source (nor did he cite any) in his critique of Heighton's analysis. Trial Ex. 401, App'x 1.

Still, Bummer contends that Bluestone, an S-Corporation, is a "pass-through entity" with "no expectation of profits." Trial Ex. 401 at 8. However, "corporations should be allowed to operate themselves in a tax-efficient manner and still be able to pursue claims for lost profits based on alleged torts, breaches of contract, and other civil wrongs." *Atkins v. Robbins, Salomon & Patt, Ltd.*, 97 N.E.3d 210, 228 (Ill. App. Ct. 2018). For that reason, the appellate court in *Atkins* concluded that "the circuit court erred when it found as a matter of law that the Corporation could not demonstrate its alleged lost profits based on the Corporation itself being unprofitable." *Id.* at 229; *see also Bettius & Sanderson, P.C. v. Nat'l Union Fire Ins. Co.*, 839 F.2d 1009, 1013 (4th Cir. 1988) (explaining that a pass-through corporation's "net income for tax purposes is almost always at or near zero, but it is unrealistic to suggest that the corporation is not earning a profit"); *Sisters of Providence in Wash. v. A.A. Pain Clinic, Inc.*, 81 P3d 989, 1006 (Alaska 2003) (holding that the law "prevents a situation where a wrongdoer can avoid liability simply because of a technicality in the corporate structure").

Here, there is no doubt that Bluestone's affiliates and their individual owners stood to profit from the CSA. Trial Tr. at 806:13-16 ("And, you know, it was our belief and our desire that we would profit significantly from the new contract and that would more than compensate us for what we were giving up in the old one."); Trial Tr. at 832:6-9 ("You know, this contract represented two things. One is it was a way for us to get paid back for some of the coal that we were not paid for before, that we could make some profit on this contract and get some, some compensation for that."); Trial Tr. at 903:3-11 ("Q. Assuming that that, that there was a difference

between the cost of goods sold and the revenue from the sale of those goods through Bluestone

Energy Sales Corporation, where would those profits go?  A. Well, ultimately the profits would

end up at our level, from an owners' standpoint.  So whether, whether the profit being the

production company or the sales company doesn't really matter.  It's still going to come to us

through the S Corp. structure."); Trial Tr. at 904:4-8 ("Q. . . . [T]ell us whether or not the price

that was set by the formula in the CSA, was it designed to produce a profit to the Justice entities

through the sales by Bluestone Energy Sales?  Yes or no.  A. Absolutely, yes, sir.").  Given this,

Bummer's critique about Bluestone's pass-through status is without merit.

### C.   Xcoal misinterprets Article 10.4's bar on indirect damages.

Xcoal also attacks Bluestone's damages claim by pointing to Article 10.4 of the CSA,

which provides: "Neither Party shall be liable under this Agreement for consequential, incidental,

punitive, exemplary or indirect damages, *lost profits*, or business interruption damages, whether

by statute, in tort or in contract, under any indemnity provision or otherwise."  Trial Ex. 4 § 10.4

(emphasis added).  Xcoal contends that this provision precludes any recovery of lost profits.  But

many courts, including one Delaware court, have rejected this interpretation of limitations on

liability.

In *M&G Polymers USA, LLC v. Carestream Health, Inc.*, No. 07C-11-242 PLA, 2010 WL

1611042, at *22 (Del. Super. Ct. Apr. 21, 2010), Article 23.0 of the supply agreement stated that

"neither party would be liable for 'lost profits.'"  Like Xcoal, the defendant argued that this

provision "was intended to deny either party recovery for lost profits in the event of a breach."

*M&G Polymers*, 2010 WL 1611042 at *28.  In rejecting this argument, the court distinguished

between lost profits as *consequential damages* and lost profits as *direct damages*.  *See id.* at *31.

It applied the contractual bar to the former but not to the latter.  *See id.* at *32 ("[E]ven if § 23.0

of the Supply Agreement purported clearly and explicitly to bar M&G from recovering lost profits

under any circumstance whatsoever, the Court would have been unable to enforce that limitation against M&G's *direct damages* claim.") (emphasis added).   Importantly, the court further explained that applying the bar to a direct damages claim "would render M&G's contractual expectancy illusory by eliminating *any* seller's remedies under the Supply Agreement."[10]  *Id.* at *31 (emphasis in original).

Here, the term "lost profits" appears in a string of other forms of indirect damages listed in Article 10.4 of the CSA, and it must be construed accordingly.  *See Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*, No. 7844-VCP, 2013 WL 1821608, at *12 (Del. Ch. May 1, 2013).  More importantly, interpreting "lost profits" to bar direct damages would result in the "much bigger problem" identified in *M&G Polymers*, namely, that "doing so would render [Bluestone's] contractual expectancy illusory by eliminating *any* seller's remedies under the [CSA]."  2010 WL 1611042 *31 (emphasis in original).  For that reason, the Court should reject Xcoal's argument that Article 10.4 precludes Bluestone's damages claim.

## CONCLUSION

For the reasons discussed, the Court should enter judgment in favor of Defendants and against Xcoal, and award damages of $41,913,505.04 plus pre-judgment and post-judgment interest.

---

[10] *See also Canters Deli Las Vegas, LLC v. FreedomPay, Inc.*, __ F. Supp. 3d __, __, No. 19-3030, 2020 WL 2494701, at *6 (E.D. Pa. May 14, 2020) ("Contractual provisions limiting recovery for lost profits, lost business revenues, etc., are generally construed as limitations on consequential damages."); *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 343 F. Supp. 3d 789, 805 (N.D. Ill. 2018) ("Viewing the term, 'loss of profits,' in the context of the surrounding words and the contract as a whole, it is not reasonable to interpret the term to refer to general lost profit damages, as Sanofi urges."); *In re Buffalo Coal Co.*, 424 B.R. 738, 746 (N.D. W. Va. 2010) ("In context, the exclusion of 'lost profits' serves the similar purpose as the other exclusions—limiting a party's right to recover indirect damages.").

OF COUNSEL:

Richard A. Getty (admitted pro hac vice)
THE GETTY LAW GROUP PLLC
The Offices at City Center
100 West Main Street, Suite 200
Lexington, KY 40507
Telephone: (859) 259-1900
rgetty@gettylawgroup.com

George Terwilliger (admitted pro hac vice)
McGUIRE WOODS LLP
2001 K Street N.S., Suite 400
Washington, D.C. 20006
Telephone: (2020) 857-2473
gterwilliger@mcguirewoods.com

John D. Wilburn (admitted pro hac vice)
Brooks H. Spears (admitted pro hac vice)
McGUIRE WOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Telephone: (703) 712-5372
jwilburn@mcguirewoods.com
bspears@mcguirewoods.com

Ryan D. Frei (admitted pro hac vice)
McGUIRE WOODS LLP
Gateway Plaza, 800 East Canal Street
Richmond, VA 23219
Telephone: (804) 775-1134
rfrei@mcguirewoods.com

Dated:  October 13, 2020

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:  */s/ John A. Sensing*  _____
    John Anderson Sensing (#5232)
    Jennifer Penberthy Buckley (#6264)
    Tracey E. Timlin (#6469)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    (302) 984-6000 – Telephone
    jsensing@potteranderson.com
    jbuckley@potteranderson.com
    ttimlin@potteranderson.com

*Attorneys for Bluestone Energy Sales Corp.,*
*Southern Coal Corp., and James C. Justice, II*