# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XCOAL ENERGY & RESOURCES, | : | |
| | : | |
| Plaintiff / Counterclaim Defendant, | : | |
| | : | |
| v. | : | C.A. No. 18-819-LPS |
| | : | |
| BLUESTONE ENERGY SALES CORP., | : | |
| SOUTHERN COAL CORP., and | : | |
| JAMES C. JUSTICE II, | : | |
| | : | |
| Defendants / Counterclaim Plaintiffs. | : | |
| | : | |

Geoffrey G. Grivner, BUCHANAN INGERSOLL & ROONEY PC, Wilmington, DE

Kevin P. Lucas and Daniel C. Garfinkel, BUCHANAN INGERSOLL & ROONEY PC, Pittsburgh, PA

   Attorneys for Plaintiff / Counterclaim Defendant


John A. Sensing, Jennifer Penberthy Buckley, and Tracey E. Timlin, POTTER ANDERSON & CORROON LLP, Wilmington, DE

Richard A. Getty, THE GETTY LAW GROUP PLLC, Lexington, KY

George Terwilliger, McGUIRE WOODS LLP, Washington, DC

John D. Wilburn and Brooks H. Spears, McGUIRE WOODS LLP, Tysons, VA

Ryan D. Frei, McGUIRE WOODS LLP, Richmond, VA

   Attorneys for Defendants / Counterclaim Plaintiffs

## **OPINION**

March 29, 2021
Wilmington, Delaware

**STARK, U.S. District Judge:**

Plaintiff Xcoal Energy & Resources ("Xcoal" or "Plaintiff") and Defendant Bluestone Energy Sales Corporation ("Bluestone") are parties to a Coal Supply Agreement ("CSA"), pursuant to which Bluestone agreed to supply Xcoal with coal. (*See* PTX4)  Defendants Southern Coal Corporation ("SCC") and James C. Justice, II ("Governor Justice" and, together with Bluestone and SCC, "Defendants") executed a Performance Guarantee Agreement ("Guarantee") guaranteeing Bluestone's full performance under the CSA. (*See* PTX2)

On May 31, 2018, Xcoal sued Defendants for breach of contract based on, among other things, Bluestone's alleged failure to supply Xcoal with the quantity and quality of coal specified in the CSA. (*See* D.I. 2)  Xcoal's suit further seeks to hold SCC and Governor Justice responsible for Bluestone's breaches of the CSA, pursuant to the Guarantee. (*See id.*)

On June 25, 2018, Defendants answered the complaint and filed counterclaims against Xcoal. (D.I. 8)  Defendants' counterclaims alleged breach of contract, based on Xcoal's alleged failure to accept delivery and pay for coal pursuant to the CSA, and further alleged that Xcoal and its Chief Executive Officer, Ernie L. Thrasher, fraudulently induced Defendants to enter into the CSA and the Guarantee. (*See id.*)

The Court held a remote bench trial (using videoconferencing technology) that stretched across six days in August and September 2020. (*See* D.I. 132-35, 152-55) ("Tr.")[1]  Thereafter,

---

[1] Pursuant to Article 17 of the CSA, the parties waived any right they might otherwise have to a jury trial. (*See* PTX4 § 17)  After several continuances, a bench trial was scheduled to begin on August 25, 2020. (*See* D.I. 87 at 7)  On the first day of the trial, after both sides presented their respective opening statements (*see* D.I. 132), the trial was interrupted by issues surrounding the unexpected surfacing of an anonymous "whistleblower letter" (*see* D.I. 125).  After a flurry of litigation (*see, e.g.*, D.I. 112-14, 116-19, 124-25, 127-30), and an opinion from the Court (*see* D.I. 126), the parties ultimately agreed that the letter would not be offered into evidence or used at trial for any purpose (*see* D.I. 138).  The trial resumed on September 15, 2020.

the parties submitted post-trial briefing (D.I. 148, 150, 156-59) and proposed findings of fact

(D.I. 147, 149, 151).

Pursuant to Federal Rule of Civil Procedure 52(a), and having considered the entire

record in this case and the applicable law, the Court concludes that: (1) Defendant Bluestone

breached the CSA, (2) Defendants SCC and Governor Justice are liable pursuant to the

Guarantee, (3) Plaintiff Xcoal did not breach the CSA, (4) Defendants abandoned, or otherwise

failed to prove, their fraud claim against Xcoal, and (5) Defendants are liable to Xcoal for

$6,814,105.30 in damages.

The Court's findings of fact and conclusions of law are set forth in detail below.

## FINDINGS OF FACT

This section contains the Court's findings of fact ("FF") on disputes raised by the parties

during trial, as well as facts stipulated to by the parties.  The Court adopts the parties' Joint

Statement of Undisputed Facts (D.I. 147) ("SUF"), which are repeated in part below.  Certain

findings of fact are also provided in connection with the Court's legal analysis later in this

Opinion.

### I.    The Parties

1.    Plaintiff Xcoal Energy & Resources ("Xcoal") is a Pennsylvania limited

partnership engaged in the business of the purchase of metallurgical coal for subsequent sale and

delivery overseas to international customers.  (Thrasher Tr. 135-36)[2]

2.    Defendant Bluestone Energy Sales Corporation ("Bluestone") is a Delaware

corporation.  (D.I. 2 ¶ 9; D.I. 8 ¶ 9)  Bluestone and Xcoal are parties to the Settlement

---

[2] Citations to the trial transcript are in the form of "([Witness last name] Tr. [page])."  Citations
to the trial exhibits are in the form of "(PTX[exhibit number])."

Agreement and Mutual General Release ("Settlement Agreement") as well as the Coal Supply

Agreement and an Amendment thereto ("CSA").  (PTX4; PTX5; PTX6)

3.      The other defendants are Southern Coal Corporation ("SCC"), a Delaware

corporation, and James C. Justice, II, the current Governor of West Virginia ("Governor Justice"

and, together with Bluestone and SCC hereinafter collectively "Defendants").  (D.I. 2 ¶¶ 10-11;

D.I. 8 ¶¶ 10-11)  SCC and Governor Justice (the "Justice Parties") were parties to two prior

lawsuits litigated against Xcoal in this Court.  (*See* C.A. Nos. 14-459-LPS and 15-267-LPS)  The

Justice Parties are parties to the Performance Guarantee Agreement ("Guarantee") (PTX2), and

along with Xcoal, parties to the Fundamental Terms of Settlement ("Fundamental Terms")

(PTX1).

4.      Bluestone's CEO is Mr. Jay Justice (hereinafter "Justice" or "Mr. Justice"), the

son of Governor Justice.  (Justice Tr. 802, 894)

5.      Bluestone and SCC are owned and controlled directly or indirectly by Governor

Justice and/or members of his family and/or entities owned and controlled by them.  (Justice Tr.

802-03)

6.      Bluestone is a pass-through entity with no assets.  (Justice Tr. 896; PTX401 at 8)

7.      The coal to be loaded and sold by Bluestone under the CSA was to be mined at

the Bishop surface mine and/or Red Fox surface mine, which were owned by non-Bluestone

affiliates of the Justice Family; that coal was to be processed and loaded at the Bishop loadout

facility, whose surface and equipment were also owned by non-Bluestone affiliates of the Justice

Family.  (Justice Tr. 895-96; PTX398 at 6-7; PTX401 at 8)

## II.    The Prior Lawsuit, Mediation, And Settlement

8.      On April 11, 2014, Xcoal sued SCC and Governor Justice, among other defendants, in this Court, in a case that became C.A. No. 14-459-LPS.

9.      SCC, among other parties, sued Xcoal and its Chief Executive Officer, Ernie L. Thrasher ("Thrasher"), in a case transferred from U.S. District Court for the Western District of Virginia to this Court on March 26, 2015, which became C.A. No. 15-267-LPS.

10.     On May 15-19, 2017, this Court held a bench trial in Consolidated Case Nos. 14-459 and 15-267 (collectively, the "Prior Lawsuit"). (SUF ¶ 1)

11.     Before this Court rendered a decision in the Prior Lawsuit, the parties participated in mediation with Magistrate Judge Christopher J. Burke on August 3, 2017 and reached an agreement in principle to settle disputes. (SUF ¶¶ 2-3; Thrasher Tr. 139-40, 218-20; PTX17)

12.     A resolution of the outstanding issues in question could not be achieved until the following day due to the need of Governor Justice to depart the mediation to attend to other business. (Thrasher Tr. 150, 218)

13.     The parties' settlement in principle included that the parties would enter into what became the CSA. The Justice Parties selected Bluestone to be the contracting party to the contemplated CSA. Bluestone was an entity unknown to Xcoal. Thus, Xcoal insisted that SCC and Governor Justice provide a Guarantee with respect to the contemplated CSA, just as these same parties had done in connection with their prior coal supply agreement (i.e., the one that was the subject of the Prior Lawsuit). (Thrasher Tr. 143-44)

14.     The Fundamental Terms of Settlement provided that mutual general releases would be exchanged, including the release by the Justice Parties and Bluestone of all possible challenges to the settlement on the grounds of alleged misrepresentation or fraud. (PTX1 § 1(d))

4

15.     Xcoal came to the mediation session expecting that the case would not settle. However, the negotiations through Magistrate Judge Burke resulted in commercial terms for the contemplated CSA which were highly favorable to Xcoal.  (Thrasher Tr. 139)

16.     The benefits to Xcoal included that the contemplated CSA would involve the sale of metallurgical mid-vol coal only.  Mid-vol coal was in high demand and had limited availability in the United States.  The CSA was important to Xcoal because it represented 15-20% of Xcoal's entire annual purchases of U.S. mid-vol coal, making the coal to be obtained through the CSA a valuable sales tool in Xcoal's marketing and blending efforts.  (Thrasher Tr. 433-35)

17.     The pricing terms for the CSA provided Xcoal with a substantial $9.88 per ton Buyer's Discount from market price.  (Thrasher Tr. 227-31; PTX4 § 6)

18.     Xcoal expected that the financial benefits to be derived from the CSA would effectively result in recovery of part of its damages incurred in connection with the Prior Lawsuit while avoiding potential challenges that might be encountered in collecting on any judgment Xcoal could obtain in those actions against the Justice Parties.  (Thrasher Tr. 139, 142-43, 230-31)

19.     Achieving these benefits required full and timely coal loading performance by Bluestone.  (Thrasher Tr. 183-84)

20.     Immediately following the settlement in August 2017, Bluestone "put the wheels in motion" to be able to meet its obligations under the anticipated CSA, including developing a mine plan, hiring mine personnel, and hauling in and arming the necessary machinery.  (Justice Tr. 814-15)

21.     This ramp-up took about 45 days and cost about $7 million.  (Justice Tr. 815)

22.     After the ramp-up, the mine – which operated 20 hours a day, seven days a week – cost $60,000 per day to operate.  (Payne Tr. 689; Justice Tr. 819-20)

23.     For Bluestone and its affiliates, the CSA represented "approximately 25 percent of our total production," making it "hugely monumental to us, to our employees, and just to the overall well-being of our organization."  (Justice Tr. 832)

24.     Bluestone's Mr. Justice testified "I think it's important to know . . . that we were real excited about this.  We thought this was a great opportunity for us."  (Justice Tr. 814)

## III.    Fundamental Terms Of Settlement

25.     The parties executed the Fundamental Terms on August 18, 2017.  (SUF ¶ 4)

26.     Pursuant to the Fundamental Terms, a settlement agreement was to be executed and was to include, among other things, the following provisions:

(a)     Execution and exchange of a mutually acceptable written coal supply agreement ("CSA") between Xcoal Energy & Resources and Bluestone Energy Sales Corporation incorporating the fundamental commercial terms on the attached outline.

(b)     Execution and delivery by Southern Coal Corporation and James C. Justice, II, of a Guaranty and Suretyship Agreement from the Justice Parties to the Xcoal Parties guaranteeing performance under the CSA . . ., capped at a maximum amount of $10,000,000.

(c)     Exchange as part of the Settlement Agreement of mutual general releases covering all claims existing as of (or based in whole or in part on the acts or omissions through) the Settlement effective date, as between the Xcoal Parties and their affiliates, on the one hand, and the Justice Parties and their affiliates on the other hand, (the "Released Claims"), excepting only claims to enforce performance of, or for breach of, the terms of this Settlement and the agreements executed pursuant thereto which are preserved (the "Preserved Claims").

(d)     Acknowledgement as part of the Settlement Agreement that the Released Claims include, but are not limited to, all claims that were asserted or could have been asserted in the Parties' Current Lawsuits or their prior litigation docketed at 12-265 (W.D. Va.)

> (the "2012 Lawsuit") (collectively, the Current Lawsuits and the 2012 Lawsuit referred to as the "Lawsuits"), and specifically including all claims or assertions on any legal or equitable basis whatsoever (e.g., lack or failure of consideration, misrepresentation, fraud, mistake, etc.) that this Settlement or any prior settlement of any or all the Lawsuits is invalid or subject to challenge or rescission.

(SUF ¶ 6; PTX1)

27.    Subsequent to the execution of the Fundamental Terms, (i) the parties to the Prior Lawsuit entered into a Settlement Agreement and Mutual Release; (ii) Xcoal and Bluestone entered into a Coal Supply Agreement and an Amendment thereto; and (iii) the Justice Parties executed a Performance Guarantee Agreement.  (PTX2; PTX4; PTX5; PTX6)

## IV.    Settlement Agreement And Mutual Release

28.    The Settlement Agreement, which resolved the Prior Lawsuit, is dated as of October 19, 2017; it was signed by the Justice Parties and Bluestone on October 18, 2017.  (SUF ¶ 8; PTX6; PTX68 at 10/18/17 email)

29.    The Settlement Agreement is governed by Delaware law.  (PTX6 § 11)

30.    The Settlement Agreement contained a mutual general claims release, whereby Bluestone and the parties to the Prior Lawsuit agreed, among other things, to "release and forever discharge the other . . . from any and all past, present and future claims."  It further was "expressly acknowledged and agreed by each of the Parties that the Released Claims specifically include any and all possible claims, defenses or assertions on any legal or equitable basis whatsoever (including but not limited to lack or failure of consideration, misrepresentation, fraud, mistake, etc.) that their settlement, this Settlement Agreement, the Settlement Documents [defined to include the CSA and Guarantee], and/or the dismissal of the [Prior Lawsuit] is invalid or subject to challenge or rescission."  (SUF ¶¶ 10-11; PTX6 § 2)

7

31.     Xcoal insisted on such protection, and would not have agreed to the settlement in its absence, in light of the Justice Parties' assertion of what Xcoal viewed as groundless fraud claims and exaggerated damage claims in prior coal sale contract lawsuits.  (Thrasher Tr. 205-07)

## V.     Coal Supply Agreement ("CSA")

### A.     General overview and basic provisions

32.     The parties to the CSA – Xcoal and Bluestone – are both sophisticated parties, who (and/or their affiliated entities) have long engaged in extensive business transactions, including by executing prior contracts with one another (and/or with affiliated entities).  These parties (and/or their affiliated entities) had also engaged in multiple litigations with one another (and/or with affiliated entities), even before the Prior Lawsuit.  (*See, e.g.*, PTX6 at 2 (referring to "2012 Lawsuit"))

33.     Xcoal delivered a draft of the CSA to Bluestone.  (Thrasher Tr. 219-20)  It was returned signed and unchanged by Bluestone on October 18, 2017.  (*Id.* 423-24; PTX68 at 10/18/17 email)

34.     The CSA is dated October 19, 2017 and provides for the sale of a specified quantity (720,000 net tons) and quality of metallurgical grade coal (the "Coal") by Bluestone to Xcoal.  (SUF ¶ 13; PTX4 §§ 2.1-3.2)

35.     Article 1 of the CSA provides that "[t]he term of this Agreement shall be 24 months, beginning on October 1, 2017."  (SUF ¶ 14; PTX4 § 1)

36.     The CSA is subject to a written Amendment "to change the commencement date of its term from October 1, 2017 to November 1, 2017 and also to change the commencement of the initial monthly shipments thereunder from October 2017 to November 2017, with all other

terms and conditions of the Agreement remaining unchanged." (SUF ¶ 15; PTX5)

37.    Pursuant to Article 3.1 and 3.2, as amended, Bluestone agreed to sell and deliver to Xcoal 720,000 net tons of "Coal," as defined by Exhibit A to the CSA, beginning November 1, 2017. (SUF ¶ 16; PTX4 §§ 3.1-3.2; PTX5)

38.    Pursuant to Exhibit A to the CSA, "all Coal shall be freshly mined." (PTX4 Ex. A)

39.    Pursuant to Article 3.4: "To the extent reasonably possible, Seller shall store Coal which is the subject of this Agreement in segregated stockpiles at the mine, processing facility and Delivery Point." (PTX4 § 3.4)

40.    Also pursuant to Article 3.4: "Buyer or its representatives shall have the right, . . . to make visits to the [Bishop facility] mine, processing facility and Delivery Point . . . in order to observe the mining, stockpiling and loading of Coal for delivery, to obtain representative samples of such Coal, and to otherwise protect its interests." (PTX4 § 3.4)

41.    The CSA provides an express right to suspend coal shipments thereunder only to Buyer (i.e., Xcoal) and not Seller (i.e., Bluestone). (PTX4 § 4.3)

42.    Article 10.4 of the CSA provides: "Neither Party shall be liable under this Agreement for consequential, incidental, punitive, exemplary or indirect damages, lost profits, or business interruption damages, whether by statute, in tort or in contract, under any indemnity provision or otherwise." (PTX4 § 10.4)

43.    Article 17 of the CSA provides that "the provisions of the Uniform Commercial Code as adopted in Delaware (the 'UCC') shall govern" the CSA. (PTX4 § 17)

**B.      Amounts to be supplied by Bluestone**

44.      Pursuant to Article 3.1 and 3.2, as amended, Bluestone was to supply Xcoal with 720,000 net tons of "Coal," as that term is defined by Exhibit A to the CSA, beginning November 1, 2017 and continuing through the 24-month term, "in equal consecutive monthly shipments of approximately 30,000 net tons, unless the Parties otherwise agree, in writing." (SUF ¶ 16; PTX4 §§ 3.1-3.2; PTX5)

**C.      Quality of coal to be provided by Bluestone**

45.      The parties had in the past experienced disputes over the quality of coal supplied by the Justice Parties to Xcoal, which Xcoal sought to address by insisting on certain quality-related provisions in the CSA.  (Thrasher Tr. 187-88)

46.      The parties agreed that all coal to be supplied under the CSA would be mid-volatile coking coal ("Mid-Vol Coal") mined from the Bishop, West Virginia mine #02111. (SUF ¶ 20; PTX4 § 3.1 and Ex. A)  The specific quality specifications for the Mid-Vol Coal – for example, the chemical specifications requirement (insisted upon by Xcoal) for Ash (Dry) of a guaranteed level of 8.00% and a reject level of greater than 9.5% – are set forth in Exhibit A to the CSA.  (Thrasher Tr. 153-55; PTX4 Ex. A)

47.      Article 5.2(a) of the CSA provides:

> The Coal shall be sampled and analyzed by SGS's Beckley, West Virginia laboratory ("SGS") by certified, bias tested mechanical sampling system, upon loading, in accordance with the applicable standards of the American Society for Testing and Materials ("ASTM").  The costs required for the determination of the quality of Coal shall be borne by [Xcoal].

(SUF ¶ 23; PTX4 § 5.2(a))

48.      Article 5.3 states: "[E]ach party shall have the right to observe, at its own expense, the sampling of the Coal."  (SUF ¶ 24; PTX4 § 5.3)

49.     Article 5.5 provides that "SGS's samples of Coal representing each Shipment, and the analysis thereof, shall be used to determine rejection rights." (SUF ¶ 25; PTX4 § 5.5)

50.     Article 5.5 also provides that SGS's sample shall be divided into three splits. One is analyzed by SGS. Another is for Buyer. The third is used for an independent referee analysis, if timely requested by Buyer or Seller. (SUF ¶ 25; PTX4 § 5.5)

51.     Article 5.6 provides, in part, that, when necessary, "SGS shall submit the retained sample to [the referee] independent laboratory agreed to by the Parties . . . for an independent analysis." (SUF ¶ 26; PTX4 § 5.6)

52.     Under CSA Article 5.6, either the SGS analysis or the referee analysis will control, depending on the reproducibility results. (SUF ¶ 26; PTX4 § 5.6)

**D.     Pricing and payment terms**

53.     A major component of the consideration to Xcoal for settling the Prior Lawsuit and entering into the CSA was the opportunity it provided for Xcoal to recover some of the damages it believed it had suffered from the Justice Parties' alleged noncompliance with prior agreements. (Thrasher Tr. 139, 142-43, 230-31) Xcoal negotiated for a discount from the market price on the coal it would purchase from Bluestone pursuant to the CSA ("Buyer's Discount"). The Buyer's Discount was agreed to be $9.88 per net metric ton of coal purchased by Xcoal from Bluestone. (SUF ¶ 17; PTX4 § 6) In this way, every ton of coal Xcoal purchased from Bluestone with pricing based on the Buyer's Discount would yield an additional $9.88/ton profit to Xcoal, compensating Xcoal for what it viewed as the Justice Parties' previous breaches. (Thrasher Tr. 230-31)

54.     Specifically, Article 6 of the CSA sets the final price for the Coal as follows:

> The Price for coal supplied hereunder shall be based on the Platts'
> U.S. East Coast Index for Low Volatile Coal ("the Index"), and

11

> shall be in effect throughout the Term. . . .  The final price shall be calculated as provided below using the average of the Index in the calendar month in which the applicable rail permit for each Shipment is originally scheduled ("Index Average"). . . .
>
> Price = Index Average (reported on a metric ton basis) multiplied by 1.01, divided by 1.1023 (to convert to net tons), minus $9.88 per net ton (the "Buyer's Discount"), and minus Norfolk Southern rail freight, vessel loading fees, and fuel surcharges, if applicable, fixed for the Term at $27.00 per ton, and subject to price adjustments for quality variances in accordance with Exhibit A hereto.

(SUF ¶ 17; PTX4 § 6)

55.     Pursuant to Article 7, "[u]pon receipt of [Bluestone's] invoice based on estimated rail weights of 100 metric tons per railcar, and a Certificate of Analysis from SGS . . ., within 1 business day [Xcoal] shall pay to [Bluestone] 75% of the Provisional Price," with the balance to be paid "within 5 business days of the Parties' receipt of final weights from Norfolk Southern upon vessel loading."  Article 6 provides that the Provisional Price "be ascertained using the average of the Index over the 20 business days preceding the beginning of load of a shipment by [Bluestone]."  (SUF ¶ 19; PTX4 §§ 6 and 7)

56.     Since the final price is based on "the average of the Index in the [entire] calendar month," it cannot be due earlier than the month after shipment.  (Thrasher Tr. 178-79; PTX4 § 6) In addition, the price "true-up" is to occur within 15 days after the final price is ascertained. (PTX4 § 6)

57.     Pursuant to Article 10.2(b), upon the occurrence of an Event of Default, the non-defaulting party is entitled (among other things) to "withhold any payment due to the Defaulting Party until such Event of Default is cured."  (PTX4 § 10.2(b))

### E.  Timing of deliveries

58.     The CSA required Coal shipments for 24 months, "in equal consecutive monthly shipments of approximately 30,000 net tons, unless the Parties otherwise agree, in writing." (SUF ¶ 16; PTX4 § 3.2)

59.     With respect to the scheduling of coal deliveries, Article 3.5 of the CSA provides that "[Xcoal] shall advise [Bluestone] on or before the 20th day of the month preceding scheduled Shipments of the loading dates, the delivery schedule and the quantity of Coal" to be delivered, and "[Xcoal] shall designate to [Bluestone] the scheduling, routing and method of Shipments of Coal purchased" under the CSA.  Further, Bluestone was to cause the Coal "to be properly loaded into railcars for delivery to [Xcoal] . . . provided that [Xcoal] has provided [Bluestone] with applicable loading instructions no less than 24 hours prior to the arrival" of the railcars.  "The delivery schedule shall be binding on both Parties and may only be changed by a written agreement between the parties.  Time is of the essence in complying with such delivery schedule."  (SUF ¶ 20; PTX4 § 3.5)

### F.  Arranging deliveries of coal from Bluestone at Bishop to Xcoal for loading onto vessel for export

60.     Pursuant to Article 2.2, "the Coal shall be delivered, and title and risk of loss thereof shall pass from [Bluestone] to [Xcoal], free on board ('F.O.B.') after the Shipment has been properly loaded into railcars at the [Bishop mine loadout]."  (PTX4 § 2.2)

61.     Consistent with risk of title not passing until the Coal is loaded into the railcars, Bluestone is responsible to load the Coal into empty railcars at the Bishop loadout, pursuant to Article 3.5: "[Bluestone] shall cause Coal sold hereunder to be properly loaded into railcars for delivery to [Xcoal] in accordance with the Transportation Provisions of the applicable rail contract of [Xcoal] with [Norfolk Southern]."  (PTX4 § 3.5)

62.     The CSA does not expressly address which party, Xcoal or Bluestone, is responsible for arranging for empty railcars to be brought to Bishop to permit Bluestone to load coal for delivery to Xcoal.  The terms pertinent to this aspect of the parties' dispute demonstrate that the contract is ambiguous on this point.  For reasons to be explained throughout this Opinion – including the most reasonable interpretation of the contractual provision, the parties' course of performance, and industry practice – the Court finds that Bluestone was responsible for arranging for empty railcars to be brought to Bishop.  Bluestone's failure to perform this obligation is a material breach of the CSA.

### G.     Force majeure

63.     Xcoal felt that the Justice Parties had abused force majeure provisions in the parties' prior coal supply agreements.  (Thrasher Tr. 220-22)  Accordingly, Xcoal insisted that the new CSA contain new protections relating to declarations of a force majeure event.  (*Id.*)

64.     The CSA provides that "[n]o failure or delay by either Party to perform its obligations hereunder, wholly or in part, shall be deemed a breach of this Agreement, if such failure or delay has arisen through . . . [Force Majeure]; provided, however, that the procedures under Section 9.3 have to be complied with."  (SUF ¶ 27; PTX4 § 9.1)

65.     Article 9.2 defines "Force Majeure" as:

> . . . any event or events which are beyond the reasonable control of the Party affected thereby, in which it or its affiliates, and any of its or their respective employees, officers, directors, agents or contractors is not negligent, and shall include, but not be limited to: acts of God, acts of public enemies, acts of terrorism, insurrections, strikes, lockouts, fires, wars, explosions, floods, interruptions or delays in transportation due to breakdown or adverse weather (including fog), perils of the seas . . . and any other event or events whether or not of a similar nature which are beyond the control of the Party affected thereby, in which it is not negligent in any way.

14

(SUF ¶ 29; PTX4 § 9.2)

66.  Article 9.3 requires:

> If a Force Majeure occurs, the Affected Party shall immediately advise the other Party of the such Force Majeure, to be promptly confirmed by a written notice describing the situation in detail. Such written notice shall be accompanied by detailed evidence from an independent third party as to the occurrence of the Force Majeure and the expected duration thereof.

(SUF ¶ 28; PTX4 § 9.3)

## VI.  The Guarantee

67.  SCC and Governor Justice executed the Guarantee, for "value received, and in consideration of, and in order to induce" Xcoal and Thrasher to enter into the Mutual Release and CSA.  (SUF ¶ 31; PTX2)

68.  By the Guarantee, SCC and Governor Justice (i) guaranteed the "full and prompt payment and performance of all obligations" of Bluestone under the CSA, subject to a $10 million cap, (ii) agreed to indemnify Xcoal against losses sustained and expenses incurred in enforcing its rights and remedies under the CSA or Guarantee, and (iii) "expressly waive[d] all defenses which might constitute a legal or equitable discharge of a surety or guarantor, and agree[d] that [the Guarantee] shall be valid and unconditionally binding upon Guarantors . . . ." (PTX2)

69.  Article 10.3 of the CSA provides:

> If [Bluestone] is the cause of an Event of Default . . . in addition to other damages available at law, [Bluestone] **_and[/]or its Guarantor,_** shall be liable to [Xcoal] for damages equal to the number of tons of coal remaining to be delivered under this Agreement, multiplied by the Buyers' Discount.

(PTX4 § 10.3) (emphasis added)

## VII.   Bluestone Repeatedly, And Almost Immediately, Failed To Perform

70.     As already noted, Bluestone was obligated under the CSA to supply and sell to Xcoal 30,000 tons of Coal per month for 24 months, which is equal to 720,000 tons.  (SUF ¶ 16; PTX4 §§ 3.1-3.2)

71.     In actuality, during the period November 2017 through May 31, 2018, Bluestone supplied and Xcoal accepted only 23,701.60 tons of Coal, with three trains being supplied and accepted in November 2017 and one train being supplied and accepted in May 2018.  (SUF ¶ 30)

72.     The instant lawsuit was filed by Xcoal on May 31, 2018 and no Coal has been supplied to Xcoal by Bluestone since that time.  (PTX391; PTX403)

73.     Thus, Bluestone ultimately supplied Xcoal with just 23,701.60 tons of the 720,000 tons contemplated by the CSA.  Therefore, Xcoal obtained 696,298.40 fewer tons than it had a contractual right to purchase from Bluestone at a price incorporating the Buyer's Discount.

### A.   October and November 2017

74.     In anticipation that the contemplated CSA would go into effect starting in October, Xcoal on September 19, 2017 advised Bluestone of load dates for October.  Mr. Justice responded that Bluestone "will be ready."  (PTX30)

75.     In the early stages of the CSA, Xcoal advised Bluestone of its selected loading dates by means of a form email which included the language "please confirm receipt and acceptance of this schedule."  (PTX30)  Xcoal included that language to have Bluestone acknowledge receipt of the notification and to confirm it would be ready to load.  (Thrasher Tr. 186-87)  This language did not modify the parties' respective obligations under the CSA.

76.     Bluestone could not load because Norfolk Southern ("NS") was unwilling to permit trains "until the mine has the means to load under their own power." (Thrasher Tr. 146-47; PTX62)

77.     Mark Hamilton, NS's Assistant Vice President of Unit Train Services, assisted Bluestone in obtaining the leased locomotive. (Hamilton Tr. 943-44, 951-54)

78.     Hamilton explained that Xcoal had nothing to do with NS requiring Bluestone to lease a locomotive. (Hamilton Tr. 951, 957)

79.     On October 26, 2017, one day prior to Xcoal delivering the executed CSA to Bluestone, Xcoal received notice from NS that Bishop "had completed their obligations [to NS] and are now able to load trains." (Thrasher Tr. 424-25; PTX68; PTX71)

80.     Also on October 26, Xcoal advised Bluestone of load dates of November 1, 3, 5, 7, and 9. (Thrasher Tr. 349; PTX67; PTX 71)

81.     Loading 30,000 tons of coal over a nine-day period is reasonable and readily achievable; other coal operators load under similar schedules in the normal course. (Payne Tr. 688, 693-94; Hamilton Tr. 954; PTX398 at 3, 22 and 26; PTX400 at 1-6)

82.     The flood load conveyor system and mechanical sampling system at the Bishop facility, when operational, would have the capability of loading a train in less than 4 hours and of loading a 110-car train rather than a 65-car train, which was the physical limit using Bluestone's front end loader at the vicinity of the stackers. (Thrasher Tr. 161-62; Taylor Tr. 507-09; PTX398 at 7)

83.     On October 27, Bluestone represented it was prepared to load five trains "now" and another five trains later in November. (Thrasher Tr. 349-50; PTX71)

17

84.     In response, Xcoal stated it would plan for Bluestone to load on November 1, 3, 5, 7, and 9, and that Xcoal would "have a vessel and permits submitted to NS on Monday October 30." (PTX71)

85.     On October 30, Xcoal provided Bluestone with permits for loadings on November 1, 3, 5, 7, and 9. (PTX82)

86.     Prior to receiving the permits, Bluestone completed loading a train for Xcoal on October 29, 2017. (PTX81)

87.     At the time of this October 29 loading, Defendants had not yet returned to Xcoal an executed copy of the Amendment to the CSA with the revised start date of November 1, 2017. (SUF ¶ 34; Thrasher Tr. 425-26; PTX5; PTX103)  Nevertheless, as an accommodation and an attempt to cooperate with Bluestone and obtain coal under the CSA, Xcoal was willing to treat this loading as an early November loading being made under the CSA. (Thrasher Tr. 323-25)

88.     Based on on-site testing results provided by SGS – which found that the coal loaded by Bluestone on October 29 did not comply with the quality requirements of the CSA and its Exhibit A – Xcoal on October 30 exercised its right under Article 4.2 of the CSA to reject the loading as non-compliant. (PTX81)

89.     Although Xcoal had reiterated its rejection of the non-compliant train on November 2, Bluestone did not arrange for the rejected train to be pulled from the loadout until November 7, when Bluestone informed NS that "[w]e are con signing [sic] the Bishop cars . . . to INTEGRITY effective immediately." (PTX95; PTX108)

90.     As the rejected train blocked the loadout, Bluestone missed the scheduled November 3, 5, and 7 load dates as well as the subsequent November 9 load date. (Thrasher Tr. 356; PTX115)

91.     As a result of Bluestone's failure to load any specification-compliant trains on the November 1, 3, 5, 7, and 9 load dates, Xcoal on November 10 made a "demand for adequate assurances of contract performance by Bluestone," to which Bluestone never supplied any factual support of its capability to produce the required 30,000 tons/month coal loading. (PTX115; PTX127; PTX151)

92.     Xcoal, as a further accommodation and to make "every effort to work with Bluestone," accepted load dates proposed by Bluestone of November 15, 17, 20, 22, and 27, despite reports from the field of "very little coal available for shipment to Xcoal." (PTX115)

93.     On November 11, Bluestone completed loading its first November train for Xcoal. (PTX403; *see also* PTX118)

94.     On November 14, Xcoal made the provisional payment for the November 11 loading in the amount of $616,044.00, as agreed upon by the parties. (PTX403; *see also* PTX121)

95.     On November 18, Bluestone completed loading a 65-railcar train for Xcoal. (PTX403; *see also* PTX139)

96.     On November 21, Xcoal made the provisional payment for the November 18, 2017 loading in the amount of $626,232.75, as agreed upon by the parties. (PTX403; *see also* PTX139)

97.     On November 28, Bluestone completed loading a 65-railcar train for Xcoal. (PTX403; *see also* PTX155)

98.     On December 1, Xcoal made the provisional payment for the November 28 loading in the amount of $635,563.50, as agreed upon by the parties. (PTX403; *see also* PTX158)

99.    On December 15, Xcoal made a true-up payment of $258,743.66 for the November 2017 loadings, as agreed upon by the parties.  (PTX403; *see also* PTX188)

100.    Xcoal accepted delivery of all coal that Bluestone loaded for it under the CSA during the month of November, which totaled 17,829.60 tons for the three loadings.  (PTX403; *see also* Thrasher Tr. 366-67)

**B.    December 2017 and January 2018**

101.    On October 27, 2017, Xcoal advised Bluestone of December load dates of December 4, 6, 8, 10, and 12.  (PTX138)

102.    Bluestone notified Xcoal on December 2 that Bluestone would "be loading split trains on the next several permits," with some coal for Xcoal and some for Integrity.  (PTX164)

103.    On December 4, Xcoal expressly rejected Bluestone's proposal to load a "split train," pointing out to Bluestone that "the CSA certainly does not permit Bluestone to unilaterally split trains which have been permitted by Xcoal, between Xcoal and another customer of Bluestone."  (PTX164; *see also* Thrasher Tr. 223-25, 248; PTX4 § 8.1(d) (CSA provision requiring that Bluestone "not enter into any agreements that would interfere with the due and timely performance of all its obligations under" CSA))  Xcoal added that "[s]uch action will seriously disrupt Xcoal's planned logistics for this coal and add substantial costs, which will be for Bluestone's account under Article 3.6 of the CSA."  (PTX164)

104.    Over Xcoal's objections, Bluestone nevertheless loaded a split train using an NS rail permit provided by Xcoal.  (PTX403; *see also* Thrasher Tr. 201)

105.    After learning that Bluestone had loaded 30 cars, 10 of which were loaded prior to SGS's arrival to do sample testing, Xcoal rejected the split loading.  (Thrasher Tr. 201, 269; *see also* PTX178 ("The splitting of Xcoal's 65 car train in no way benefits Xcoal, as you have

suggested in prior emails – it only results in disruption of [Xcoal's] logistics, additional costs and ultimately, adverse effects on service to [Xcoal's] customers."))

106.    On December 11, Bluestone declared it had "suspend[ed] any and all further shipments" under the CSA because (i) Xcoal did not accept and pay for the split loading and (ii) Xcoal had not yet issued the true-up payment for the November loadings.  (Justice Tr. 841; PTX186)

107.    However, the earliest possible due date for a true-up payment is the 15th day of the month following delivery; the true-up payment for the November loadings was timely made by Xcoal on December 15.  (Thrasher Tr. 178-79, 247-48; PTX188; *see also* PTX4 § 6 ("The final price shall be calculated . . . using the average of the Index in the calendar month . . . . True-up shall occur within 15 days after the final price is ascertained."))

108.    Also on December 15, Xcoal notified Bluestone that it "has no right to suspend its performance," and "Xcoal expects Bluestone to strictly comply with its obligations under the contract."  (PTX186)

109.    Meanwhile, on December 4, 2017, Xcoal had advised Bluestone of January load dates of January 8, 10, 12, 14, and 16.  (PTX165)  On December 12, Bluestone confirmed that it would load on these January dates (PTX183), despite having purportedly suspended performance a day earlier (PTX186).

110.    On December 29, Xcoal sent the January loading permits to Bluestone.  (PTX196)

111.    Bluestone, however, was not ready to load.  According to Steven Sarver, Bluestone's Senior Vice President for coal sales, the locomotive at Bishop had failed as of December 17 (with the exception of a two-day period beginning on December 30) and was not

replaced until January 10. As of January 8, 2018, Sarver was in direct contact with NS about Bluestone having "no empties and no engine." (Sarver Tr. 987; PTX249; PTX253)

112.    On January 10, 2018, after receiving notices of default due to Bluestone's failure to load any coal during the month, Mr. Justice responded as follows:

> *We requested cars from NSSR* to load on 1/8. They still have not been provided. If the rail road won't provide cars there is nothing that we can do. The mine is ready to load when the cars arrive. *Please assist us* in pushing the rail road to get these needed cars.

(PTX205) (emphasis added)

113.    On January 11, and inconsistent with his request of the prior day that Xcoal "assist" in obtaining cars, Mr. Justice for the first time asserted that Xcoal "has this responsibility" to obtain empty railcars from NS. (PTX207) Several days later, on January 17, Mr. Justice acknowledged that Xcoal "takes the position that it is Bluestone that is responsible to provide the cars." (PTX216)

**C.    February through April 2018**

114.    Xcoal advised Bluestone of five load dates for each of February, March, and April of 2018, and forwarded NS permits for each of those dates. (PTX403; *see also* PTX210; PTX224; PTX227; PTX237; PTX246; PTX251) Bluestone did not load any coal for Xcoal during these months. (PTX391; PTX403)

115.    Rather, on February 13, 2018, Mr. Justice stated Bluestone would "continue to suspend shipments" under the CSA due to Xcoal's exercise of its rights under Article 3.4 and 5.3 of the CSA (which rights, although express in the CSA, Bluestone disputed) to have Xcoal representatives from Standard Labs on site at the Bishop facility to observe the mining, stockpiling, and sampling of Coal pursuant to the CSA. (PTX234; PTX254 (reaffirming

"suspension" of CSA))  Xcoal responded by notifying Bluestone it "rejects Bluestone's attempted suspension of its performance as being totally without basis in the CSA."  (PTX234)

### D.    May 2018

116.    On April 3, 2018, Mr. Justice proposed load dates of May 2, 5, 9, 14, and 20. (PTX254)

117.    Mr. Justice reiterated his proposed load dates of May 2, 5, 9, 14, and 20 on April 17.  (PTX261)  At this time Mr. Justice requested Xcoal to let Bluestone know if the load dates are acceptable so that Bluestone can "have our May shipping plan put in place."  (*Id.*)

118.    In yet a further accommodation to Bluestone and effort to obtain Coal under the CSA, Xcoal accepted Bluestone's suggested May load dates of May 2, 5, 9, 14, and 20 and forwarded rail permits to Bluestone for each of those dates.  (Thrasher Tr. 280-81; PTX260; PTX262)

119.    Bluestone failed to load any coal for Xcoal on the first three May loading dates of its choosing of May 2, 5, and 9.  In accordance with the CSA, Xcoal issued written notice with respect to each of these missed loadings to Bluestone (with a copy to the Guarantors), advising that Xcoal was giving "notice under Article 10.1(d) of the CSA that failure by Bluestone to deliver these 65 cars of coal within seven (7) days . . . shall constitute an 'Event of Default' as defined in Article 10.1(d) of the CSA."  (Thrasher Tr. 239-42 (explaining Xcoal practice of regularly delivering default/cure notices to Bluestone and Guarantors); PTX405; *see also* PTX264; PTX 266; PTX272)

120.    On May 10, 2018, Bluestone completed its only loading for Xcoal in May, supplying 63 cars of Coal to Xcoal.  (Thrasher Tr. 282, 296; PTX301)

121.   On May 16, Xcoal timely made the 75% provisional price payment required under Article 7 of the CSA in the amount set forth in Bluestone's corrected May 15 invoice. (PTX305)

122.   Bluestone failed to load on the final two scheduled May load dates of May 14 and 20.  (PTX405; *see also* PTX299; PTX311)

123.   On May 19, 2018 at 5:39 p.m. – the evening before the final scheduled May loading – Bluestone declared force majeure due to "heavy rains," which supposedly caused the "shut down" of the "Bishop Impoundment."  (Thrasher Tr. 282-83; PTX308)

124.   On May 20, Xcoal requested "the detailed independent third party evidence of the occurrence of the alleged force majeure event and its expected duration as required by Section 9.3 of the [CSA]."  (Thrasher Tr. 283-84; PTX4 § 9.3; PTX310)

125.   As of May 23, Xcoal had not received a response to its May 20 request, and therefore notified Bluestone that "its declaration of a force majeure event is not valid." (PTX313)

126.   By letter dated May 29, Bluestone finally responded, attaching to its letter a copy of Mine Safety Health Administration ("MSHA") Citation 9070234, which is dated May 10, 2018.  Bluestone described that document as "the violation issued by MSHA relating to the pool level of the impoundment area," adding: "Due to the continued heavy rains that have persisted over the past week or so, and despite our best efforts to pump down the water level the impoundment remains shut down due to the water level."  (Thrasher Tr. 285-87; PTX320)

127.   Xcoal responded on May 31 that Bluestone's May 29 letter was untimely and included inadequate support under Section 9.3 of the CSA.  Xcoal also reiterated its position that

Bluestone's force majeure declaration was "without merit and remain[ed] invalid." (PTX4 § 9.3, PTX322)

128.    As of May 31, 2018, Bluestone had loaded only approximately 5,872 net tons of the 30,000 net tons it was required to supply Xcoal during the month of May. (Thrasher Tr. 267; PTX391)

129.    As a result of these and other previous Events of Default under the CSA, on May 31, 2018 Xcoal formally notified Bluestone in writing (the "May 31 Notice") that it was exercising its rights both under Article 10.2(a) and applicable law to cancel the CSA effective that day, "thereby 'terminating, accelerating, and liquidating the Parties' respective obligations' thereunder and also under Article 10.2(b) and applicable law to withhold payment of the price balance amount that otherwise under Article 7 of the CSA would or possibly would become due in the future with respect to Bluestone's" May 10 loading. (Thrasher Tr. 293-94; PTX323)

130.    With respect to the remaining price balance for the May 10 loading in the amount of $65,322.89, which otherwise would have become due in June, Xcoal withheld payment under CSA Article 10.2(b) and applicable law. (Thrasher Tr. 293-94, 296-97; PTX403)

## VIII.  Bluestone Failed To Put A Mechanical Sampling System Into Operation

131.    Article 5.2 of the CSA provides: "The Coal shall be sampled and analyzed by [SGS] by certified, bias tested mechanical sampling system, upon loading . . . ." (PTX4 § 5.2(a)) Although this provision does not mention Bluestone, it implicitly obligates Bluestone to implement and operate a loading site mechanical sampler.

132.    Before Xcoal executed the CSA, Bluestone's Mr. Justice notified Jason Popivchak, Xcoal's Director of Logistics, that the system was "not in place yet at the mine." (Thrasher Tr. 304; PTX61)

133.    Specifically, within one hour of Defendants having returned the signed CSA to Xcoal, Mr. Justice forwarded an October 18 email to Xcoal stating "the permanent loadout system is not in place yet at the mine.  Currently the coal can be sampled by SGS using cartop method which is ASTM compliant.  As soon as the permanent sampling system is in place we will adjust from this method."  (PTX61; PTX68)

134.    In Article 8.1 of the CSA, Bluestone never represented or warranted that it had a mechanical sampling system in place at the mine.  (PTX4 § 8.1)

135.    Thrasher was aware that there was not a functional mechanical sampling system at the mine for the entire term of the CSA.  (Thrasher Tr. 306)

136.    However, Xcoal never agreed to change or waive the mechanical sampling system requirement of the CSA.  (Thrasher Tr. 189, 192)

137.    In an effort to cooperate with Defendants and to obtain the financial and commercial benefits of the CSA until such time as Bluestone activated the mechanical sampling system at the Bishop facility, Xcoal was willing to have SGS perform sampling by means of flow sampling, which is more reliable than cartop sampling.  (Thrasher Tr. 149-50, 156, 217; PTX195)

138.    Following Thrasher's October 30, 2017 proposal of an alternative system at the port (Thrasher Tr. 193-94; PTX80), the issue of the mechanical sampling system never arose again in a single communication between the parties or in any of Xcoal's many notices of default.  (*See* PTX1-417)  Further, the mechanical sampling system is not mentioned in Xcoal's termination letter.  (PTX323)

139.    The specification compliance disputes between the parties could have been avoided entirely if Bluestone had complied with the CSA by activating its mechanical sampling system, at an estimated cost of $100,000.  (PTX400 at 7)

140.    Bluestone did not put a mechanical sampling system into operation until 2019. (Justice Tr. 822-23)

141.    Consequently, as noted above, it was impossible to sample the coal Bluestone loaded onto trains for Xcoal by mechanical sampling, beginning with the October 29, 2017 loading.  The October 29 train was, instead, sampled and tested by SGS via the flow sampling method; that is, from the piles as the coal was loaded into the railcars.  (Thrasher Tr. 149-50, 156, 217; PTX195)

142.    SGS's results indicated that the ash level of the loading was 9.90% dry, which was in excess of the contractually-specified reject level of 9.5% dry.  Accordingly, on October 30, Xcoal rejected the October 29 loading as non-compliant.  (PTX4 Ex. A; PTX81)

143.    Thereafter, the referee sample was delivered to SAI by SGS, in accordance with Article 5.6 of the CSA and standard practice in the industry.  (Thrasher Tr. 152-53, 255-56; PTX4 § 5.6; PTX129; PTX133)

144.    SAI's Certificate of Analysis shows it found the referee sample had a dry ash level of 9.71%, which exceeded the reject specification of 9.5%.  (Thrasher Tr. 159; PTX163)

145.    Thereafter, Bluestone had the October coal retested 40 times by four different labs, including the same lab that had tested it for Xcoal, and each of the labs returned composite ash levels well below 9.5%.  (PTX94)

146.    Bluestone was ultimately forced to sell the coal it had loaded in October 2017 for Xcoal to a third-party entity, Integrity Coal Sales, which had the same coal tested by the same

lab as Xcoal and obtained ash content results well below 9.5%. (Justice Tr. 858-59; PTX109 at 4)

## IX. Bluestone Failed To Store Coal For Delivery To Xcoal In Segregated Stockpiles

147.    From November 2017 through May 2018, Rick Taylor – an independent consultant for Xcoal – visited the Bishop facility regularly and prepared written narrative reports (with photographs), which included estimated quantity inventories based upon his experience, visual observations, and discussions with Bluestone representatives. Taylor attempted to estimate the amount of load-ready coal available for delivery to Xcoal located in stockpiles at the Bishop stacker/loadout area. (Taylor Tr. 439, 480-90; PTX406R; *see also* PTX333G-JJ)

148.    Bluestone did not maintain inventory records of its quantities of coal generally, or specifically the amount of load-ready coal for Xcoal, located at the stackers or at the surface mine pits (Justice Tr. 893), despite the CSA Article 3.4 requirement to maintain segregated stockpiles (PTX4 § 3.4).

149.    During the entire November 2017 through May 2018 period, Taylor's inventories and related photographs demonstrate there never were more than 4,800 tons of such stockpiled ready-for-delivery coal; often there were far fewer tons and sometimes there were none. (Taylor Tr. 490; PTX406R; *see also* PTX333G-JJ)

150.    Taylor's reports of insufficient coal production were corroborated by the coal production quantity information for the Bishop and Red Fox surface mines submitted at the time by Bluestone or its affiliates in accordance with MSHA requirements. (Thrasher Tr. 170-72, 263-67; PTX392A-B) Bluestone's statutorily-required reported production quantities for the last quarter of 2017 and first two quarters of 2018 totaled less than half the 210,000 tons (i.e., 30,000 x 7 months) it was obligated under the CSA to load for Xcoal, even disregarding that significant

portions of that reported production was coal for Integrity or coal that otherwise did not satisfy the CSA specifications.  (PTX391; PTX392A-B)

## X.     No Evidence Was Presented At Trial To Support Bluestone's (Seemingly Abandoned) Fraud Claims

151.    In its answer and counterclaims filed in June 2018, Bluestone alleged that Xcoal fraudulently entered into the CSA and never had any intent to perform.  (D.I. 8)

152.    In the operative version of the pretrial order, filed on July 9, 2020, Bluestone continued to allege fraud.  (D.I. 87 Ex. G)

153.    Fraud allegations featured prominently in Defendants' opening statement, during which counsel told the Court the following:

> Now, Xcoal has defaulted on its contractual obligations and, again, to avoid its obligations, Xcoal has resorted to fraud and manipulation.
>
> Xcoal has repeatedly entered into agreements it had no intention of honoring.  It has done so with others, and it has done so on multiple occasions now with the Justices.
>
> . . . .  [T]he evidence will show that from the outset, Xcoal had absolutely no intention of honoring this contract.  This was not only another disregard for Bluestone's precarious situation and its intention to adhere to the contract, but it also was contrary to the representations to the Court that it was entering into the settlement agreement and contract in good faith.

(Tr. 36-37)

154.    Yet, during the evidentiary portion of the trial, Defendants failed to present any evidence of fraud.

155.    When, during closing argument, the Court asked counsel whether Defendants' fraud claim was still before the Court, counsel said only that the breach of contract claim was the "nub" of its case.  (Tr. 1011)

156.    In their post-trial briefs and proposed findings of fact, Defendants say essentially nothing about fraud.

157.    The Court concludes that Defendants have abandoned their fraud counterclaims.

158.    In any event, given the trial record, Defendants have also utterly failed to prove their fraud claims.

159.    Thrasher testified clearly and credibly that Xcoal intended at all times to perform its obligations under the CSA, as the CSA was important to Xcoal and provided substantial benefits – including in terms of a substantially-below-market price and the promised delivery of specification-compliant mid-vol coal, which was in short supply and of great value in Xcoal's dealings with its customers.  Performance by both Xcoal and Bluestone under the CSA would have enabled Xcoal to recover a substantial amount of the damages it felt it had suffered due to the Justice Parties' wrongful conduct in connection with the settled Prior Lawsuit.  (Thrasher Tr. 139, 142-43, 230-31)

160.    Xcoal's conduct, as detailed throughout these Findings of Fact, further demonstrates Xcoal's good faith in entering into the CSA and attempting to perform under it.

## XI.    Course Of Performance And Industry Practice Further Support The Common Sense Conclusion That Bluestone, Not Xcoal, Was Responsible For Obtaining Empty Railcars

161.    As Thrasher explained, "Xcoal's actions to get empty rail cars ends with the permitting process. . . . [O]nce Xcoal permits the trains, Norfolk Southern coordinates the placement of those empty railcars with Bluestone." (Thrasher Tr. 354) Xcoal does "not have the right" to place a train on the Bishop siding, and whether a train may be placed on that siding is "between Bluestone or the company that runs the Bishop siding and the railway." (*Id.* 339)

Further, as a practical matter, Bluestone must coordinate with NS as to which customer it is loading for and when it has coal and is ready to have empty trains arrive at its own facility. (*Id.*)

162.    Mr. Justice repeatedly requested empty railcars. (PTX106; PTX202; PTX205) He testified that Bluestone "e-mailed, called, begged, [and did] everything we can do, but yet the railcars are still not being provided." (Justice Tr. 831)

163.    Bluestone's Sarver testified that Bluestone had no "authority or the practical ability to order railcars to be delivered to the Bishop operations in connection with the loading of coal for Xcoal." (Sarver Tr. 983) The Court did not find this testimony persuasive. In any event, even if it were true that Bluestone lacked this authority and ability (matters which the record does not establish), the reality would remain that, under the CSA, Bluestone is obligated to arrange for NS to send the empty railcars to the Bishop loadout.

164.    Bluestone's Sarver and Mr. Justice testified that Xcoal was responsible for obtaining empty railcars to be delivered by NS to the Bishop loadout. (Justice Tr. 807-08; Sarver Tr. 983-85) This testimony was unpersuasive.

165.    Neither Mr. Justice nor Sarver presented any documentary support for their contention.

166.    Based on the trial record, the first occasion on which anyone associated with Defendants informed Xcoal that Defendants purportedly believed obtaining the empty railcars was Xcoal's responsibility is a January 2018 email from Mr. Justice to Thrasher. (PTX207) This communication post-dates months of conduct (set out above) by which Bluestone acted as if it understood it was Bluestone's obligation to order the empties. It also post-dates Bluestone's suspension of performance on grounds having nothing to do with the delivery of empties. (Thrasher Tr. 430; PTX186)

167.   In January 2018, Mr. Justice notified Thrasher that in his view "Xcoal is solely responsible for all aspects of rail transportation of the Coal under the Agreement." (PTX209) Mr. Justice stated to Thrasher:

> You and I both know how this works. XC has the freight contract with NSRR not Bluestone. So XC is paying the freight, contracting with NS to provide cars to Bluestone. NS would not bring cars to a mine without payment, credit, and a contract for rail service in place. None of which Bluestone has on the XC shipments.

(PTX216) Mr. Justice acknowledged that Xcoal "takes the position that it is Bluestone that is responsible to provide the cars." (*Id.*)

168.   Jason Popivchak, Xcoal's Director of Logistics during the relevant period, had worked at Norfolk Southern for 15 years prior to joining Xcoal. (Popivchak Tr. 741-43)

169.   Rick Taylor, Xcoal's independent consultant, testified to his understanding that Popivchak was responsible for ordering the railcars from Norfolk Southern to travel to Bishop for loading, an understanding based on "what [Popivchak] told" him. (Taylor Tr. 569, 605)

170.   Third-party witness Mark Hamilton, who was an NS employee for 39 years and its Assistant Vice President of Unit Train Services when the Xcoal and Bluestone executed the CSA, testified credibly that it is "the producer's responsibility to order the empties when they were ready for them." (Hamilton Tr. 942-46)

171.   Hamilton also carefully explained why NS will not take directions or instructions from the buyer, such as Xcoal:

> Well, they [i.e., the buyer] may not know the situation at the producer's site. . . . [I]f they want to load 65 cars, then they [i.e., the producer] need to have 65 cars of coal available. If they don't have that much tonnage, then we may not send the empties there. ***But it's always been between the producer and the railroad to arrange for the empties.*** Now, the buyer would get the permits and schedule the vessels, but from that point on, between the buyer

> and the producer, they have to agree upon a time that they will load
> those. And then when they're ready, they need to let – they [i.e.,
> the producer] have to let the railroad know . . . .

(Hamilton Tr. 946) (emphasis added)

172.    Additionally, as Hamilton continued, only the producer (i.e., Bluestone) can

notify NS who it is loading for, as only the producer knows

> if they have coal and what supplier that coal should be going to,
> depending upon quality, depending upon various things, how much
> coal they have, how many cars they have to load, but if you have
> multiple people buying coal from a producer, then the producer
> must determine who is getting what coal and when to bring
> empties.

(Hamilton Tr. 945)

173.    The railcars are the railroad's assets, and are "very important" to it, so NS wants

to minimize the chance that they sit empty at a producer's site. (Hamilton Tr. 945, 970)  The

producer, not the buyer, possesses the information most likely to reduce the risk of the railroad's

assets being wasted in this manner.

174.    Hamilton further confirmed that "[t]he producer has the responsibility to order the

trains" and "that's just the way it's always been handled. . . . [E]very producer that [NS] has

orders their own trains. When they're ready [to load], they tell us to bring it." (Hamilton Tr.

964)

175.    Hamilton also observed that Xcoal does not incur the cost of relocating empties

from an NS depot or other point of origin to the mine. (Hamilton Tr. 965)

176.    At the outset of loadings under the CSA, Bluestone's Sarver advised Xcoal's

Popivchak, in clear and succinct terms: "Please submit the loading dates going forward to Alice

Ann and me as well. We do the scheduling." (PTX73)

177.     By way of illustration, Sarver made at least the following railcar requests directly to NS for Xcoal loadings, without copy to Xcoal:

(a)     October 25, 2017: "BISHOP.  Need 65 empties for X Coal."

(b)     November 2, 2017: "Xcoal is expecting us to load 65 cars at Bishop tomorrow.  Please provide ETA for these 65 empties."

(c)     November 3, 2017: "[C]an you send the 65 empties to BISHOP today.  X Coal is expecting us to load them 65 cars today."

(d)     November 8, 2017: "NS.  Please confirm 65 empties to load for BISHOP X COAL tomorrow."

(e)     November 12, 2017: "We are ready to load another X Coal train at BISHOP.  Please confirm you can place 65 empties tomorrow PM for loading."

(f)     November 21, 2017: "I have not received any response to my previous requests for 65 empties at BISHOP today to load X COAL.  Please confirm these empties."

(g)     November 25, 2017: "Need 65 more empties at BISHOP on Tuesday."

(h)     November 29, 2017: "We request 65 cars for X COAL at BISHOP ASAP . . . on Friday/Saturday."

(PTX417)

178.     In correspondence with Xcoal, Bluestone did not insist that arranging for empty cars was Xcoal's responsibility; instead, Bluestone repeatedly asked for Xcoal's "assistance" in complying with what Bluestone seems to have understood was Bluestone's own obligation.  For example:

(a)     "Please assist in getting empties . . . ."  (PTX72)

(b)     "Any assistance you can lend would be helpful."  (PTX106)

(c)     "Any assistance you can provide regarding NS empties . . . greatly appreciated.  I have pushed NS for 3 days to provide empties."  (PTX128)

(d)    "Please help push NSSR to us the cars."  (PTX202)

(e)    "Please assist us in pushing the rail road to get these needed cars."
(PTX205)

179.    Likewise, Sarver ordered railcars directly from NS when loading for Integrity,
including on October 25 and November 29.  (PTX417)

180.    Trying to explain this evidence, Sarver testified NS employee Kristopher Sandlin
– who is recently deceased – supposedly told him "numerous times" that "it's up to Xcoal to tell
us when they want the cars there."  (Sarver Tr. 985)  The Court did not find this testimony
persuasive.  It is not corroborated by any documentary evidence in the record.  It is also directly
contradicted by the testimony of Hamilton, who was Sandlin's boss.  (Hamilton Tr. 944)

**XII.    The Transportation Contract Does Not Give Xcoal The
Right Or Obligation To Supply Empty Railcars To Bluestone**

181.    Xcoal is a party to a Transportation Contract with NS.  (PTX395 at NS0000127-
42)

182.    The Transportation Contract is referenced in the CSA.  (PTX4 § 3.5)

183.    Even though Xcoal and Norfolk Southern executed the Transportation Contract in
January 2018, they specifically agreed to a retroactive effective date of November 1, 2017,
which corresponds exactly to the November 1, 2017 effective date of the CSA.  (PTX5; PTX395
at NS0000127)

184.    Article 3.5 of the CSA references "Buyer's railcars."  (PTX4 § 3.5)

185.    The CSA further implies that Xcoal, not Bluestone, was obligated to pay NS any
demurrage incurred before "rail cars have been placed at the mine."  (Justice Tr. 811-12; PTX4 §
3.6 ("[Bluestone] will reimburse [Xcoal] the amount of any demurrage . . . incurred by
[Xcoal] . . . *after* rail cars have been placed at the mine.") (emphasis added))

186. Mr. Justice testified: "The person paying the rail provider is the person that is in charge of running that show, and so that's, that's just how it works." (Justice Tr. 830)

187. However, as NS's Hamilton explained, the Transportation Contract did not make Xcoal responsible for obtaining empty railcars at Bluestone's loadout. According to Hamilton, the purpose of the Transportation Contract, instead, "is to cover the movement from" the time *after* the cars are loaded at Bishop through the time they reach the port (i.e., Lambert's Point). (Hamilton Tr. 949-50, 965 ("That agreement covers the loaded transportation of those cars. . . . The transportation agreement doesn't cover the ordering of empties. . . . [I]t governs the movement of the trains after they're loaded to Lamberts Point."); *see also* Thrasher Tr. 329-32, 335)

188. Paragraph 13 of the Transportation Contract provides that Xcoal is to use NS's Coal Transportation Management System ("CTMS") to schedule and permit shipments. (PTX395 at NS0000131) Paragraph 19 of the Transportation Contract states: "NS shall issue the necessary permits and supply or cause to be supplied the necessary cars" for loading. (*Id.* at NS0000133) These provisions neither explicitly nor implicitly make Xcoal responsible for ordering the empty rail cars. (Hamilton Tr. 968-72) (further explaining that CTMS is used for obtaining permits but not for coordination of sending empty railcars)

## XIII. The Siding Lease Agreement, To The Extent Relevant, Is Not Inconsistent

189. Although Bluestone had no contract with Norfolk Southern, a Bluestone affiliate, Justice Energy Company, entered into a Siding Lease Agreement ("SLA") with Norfolk Southern Railway Company in August 2011. (Justice Tr. 809; PTX395 at NS0000169-77)

190. Pursuant to Paragraph 2(b) of the SLA, NS leased the land and track at the siding to Defendants' affiliate, Justice Energy Company. (Justice Tr. 824-25; PTX395 at NS0000169)

191.    Hamilton testified that the SLA governs movement of empties at the mine facility itself – not the movement of empties from NS to the mine facility.  (Hamilton Tr. 947-48)

192.    The SLA, to the extent it is even relevant, is not in any way inconsistent with the Court's findings that Bluestone, and not Xcoal, was responsible for obtaining the empty railcars from NS.

## XIV.    Defendants Seemingly Abandoned Their Contention They Suffered A Force Majeure Which, In Any Event, They Failed To Prove

193.    Defendants seemingly abandoned at trial the force majeure declaration Bluestone had made in May 2018.

194.    In any event, Xcoal's liability expert witness, Hubert Payne, a former MSHA employee in numerous capacities including as District Manager, established, among other things, that: Bluestone's May 19, 2018 assertion of force majeure based upon an alleged event of May 10, 2018 failed to comply with the three-day written notice provisions of the CSA; MSHA citation 9070234 (the "Citation"), relied on by Bluestone in a May 29, 2018 letter to satisfy the additional requirement of detailed evidence from an independent third party, was wrong as a matter of fact and insufficient under the requirements of the CSA; the Citation did not prohibit Bluestone from mining and loading coal for Xcoal under the CSA, did not restrict Bluestone's use of the Bishop loadout facility or preparation plant, and did not prevent Bluestone from disposing of preparation plant waste on the Red Fox property; the Citation had nothing to do with the force majeure event but, rather, was part of ongoing failures by Bluestone to properly and timely implement the abandonment of the Bishop facility Impoundment, which were matters under the control of Bluestone and with respect to which MSHA repeatedly determined it to be acting negligently; and the Citation involved activity within the control of Bluestone and

concerning which it did not take reasonable steps to remedy the situation and remove the alleged force majeure impediment. (Payne Tr. 651-52, 660-65; PTX382, PTX398, PTX400, PTX407)

## XV.  Bluestone Failed To Prove Any Breach By Xcoal Or Any Damages

195.    Bluestone seeks by its counterclaims to recover its alleged lost profits. (D.I. 8)

196.    Bluestone failed to prove any breach of contract by Xcoal or any basis to recover any damages from Xcoal.

197.    Bluestone's damages expert, Aaron J. Heighton, calculated Bluestone's lost profits on the unperformed portion of the CSA. (PTX396) His calculations resulted in damages of $41,913,505.04, exclusive of pre-judgment and post-judgment interest. (PTX396 Ex. V) The Court rejects Heighton's analysis because Bluestone failed to prove any breach by Xcoal and based on the persuasive criticisms of Heighton's analysis by Plaintiff's damages expert, Raymond L. Bummer. (PTX401)

198.    It is also unclear how a pass-through entity like Bluestone could, as a matter of law or fact, suffer lost profits.

## XVI.  Xcoal Has Proved Its Damages Pursuant To CSA's Damages Provision

199.    Defendants, who are sophisticated individuals and business entities represented at all times by counsel of their choosing, expressly agreed in CSA Article 10.3 that, in the Event of Default by Bluestone, "in addition to other damages available at law, Seller and[/]or its Guarantor, shall be liable to Buyer for damages equal to the number of tons of coal remaining to be delivered under this Agreement, multiplied by the Buyer's Discount." (PTX4 § 10.3)

200.    Article 6 of the CSA essentially provided Xcoal with a $9.88 per ton Buyer's Discount from market price. (Thrasher Tr. 227-31; PTX4 § 6)

201.   Until the night before the third day of trial (that is, until September 14, 2020), Defendants never raised any challenge to the enforceability of Article 10.3 of the CSA.  (*See* D.I. 8; D.I. 87 Ex. G; D.I. 139)

202.   In accordance with the express language of Article 10.3 and the operative version of the pretrial order (D.I. 87 Ex. L), Xcoal requested at trial an award against Bluestone under the CSA, and against SCC and Governor Justice under the Guarantee, of damages in the amount of the total number of tons of coal that were not supplied by Bluestone under the CSA (i.e., 696,298.40) multiplied by the Buyer's Discount of $9.88 per ton, which results in a gross total of $6,879,428.19, reduced by the payment of the price balance of $65,322.89 withheld by Xcoal under CSA Article 10.2(b) with respect to the May 10, 2018 loading of coal, resulting in a net amount of damages of $6,814,105.30, plus pre-judgment and post-judgment interest at applicable rates.  (Thrasher Tr. 300-01)

203.   As further explained throughout this Opinion, including in the legal discussion to follow, Xcoal has proven it is entitled to the full amount of its requested damages.

## LEGAL STANDARDS

### I.   Breach Of Contract

Under Delaware law, the elements for a breach of contract claim are: "first, the existence

of the contract, whether express or implied; second, the breach of an obligation imposed by that

contract; and third, the resultant damage to the plaintiff." *VLIW Tech., L.L.C. v. Hewlett-*

*Packard Co.*, 840 A.2d 606, 612 (Del. 2003).[3]

### II.   Motion To Dismiss

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires

the Court to accept as true all material factual allegations of the complaint. *See Spruill v. Gillis*,

372 F.3d 218, 223 (3d Cir. 2004).  "The issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat*

*Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted).

Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded

---

[3] Although Defendants also alleged a counterclaim for fraud (D.I. 8), continued to allege fraud in the pretrial order (D.I. 87 Ex. G), and featured their fraud theories in their opening statement at trial (Tr. 36-37), they failed to present any evidence of fraud during the trial.  During closing argument, when asked by the Court whether the fraud claim was still before the Court, counsel responded that the breach of contract claim was the "nub" of their case. (Tr. 1011)  Defendants include essentially no discussion of alleged fraud in their post-trial submissions. (*See* D.I. 150, 157, 158)  The Count concludes that Defendants abandoned their fraud claim.  Even if they have not, they have utterly failed to prove it.  Accordingly, judgment will be entered for Plaintiff on Defendants' Counterclaim II.

Similarly, although Defendants included a force majeure defense in their answer (D.I. 8) and in the pretrial order (D.I. 87 Ex. G), they did not ask a single question regarding force majeure to their two live witnesses; they also declined to call their liability expert witness to testify about this issue during trial.  By contrast, Xcoal's liability expert witness, Payne, credibly debunked Bluestone's force majeure theory.  (Payne Tr. 651-52, 660-65; PTX382; PTX398; PTX400; PTX407; FF ¶ 194)  Defendants barely mention force majeure in their post-trial submissions. (*See* D.I. 150, 157, 158)  In sum, Defendants have failed to meet their burden to show that Bluestone suffered a force majeure event.

allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

## DISCUSSION

**I.    Plaintiff's Count I And Defendants' Counterclaim I:
        Defendant Bluestone, But Not Plaintiff Xcoal, Breached The CSA**

Count I of Xcoal's complaint alleges that Bluestone breached the Coal Supply Agreement. In turn, Defendants' Counterclaim I alleges that Xcoal breached the CSA. As explained below, the Court concludes that Xcoal proved a breach of contract while Bluestone did not.

### A.    Bluestone Breached The CSA By Failing To
###        Deliver The Requisite Amount Of Coal To Xcoal

Articles 3.1 and 3.2 of the CSA, as amended, provide that Bluestone was required to supply Xcoal with 720,000 net tons of "Coal," as defined by Exhibit A to the CSA, beginning on November 1, 2017 and continuing through a 24-month term, "in equal consecutive monthly shipments of approximately 30,000 net tons, unless the Parties otherwise agree, in writing." (SUF ¶ 16; PTX4 §§ 3.1-3.2; PTX5; FF ¶ 44) It follows that during the seven-month period from November 1, 2017 through May 31, 2018, when Xcoal terminated the CSA, Bluestone was required to supply Xcoal with approximately 210,000 net tons of coal. In reality, however, during that seven-month period, Bluestone delivered and Xcoal accepted only 23,701.60 tons of coal, with three trains delivered and accepted in November 2017 and one train delivered and accepted in May 2018. (SUF ¶ 30; FF ¶ 71) Hence, Bluestone breached the CSA by failing to deliver the requisite amount of coal to Xcoal.

Bluestone contends that it has satisfied its contractual duty because its "obligation was limited to the ***tender*** of delivery" and that it "had no obligation to load coal into the . . . trains that never arrived." (D.I. 150 at 16)  Bluestone's contention is unpersuasive.  Pursuant to Articles 2.1 and 2.2 of the CSA, Bluestone was required to "sell and deliver" the Coal, Coal which "will be delivered . . . free on board ('F.O.B.') after the Shipment has been properly loaded into railcars." (PTX4 §§ 2.1-2.2)  Article 3.5 provides that Bluestone was required to "cause Coal sold hereunder to be properly loaded into railcars for delivery" to Xcoal.  (*Id.* § 3.5)  Therefore, under the plain language of the CSA, Bluestone's obligation was not limited to "tender of delivery" by "stockpiling the coal at the mine pit." (D.I. 150 at 17)

Further, as will be explained in detail, the Court finds that Bluestone, rather than Xcoal, was responsible for providing the empty railcars into which the coal was to be loaded. (*See infra.*)  Thus, Bluestone's failure to perform under the CSA cannot be excused by the unavailability of empty railcars.

### B.      Xcoal Did Not Breach The CSA

Defendants' breach of contract counterclaim is based on the proposition that "Xcoal failed to accept and pay for" the requisite amount of coal as required by the CSA.  (D.I. 150 at 6)  Defendants acknowledge that the underlying issue for assessing liability on their counterclaim is whether "[t]he CSA required Xcoal to provide trains for Bluestone to load." (*Id.* at 7)  Because the Court finds that the CSA required Bluestone, rather than Xcoal, to provide the empty railcars (*see infra.*), Defendants' breach of contract theory necessarily fails.

Xcoal's unilateral termination of the CSA on May 31, 2018 did not constitute a breach, because Xcoal acted in accordance with both the CSA and 6 Del. C. § 2-612(3).  Article 10.2(a) of the CSA provides that "upon the occurrence and during the continuance of an Event of

Default, the . . . 'Non-Defaulting Party' may, in its sole discretion: (a) terminate . . . the Parties'
respective obligations under this Agreement by establishing, and notifying the Defaulting Party
of a termination date." (PTX4 § 10.2(a))  After Bluestone failed to deliver any coal from
December 2017 through April 2018, and missed four of the five scheduled and required May
2018 loadings, Xcoal notified Bluestone in writing that it was exercising its rights under both
Article 10.2(a) and applicable law to cancel the CSA.  (Thrasher Tr. 267, 293-94; PTX323;
PTX391; FF ¶¶ 128-29)  Xcoal's termination of the CSA is consistent with Article 10.2(a), and
Defendants do not argue to the contrary in their post-trial submissions.

Xcoal's termination of the CSA also comported with 6 Del. C. § 2-612(3), which governs
breach of installment contracts.  The statute provides that "[w]henever non-conformity or default
with respect to one or more installments substantially impairs the value of the whole contract
there is a breach of the whole."  6 Del. C. § 2-612(3).  Under such circumstances, the non-
breaching party is entitled to cancel the contract.  *See Carey v. Estate of Myers*, 2015 WL
4087056, at *20 (Del. Super. Ct. July 1, 2015) ("Material breach acts as a termination of the
contract going forward, abrogating any further obligations to perform by the non-breaching
party.").

The determination of whether nonconformity in installments substantially impairs the
value of the whole contract is dependent on the cumulative effect of the defects in prior
installments.  *See* U.C.C. § 2-612, cmt. 6.  Xcoal has demonstrated that Bluestone's continued
and repeated breaches substantially impaired of the value of the whole CSA.  As Xcoal correctly
points out: "Xcoal only received 4 of the required 35 loadings during this time period [i.e., the
term of the CSA, November 2017 through May 31, 2018].  Bluestone's cumulative failure to

supply coal under the CSA alone substantially impaired the CSA's value to Xcoal, thereby justifying its cancellation of the same." (D.I. 148 at 7)

Defendants contend that "[o]nce Bluestone's purported failure to load is removed from the 'mix' of alleged breaches, the remainder falls well short of satisfying the substantial impairment test." (D.I. 157 at 10)  This is tantamount to an admission that the failure to deliver the requisite coal satisfies the substantial impairment test of 6 Del. C. § 2-612(3), as there is no basis to "remove[]" this breach from the calculus.  If there were any remaining doubt on this point (and there is not), it is eliminated by Defendants' acknowledgement that it is undisputed that "the failure to exchange the full 30,000 tons of coal in November 2017 was a material breach by one party or the other." (D.I. 150 at 21 n.6)  It was a material breach by Bluestone.

Accordingly, whether or not the Court were to find additional breaches, Bluestone's failure to deliver the required amount of Coal to Xcoal from November 2017 through May 31, 2018 substantially impaired the value of the CSA and constituted a breach of the whole installment contract.  Hence, Xcoal's termination of the CSA was appropriate under Article 10.2(a) of the CSA as well as under 6 Del. C. § 2-612(3).

C.   **The Issue Of Providing Empty Railcars Drives The Outcome Of The Case**

Defendants have essentially conceded that the issue of providing empty railcars "drives the outcome of the case, for good or bad." (Tr. 1015)  They have repeatedly indicated that the parties' competing breach of contract claims turn on the same single issue: which party, Xcoal or Bluestone, was responsible for delivery of the empty railcars.  For example, Defendants state in their post-trial briefs that "[t]he real issue for decision, therefore, is whether Xcoal was legally obligated to provide trains before Bluestone incurred an obligation to load them." (D.I. 150 at 7; *see also* D.I. 157 at 3 ("Xcoal's case rises and falls on whether Bluestone incurred an obligation

44

to load coal into trains that were never placed at the mine. This issue, in turn, depends on which party was obligated to provide the trains.")) Defendants' counsel explicitly conceded during closing arguments that "the core issue is, who had the obligation to have the trains there? And if it was us, then I don't think we can recover on our counterclaim. . . . We would be in breach." (Tr. 1014)

The Court agrees with Defendants that determining which party was required to obtain empty railcars from NS "is *the critical issue in the case*." (D.I. 158 at 4) (emphasis added) Crucially, however, the Court disagrees with Defendants as to the proper answer to the question. Contrary to Defendants' argument, the Court finds that Bluestone, rather than Xcoal, was required to provide the empty railcars. (*See infra.*) Therefore, as Defendants have lost on the "critical" issue that they expressly acknowledge (correctly) is dispositive of both sides' breach of contract claims, Defendants have also lost "the case." Xcoal is entitled to judgment in its favor and recovery of its full damages, regardless of whether the Court finds additional breaches committed by Bluestone.[4]

### D.   Xcoal Was Not Obligated To Provide Empty Railcars To Be Loaded By Bluestone, So Xcoal's "Failure" To Do So Does Not Excuse Bluestone's Non-performance

Contrary to Bluestone's contention, the CSA does not unambiguously require Xcoal to deliver empty railcars to Bluestone's Bishop loadout facility. (*See* D.I. 150 at 7) Article 2.1 of the CSA provides that Bluestone shall "sell and deliver," while Xcoal need only "purchase and

---

[4] Accordingly, the Court will not reach conclusions on whether Xcoal has proven any of the additional breaches it alleges, e.g., relating to the lack of mechanical sampler, the allegedly poor quality of certain coal offered by Bluestone, and the purported lack of segregated and sufficient stacks of Coal for Xcoal. The Court has made findings of fact relating to these alleged breaches. Because a conclusion on these additional alleged breaches would not impact the Court's conclusions on liability or damages, it is unnecessary to address them any further.

take delivery." (PTX4 § 2.1) Article 2.2 further provides that title to the coal only passes to

Xcoal "*after* the Shipment has been properly loaded into railcars." (*Id.* § 2.2) (emphasis added)

Article 3.5 states that it is Bluestone who "shall cause Coal sold hereunder to be properly *loaded*

into railcars for delivery" to Xcoal. (*Id.* § 3.5) (emphasis added) A reasonable person could

interpret these provisions of the CSA as requiring Bluestone, rather than Xcoal, to be responsible

for providing empty railcars. Although Article 3.5 also contains a reference to "Buyer's railcar,"

neither that provision nor any other expressly requires (or even refers to) Xcoal (or "Buyer")

ordering these railcars. (*Id.*) It is reasonable and convenient to refer to a railcar destined to be

loaded with Coal purchased by Xcoal as "Buyer's railcar."

The Transportation Contract between NS and Xcoal, which is incorporated in the CSA by

reference, also does not unambiguously obligate Xcoal to obtain empty railcars. Defendants

point to specific provisions of the Transportation Contract, contending that the "straightforward

language is susceptible to only one interpretation, namely, that Xcoal held a contractual right to

compel NS to place railcars at the mine for loading under the CSA." (D.I. 150 at 10) The Court

is not persuaded. Paragraph 13 of the Transportation Contract provides that Xcoal is to use NS's

Coal Transportation Management System ("CTMS") to schedule and permit shipments.

(PTX395 at NS0000131) Paragraph 19 of the Transportation Contract requires NS to "issue the

necessary permits and supply or cause to be supplied the necessary cars" for loading. (*Id.* at

NS0000133) Neither provision expressly requires Xcoal to order empty railcars to be loaded at

Bluestone's Bishop facility. Further, both Thrasher and Hamilton[5] credibly testified that the

---

[5] In their post-trial submissions, Defendants continue to fight the Court's decision to permit
Hamilton to testify. (*See, e.g.*, D.I. 157 at 9) The Court overruled their objection at trial. (*See*
Tr. at 935-40; *see also* D.I. 159 at 2-4) Defendants identify no timely nor meritorious basis for
the Court to reconsider this decision. Moreover, the purported surprise to Defendants is muted
by the fact that Xcoal disclosed as long ago as August 22, 2019 – a full year before trial

Transportation Contract was to cover the movement from the time *after* the railcars were loaded at Bishop through the time they reached the port.  (Thrasher Tr. 329-32; Hamilton Tr. 949-50, 965; FF ¶ 187)  Hamilton also explained that the Transportation Contract covered obtaining *permits* but not the actual coordination of sending empty *railcars*.  (Hamilton Tr. 950; FF ¶ 187)  Therefore, again, and contrary to Bluestone's contention, the Transportation Contract does not unambiguously require Xcoal to obtain empty railcars.  (*See* D.I. 150 at 9)

As the four corners of the CSA and Transportation Contract do not unambiguously obligate Xcoal to provide railcars for Bluestone to load, the Court agrees with Xcoal that the CSA is ambiguous on this issue.  (*See* D.I. 148 at 14 ("*[I]t is certain* that the language does not unambiguously support Defendants' contention."))  Since the contract is ambiguous on the issue of which party was responsible for empty railcars, the Court must consider extrinsic evidence to resolve the ambiguity.  *See Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014); *see also Eagle Indus., Inc. v. DeVilbliss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("[W]hen there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms.").  "The best extrinsic evidence is what the parties actually did." *Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *41 (Del. Ch. May 13, 2013).

The parties' course of performance under the CSA supports the conclusion that Bluestone, not Xcoal, was responsible for the empty railcars.  As Thrasher explained, "Xcoal's actions to get empty rail cars end[] with the permitting process. . . .  [O]nce Xcoal permits the

---

eventually convened – that it might seek to call a "Designee from Norfolk Southern Railway" as a trial witness.  (*See* D.I. 62 Ex. H)

trains, [NS] coordinates the placement of those empty railcars with Bluestone." (Thrasher Tr. 354; *see also* FF ¶ 161)

Although Bluestone's Sarver testified that NS employee Kristopher Sandlin – who is recently deceased – told him "numerous times" that "[i]t's up to Xcoal to tell us when they want the cars there" (Sarver Tr. 985), the Court was not persuaded by this testimony, which is not corroborated by any documentary evidence. It is also directly contradicted by the testimony of Hamilton, who was Sandlin's boss. (*See* Hamilton Tr. 944) Sarver's testimony is also inconsistent with his own acts. At the outset of arranging the loadings under the CSA, Sarver advised Xcoal's Popivchak, in clear and succinct terms: "Please submit the loading dates going forward to Alice Ann and me as well. *We do the scheduling*." (PTX73) (emphasis added) During the term of the CSA, Sarver made multiple railcar requests directly to NS for Xcoal loadings, without copy to Xcoal.[6] (*See, e.g.*, PTX417) Further, in correspondence with Xcoal, instead of insisting that Xcoal arrange for empty railcars, Bluestone repeatedly asked for Xcoal's "assistance" in complying with what Bluestone seems to have understood was its own responsibility.[7] (*See* PTX72; PTX106; PTX128; PTX202; PTX205) It was not until January 2018 that Bluestone informed Xcoal it purportedly believed obtaining the empty railcars was

---

[6] Although Defendants contend that events occurring on October 25, 2017 – after the original October 19, 2017 effective date of the CSA but before its amended effective date of November 1, 2017 – may not be considered as part of the parties' course of performance (*see* D.I. 158 at 6 n.3), the Court finds this evidence relevant. The amendment to the CSA only changed the effective date, "with all other terms and conditions of the Agreement remaining unchanged." (PTX5) Even if the Court did not consider this evidence, it would not impact the outcome, as, among other things, Sarver made multiple railcar requests directly to NS for Xcoal loadings after November 1, 2017. (PTX417)

[7] That Bluestone may have been unsuccessful in getting NS to send empty railcars, and that Bluestone repeatedly sought Xcoal's assistance in trying to get NS to do so, are not inconsistent with the legal reality that it was Defendants' contractual obligation to get the railcars.

Xcoal's responsibility.  (PTX207)  That communication post-dates months of conduct by which Bluestone acted as if it understood it was its own obligation to order the empty railcars.

The parties' course of performance is also consistent with industry practice, also known as the "usage of trade."[8]  *See* 6 Del. C. § 1-303(e) ("[T]he express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable as consistent with each other.").  The testimony of Thrasher and Hamilton demonstrates it is custom and practice that the producer, not the buyer, must order the railcars.  Thrasher testified that Xcoal did "not have the right" to place a train on the Bishop siding, adding that as a practical matter, ***Bluestone*** must coordinate with NS as to which customer it is loading for, when it has coal, and when it is ready to have empty trains arrive at its facility.  (Thrasher Tr. 339; *see also* FF ¶ 161)  Thrasher's testimony is corroborated by Hamilton, who testified credibly that it is "the producer's responsibility to order the empties when they were ready for them."  (Hamilton Tr. 942-46)  Hamilton carefully explained the reason why NS would take directions or instructions from the producer, and not the buyer: because only the producer knows if it has coal and what supplier that coal should be going to, only the producer can help the railroad reduce the risk its assets sit empty at a producer's site.  (*Id.* 945, 970; *see also* FF ¶¶ 171-73)  Directly addressing the industry practice, Hamilton testified that "***it's always been between the producer and the railroad to arrange for the empties***," and that "every producer that [NS] has orders their own trains.  When they're ready to load, they tell us to bring it." (Hamilton Tr. 946, 964)

---

[8] Pursuant to 6 Del. C. § 1-303(c), a "'usage of trade' is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question."

Therefore, the Court finds that the parties' course of performance, which is entirely consistent with the usage of trade, further demonstrates the parties' mutual intent that the CSA required Bluestone to order the empty railcars from NS.[9]

In reaching this conclusion, the Court entirely disagrees with Defendants' characterization of Thrasher's trial testimony. According to Defendants, "Thrasher acknowledged, however, that his testimony *contradicted* the plain language of the Transportation Contract." (D.I. 150 at 10) (emphasis added) As purported support for this bold assertion, Defendants excerpt the following one answer to a single question (out of testimony that stretches across no fewer than 300 transcript pages):

> Q:   Well, it doesn't say that in this contract, right?
>
> A:   No, the contract – I'm sorry, it says what it says. I can't, I can't change what it says.

(Thrasher Tr. 332-33) This is in no way an *acknowledgement* that the CSA or the Transportation Contract *contradicts* Thrasher's testimony, which was that delivery of the empty railcars was the responsibility of Bluestone. Instead, Thrasher's testimony was consistent and credible, and fully supports Xcoal's position – and the Court's conclusion – that the contracts are ambiguous. It is the record as a whole, including Thrasher's credible testimony, which establishes it was Bluestone's obligation to arrange for the empty railcars.

The Court further rejects Defendants' contention that "Thrasher also offered an evasive, confusing response when asked directly about the conflict between his testimony and the plain language of the Transportation Contract." (D.I. 150 at 10-11) Defendants boldly request that the

---

[9] The parties' arguments about the Siding Lease Agreement do nothing to alter this analysis. That agreement, between NS and a Justice-related entity, governs the movement of railcars at the Bishop loadout. It does not address, expressly or implicitly, who is responsible for arranging for NS to bring empty railcars to Bishop. (*See* FF ¶¶ 189-92)

Court "should give no weight to Thrasher's testimony." (*Id.* at 11)  To the contrary, and as previously noted, Thrasher testified credibly and the Court places substantial weight on his testimony.

Defendants try a similar ploy with the testimony of Rick Taylor, who Defendants assert "believed that Xcoal was responsible for ordering the trains." (D.I. 150 at 15) (citing Taylor Tr. 569)  In reality, Taylor explained that he "kind of *assumed* that" Xcoal's Popivchak ordered the cars, adding "I think that he did it.  *I'm not sure.*" (Taylor Tr. 605) (emphasis added)  Taylor was clear that he did not *know* how railcars for Xcoal's loadings were obtained or who made the arrangements for their arrival at Bishop. (*Id.* 606)  Defendants' effort to enlist Taylor as supporting Defendants' contention is unavailing.

The Court further disagrees with Defendants' insistence that "Hamilton has no credibility." (D.I. 157 at 10)  Defendants ask the Court to draw this conclusion based on their contorted history of how and when Hamilton learned for certain he was going to be called to testify. (*See id.*) (citing Hamilton Tr. 930, 961)  The Court finds nothing in the story of how Hamilton came to testify, and his testimony about it, to undermine his credibility.

In sum, contrary to Defendants' contention (*see* D.I. 158 at 6), the testimony of Justice, Sarver, and Taylor does not nearly "outweigh[] any contrary testimony from Thrasher and Hamilton."  The Court as factfinder assesses credibility and weighs the evidence.  In doing so in this case, on the critical (essentially dispositive) issue of responsibility for obtaining empty railcars, the Court concludes that Thrasher and Hamilton's testimony far outweighs any contrary testimony from the witnesses relied on by Defendants.

Thus, based on the ambiguous provisions of the CSA combined with the extrinsic evidence (including that relating to the parties' course of performance and industry practice), the

Court agrees with Xcoal that Bluestone was "responsible for the procurement of empty railcars, the movement of those railcars on the Bishop track to facilitate loading, and the loading of the railcars." (D.I. 149 at 17)  Since it was Bluestone's obligation to obtain empty railcars, and Bluestone did not do so and did not deliver the required Coal, Xcoal has proven that Bluestone breached the CSA.

### E.      Defendants' Additional UCC Arguments Lack Merit

Defendants alternatively argue that "[a]ssuming the CSA did not obligate Xcoal to provide railcars and was silent on the issue, 6 Del. Code § 2-503(1)(b) filled that gap." (D.I. 157 at 5)  Since § 2-503(1)(b) provides that "unless otherwise agreed the buyer must furnish facilities reasonably suited to the receipt of the goods," Defendants contend that the "unambiguous statute requir[es] [Xcoal] to furnish railcars for the loading of coal." (D.I. 158 at 5)

Defendants' reliance on § 2-503(1)(b) is misplaced, as the statute – "unambiguous" or not – has no applicability here.  Defendants' argument relies on the erroneous assumption that the CSA is *silent* on the issue of who was responsible for the railcars.  (*See* D.I. 157 at 5)  As explained at length, the Court has found that the record as a whole, including the plain language of the contract, the parties' course of performance, and the usage of trade, proves that the parties agreed that Bluestone was responsible for obtaining empty railcars.  The Court does not view the parties' contractual relationship as *silent* on that issue (just ambiguous).  Since the statute is only applicable "unless otherwise agreed," having resolved the ambiguity and found an agreement between the parties, the Court need not resort to the gap-filler provided by the statute to determine which party was responsible for ordering the empty railcars. *See* U.C.C. § 2-208, cmt. 1 (stating that course of performance and usage of trade can be used to determine meaning of "unless otherwise agreed" qualification).

Having determined that 6 Del. C. § 2-503(1)(b) is not applicable here, the Court does not

have to resolve the parties' dispute over whether or not the CSA is a "shipment contract." (*See,*

*e.g.*, D.I. 156 at 18-21; D.I. 158 at 5-6)

## II.     Plaintiff's Count II: SCC And Governor Justice Are Liable Under The Guarantee

It is undisputed that under the Guarantee, Defendants SCC and Governor Justice were

Defendant Bluestone's guarantors. (PTX2)  Article 10.3 of the CSA provides that, in the event

of a default by Defendant Bluestone (which the Court has found happened here), the guarantors

shall be liable to Xcoal for its damages. (PTX4 § 10.3)  Defendants do not dispute Xcoal's

contention that that if the Court finds in favor of Xcoal on its Count I against Defendant

Bluestone, then judgment on Xcoal's Count II should be entered for Xcoal and against

Defendants SCC and Governor Justice. (*See, e.g.*, D.I. 148 at 8-9)  Hence, having found for

Xcoal on its Count I against Bluestone, the Court also finds for Xcoal on its Count II against

SCC and Governor Justice.

## III.    Damages

Having found in favor of Xcoal on the competing breach of contract claims, the Court

now turns to Xcoal's damages claim.[10]  The Court rejects Defendants' contention that Article

10.3 of the CSA renders Xcoal's damages claim unenforceable, and finds that Defendants are

liable for damages pursuant to that provision.

### A.      Article 10.3 Of The CSA Is Not Unenforceable

Article 10.3 of the CSA provides that, in the event of default by Bluestone, "in addition

to other damages available at law, Seller and/or its Guarantor, shall be liable to Buyer for

---

[10] Because the Court does not find in Defendants' favor on any of its counterclaims, the Court
does not further address the parties' disputes regarding Defendants' requested damages.

damages equal to the number of tons of coal remaining to be delivered under this Agreement, multiplied by the [$9.88 per ton] Buyer's Discount." (PTX4 § 10.3)  On September 14, 2020, the day before trial was scheduled to restart following the pause due to an anonymous letter (i.e., on the eve of the third day of trial), *see Xcoal Energy & Res. v. Bluestone Energy Sales Corp.*, 2020 WL 5369109 (D. Del. Sept. 8, 2020), Defendants filed a motion to dismiss based on a purported failure by Plaintiffs to state a claim on which relief can be granted.  (D.I. 139)

In defense of the unusual timing of the motion, Defendants relied on Federal Rule of Civil Procedure 12(h)(2)(C), which provides that a Rule 12(b)(6) defense "may be raised . . . at trial."  In the motion, Defendants seek to "dismiss Count I of the Complaint filed by Plaintiff Xcoal" on the basis that Article 10.3 of the CSA is void for "expressly allow[ing] Xcoal to recover both [a] penalty amount and actual damages."  (*See* D.I. 139 at 1-2)  Defendants insisted they were not seeking to derail the trial by their last-minute motion and, without objection, the Court ordered the parties to brief it after trial was completed.  (*See id.* at 1; Tr. 739)

For multiple reasons, the Court will deny the motion.  Defendants' arguments about Article 10.3 do not provide a meritorious basis to award Xcoal any less than the full amount of damages it is seeking to recover.

As an initial matter, Defendants waived the opportunity to argue, as they do in their motion to dismiss, that they should avoid all liability based on Article 10.3 being unenforceable. This issue was waived no later than the time the parties filed their proposed pretrial order and Defendants did not raise (or even suggest) it in that proposed order.  (*See* D.I. 87)

Although Rule 12(h)(2)(C) permits a motion to dismiss based on failure to state a claim to be raised "at trial," it does not expressly allow a movant to ignore the Court's scheduling and other case management orders.  Accordingly, courts have denied motions to dismiss raised at

trial when the issues presented in the motion were not disclosed in pretrial orders. *See, e.g.,*

*Contreras v. City of Los Angeles*, 2012 WL 12886488, at *2-3 (C.D. Cal. June 22, 2012)

(denying Rule 12(b)(6) motion to dismiss filed after commencement of trial as defendant had

waived defense by not including it in Memorandum of Contentions of Fact and Law and Pretrial

Conference Order). Defendants cite no case to support their position that a defense not pleaded

in the answer, not raised in pretrial motions, and not described in the pretrial order can be

packaged into a Rule 12(b)(6) motion and raised "at trial" under Rule 12(h)(2)(C), "irrespective

of anything included in the Pretrial Order."[11] (D.I. 157 at 17)

 "[T]he pretrial order is generally binding on the parties." *Ely v. Reading Co.*, 424 F.2d

758, 763 (3d Cir. 1970). One of the main purposes of the pretrial order is to formulate the issues

to be litigated at trial, in order to aid the parties in preparation for trial. If the parties are

permitted to change the positions taken in the pretrial order, "obviously the effectiveness of this

procedure is destroyed." *Id.* Exclusion by the trial court of contentions or evidence not listed in

or disclosed in accordance with the pretrial order has been repeatedly upheld. *See United States*

*v. First Nat'l Bank*, 652 F.2d 882, 886 n.5 (9th Cir. 1981) (collecting cases). Consistent with this

approach, the form pretrial order employed by the undersigned Judge – which was the basis for

the proposed pretrial order submitted here by the parties – requires inclusion of "a statement of

law which any party contends remain to be litigated" and expressly warns: ***"[t]he Court will***

---

[11] The case cited by Defendants, *Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F.
Supp. 2d 519, 525 (D. Del. 2012), involved a materially different situation, in which a party was
found to have not waived its opportunity to file a Rule 12(b)(6) motion subsequent to a Rule
12(b)(7) motion. *Kuhn* did not involve a Rule 12(b)(6) motion being raised at trial to press an
issue that had not been disclosed in the pretrial order.

*preclude a party from seeking relief based on claims and defenses not described in the draft pretrial order.*"[12]

Although Rule 12(h)(2)(C) does not address its interaction with the pretrial order, it – like all Federal Rules of Civil Procedure – "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.  Interpreting Rule 12(h) in a way that allows litigants to disregard the pretrial order would be utterly inconsistent with the fundamental purposes of the Federal Rules of Civil Procedure, including to avoid surprise.  It would, thereby, inevitably lead to injustice, delay resolution of cases, and increase litigation expenses.  As the Ninth Circuit has convincingly stated:

> Pretrial orders play a crucial role in implementing the purposes of the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. Unless pretrial orders are honored and enforced, the objectives of the pretrial conference to simplify issues and avoid unnecessary proof by obtaining admissions of fact will be jeopardized if not entirely nullified.  Accordingly, a party need offer no proof at trial as to matters agreed to in the order, nor may a party offer evidence or advance theories at the trial which are not included in the order or which contradict its terms. ***Disregard of these principles would bring back the days of trial by ambush and discourage timely preparation by the parties for trial.***

*First Nat'l Bank*, 652 F.2d at 886 (emphasis added).

The dangers of permitting a party to wait until trial to raise, for the first time, an issue that would entirely absolve it of all liability are illustrated in this case.  Defendants' withholding of their new defense until trial deprived Xcoal of the opportunity of presenting alternative evidence to prove actual damages.  Given the findings the Court has reached on the merits of the parties'

---

[12] *See* www.ded.uscourts.gov/sites/ded/files/chambers/Proposed_Final_Pretrial_Order_Rev-01-11.pdf (emphasis added).

disputes, Defendants' tactic, if permitted, could easily have led to an unjust result. The injustice of such an outcome would be all the more heightened because Defendants' delay here was so egregious – and so inexplicable. Trial in this case was delayed multiple times, for a total of eleven months, at Bluestone's request.[13] Even with all this extra time, Defendants nevertheless failed even to hint at the new defense at any point during the two-plus years of pretrial litigation or in either of the *two* proposed final pretrial orders submitted by the parties. (*See* D.I. 62, 87)[14]

Therefore, the Court agrees with Xcoal that the sensible understanding of Rule 12(h)(2)(C), one which is consistent with the principles prescribed in Rule 1, allows a party to assert a failure to state a claim at trial "so long as [at a minimum] its intention to do so is disclosed to the parties and the Court in the final pretrial order process." (D.I. 159 at 12)[15] It

---

[13] The complaint was filed on May 31, 2018 (D.I. 2) and trial was initially scheduled for September 16, 2019. (D.I. 17) On August 23, 2019, Defendants made an unopposed request to continue trial (D.I. 63), which the Court granted on September 9, 2019, rescheduling trial for March 19, 2020 (D.I. 68). On February 6, 2020, Defendants again requested a trial continuance, this time opposed by Xcoal. (D.I. 71). On February 21, the Court granted the continuance, rescheduling trial for August 25, 2020 and indicating (prior to the coronavirus pandemic) that it would not continue trial a for a third time. (D.I. 78)

[14] Defendants insist that the defense contained in their motion actually was presented in the pretrial order. (*See* D.I. 157 at 17-18) They point to this statement in the portion of the pretrial order listing *Xcoal's* statements of issues of law to be litigated: "[w]hether Xcoal is entitled to the contractually provided for measure of damages." (D.I. 87 Ex. F) This general statement, made by Xcoal and not Defendants, was far from sufficient to put Xcoal on notice that Defendants would raise at trial a defense that they are protected from liability due to the purported unenforceability of Article 10.3.

[15] The Court recognizes that the 1966 Advisory Committee Notes state: "It is to be noted that while the defenses specified in subdivision (h)(1) are subject to waiver as there provided, the more substantial defenses of failure to state a claim upon which relief can be granted, failure to join a party indispensable under Rule 19, and failure to state a legal defense to a claim (see Rule 12(b)(6), (7), (f)), as well as the defense of lack of jurisdiction over the subject matter (see Rule 12(b)(1)), are expressly preserved against waiver by amended subdivision (h)(2) and (3)." The Court has found no case holding that a party can rely on this note to excuse its failure to include an issue in the proposed pretrial order.

follows, and the Court holds, that Defendants have waived Article 10.3-based liability defense they raised for the first time in their trial-day motion to dismiss.[16]

In any event, even assuming, arguendo, that Defendants' Article 10.3-based challenge had not been waived, it also lacks merit.  Delaware law, which governs interpretation of the CSA, upholds the freedom of contract and enforces, as a matter of fundamental public policy, the voluntary agreements of sophisticated parties.  *See NACCO Industries, Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009)  It is undisputed that the CSA was negotiated and entered into

---

[16] A further problem with Defendant's motion appears to be that, as it arises under Rule 12(b)(6), it is a challenge to how Xcoal states its claim in the complaint.  With respect to damages, the complaint alleges:

> Xcoal has suffered and will continue to suffer substantial damages as a result of Bluestone's breach, default and repudiation of the CSA as set forth above.  Such damages and/or other amounts to which Xcoal is entitled under the circumstances and the CSA include, but are not limited to: (i) recovery under Article 10.3 of the CSA, which provides in pertinent part that "in addition to other damages available at law, [Bluestone], and or its Guarantor, shall be liable to [Xcoal] for damages equal to the number of tons of Coal remaining to be delivered under this Agreement, multiplied by the Buyer's Discount" of $9.88 per net ton, (See Article 6, 10.3); (ii) the difference in value between the quality of coal Bluestone was required to supply under the CSA and the quality of the coal that it actually supplied; (iii) rail charges, vessel charges, and other direct damages incurred by Xcoal due to Bluestone's failure to supply coal on a timely basis under Article 3.6; and (iv) all other damages to which Xcoal is entitled under applicable law, including under the Delaware Uniform Commercial Code.

(D.I. 2 ¶ 80)  Defendants' motion is directed only to the enforceability of Article 10.3, which is only one of the four types of damages alleged in the complaint.  Therefore, even if Defendants' challenge were not waived, multiple remedies would still remain available to Xcoal, both as alleged and by operation of law.  *See, e.g.*, *Del. Bay Surgical Servs, P.A. v. Swier*, 900 A.2d 646, 650 (Del. 2006) ("[I]f a provision is considered a penalty, it is void as against public policy and recovery is limited to actual damages.").  Thus, Defendants' challenge fails to negate the plausibility of Xcoal's breach of contract claim alleged in the complaint and would have to be denied.

between sophisticated parties represented by counsel. Under Delaware law, mutually agreed-upon damages provisions are presumptively enforceable. *See S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc.*, 1997 WL 817883, at *3 (Del. Super. Ct. May 21, 1997). Defendants have not rebutted this presumption.

Instead, the Court agrees with Xcoal that Article 10.3 is a permissible liquidated damages provision, not a prohibited penalty provision. Determining the validity of a liquidated damages provision requires a review of the intent of the parties to the contract. *See Del. Bay Surgical Servs.*, 900 A.2d at 650. Whether a stipulated sum is for liquidated damages or a penalty is determined pursuant to a two-part test:

> a stipulated sum is for liquidated damages when (1) the damages which the parties might reasonably anticipate are difficult to ascertain (at the time of contracting) because of their indefiniteness or uncertainty, and (2) the amount stipulated is either a reasonable estimate of the damages which would probably be caused by the breach or is reasonably proportionate to the damages which have actually been caused by the breach.

*S.H. Deliveries*, 1997 WL 817883, at *2.

Here, Defendants do not dispute that calculating Xcoal's losses in the event of Bluestone's breach would be difficult, due to lack of substitute coal of similar quality and market vagaries. (*See* D.I. 148 at 25) Nor do they dispute that the $9.88 per ton "Buyer's Discount" is a reasonable estimate of the damages suffered by Xcoal in an event of breach. (*See id.*) Hence, Article 10.3 of the CSA provides for permissible liquidated damages, rather than a penalty. *See Jeddo Coal Co. v. Rio Tinto Procurement (Sing.) PTE Ltd.*, 2020 WL 3474078, at *15 (W.D. Pa. Feb. 10, 2020) (upholding contractual provision providing non-breaching party with $30 per ton for each ton of coal not purchased, and noting that such damage provision is designed to address market vagaries).

Furthermore, and again contrary to Defendants' unpersuasive interpretation, Article 10.3's phrase "in addition to other damages available at law" does not permit the non-breaching party to recover **both** actual damages and liquidated damages. (*See* D.I. 150 at 3-6)  Even if one were to read this provision as potentially permitting recovery of the liquidated Buyer's Discount damages **and** actual damages (which, not incidentally, Xcoal has never sought), on its face the provision only permits such a combination if it is "available at law."  If, as Defendants contend, the combination of damages is not "available at law," Article 10.3 does not permit it, since it only permits damages that are "available at law." (*See* D.I. 148 at 26; *see also Palekar v. Batra*, 2010 WL 2501517, at *8 n.40 (Del. Super. Ct. May 18, 2010))  Therefore, again, Article 10.3 is not unenforceable.[17]

Finally, given the very late timing with which Defendants raised their unenforceability theory, and given Bluestone's repeated and clear breaches of the CSA, if all of the reasons the Court has stated for rejecting Defendants' new theory were wrong, the Court would grant Xcoal's alternative request to reopen the record to present additional damages evidence. (*See* D.I. 148 at 26-27)  It would be manifestly unjust for Defendants to avoid liability by withholding their only meritorious defense until trial – particularly a trial that was delayed multiple times, for a total of eleven months, at Defendants' request, where the new defense was not even suggested at any prior point in this lengthy litigation.  Before allowing that to be the outcome here, the Court would instead offer Xcoal the chance to present additional damages evidence.

---

[17] Although Defendants cite several non-Delaware cases finding damages provisions containing similar (but not identical) language unenforceable, they do not cite any case applying Delaware law that construes "in addition to other damages available at law" as permitting concurrent recovery of both actual damages and liquidated damages.

**B.      Defendants Are Liable For Damages Pursuant To Article 10.3**

Again, Article 10.3 of the CSA provides that, in the event of default by Bluestone, "in addition to other damages available at law, Seller and[/]or its Guarantor, shall be liable to Buyer for damages equal to the number of tons of coal remaining to be delivered under this Agreement, multiplied by the Buyer's Discount." (PTX4 § 10.3)  Article 6 of the CSA provides Xcoal with a Buyer's Discount of $9.88 per ton.  (*Id.* § 6)  Therefore, Xcoal seeks, and is entitled to, an award against Bluestone under the CSA and against SCC and Governor Justice under the Guarantee of damages in the amount of the total number of tons that were not supplied by Bluestone under the CSA – that is, 696,298.40 tons – multiplied by the Buyer's Discount of $9.88 per ton, which results in a gross total of $6,879,428.19.  This amount must be reduced by the payment of $65,322.89 withheld by Xcoal under CSA Article 10.2(b) with respect to the May 10, 2018 loading of coal, resulting in a net amount due to Xcoal of $6,814,105.30.

Xcoal may also be entitled to pre-judgment and post-judgment interest[18] at applicable rates as well as attorney's fees and costs under the Guarantee.  (*See* D.I. 148 at 20)  The Court will solicit the parties' views on these points and generally on what, if anything, remains to be determined in this action.

---

[18] It appears undisputed that pre- and post-judgment interest is to be awarded to whichever party prevails, as both sides requested such interest awards.  (*See* D.I. 148 at 2; D.I. 150 at 30)

## CONCLUSION

Xcoal has proven, by a preponderance of the evidence, that Bluestone breached the CSA by failing to deliver the amounts of Coal it was obligated to deliver. This conclusion essentially turns on the Court's finding that Bluestone, and not Xcoal, was responsible for getting the Norfolk Southern railroad to bring empty railcars to Bluestone's Bishop loadout. The Court further concludes that Xcoal has proven, again by a preponderance of the evidence, that it is entitled to the full amount of damages provided for by Article 10.3 of the CSA, namely, the Buyer's Discount of $9.88 per ton multiplied by the 696,298.40 tons Bluestone failed to deliver, reduced by the payment of $65,322.89 withheld by Xcoal – for a total of $6,814,105.30. Defendants Governor Justice and SCC are responsible for paying Xcoal's damages pursuant to the Guarantee. Defendants have failed to prove any of their counterclaims.[19]

An appropriate Order follows.

---

[19] During trial, Defendants moved for judgment pursuant to Federal Rule of Civil Procedure 52(c). Both of the grounds they raised – Article 10.3 of the CSA is unenforceable and Xcoal failed to prove Bluestone's breach, because Xcoal was responsible for the empty railcars (*see* Tr. 707-39) – have been addressed in this Opinion and resolved against Defendants. It follows, therefore, that Defendants' Rule 52(c) motion is denied.

Neither party addresses their declaratory judgment claims (Count III of Xcoal's complaint and Count III of Defendants' counterclaims) in their post-trial submissions. These counts raise the same issues that are addressed throughout this Opinion. It follows, therefore, that Plaintiff is entitled to judgment on these claims and Defendants are not.